**BLEICHMAR FONTI & AULD LLP**
Peter E. Borkon (Bar No. 212596)
pborkon@bfalaw.com
555 12th Street, Suite 1600
Oakland, California 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020

**BLEICHMAR FONTI & AULD LLP**
Javier Bleichmar (*pro hac vice*)
jbleichmar@bfalaw.com
7 Times Square, 27th Floor
New York, New York 10036
Tel: (212) 789-1340
Fax: (212) 205-3960

(*additional counsel on signature page*)

*Counsel for Lead Plaintiff
the Police Retirement System of St. Louis
and Lead Counsel for the Putative Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS GREENE, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>        v.<br><br>GRANITE CONSTRUCTION INCORPORATED, JAMES H. ROBERTS, JIGISHA DESAI, and LAUREL J. KRZEMINSKI,<br><br>        Defendants. | Case No. 3:19-cv-04744-WHA<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

# **TABLE OF CONTENTS**

I.   NATURE OF THE ACTION ................................................................................... 1

II.  JURISDICTION AND VENUE ........................................................................... 9

III. PARTIES ............................................................................................................ 10

   A.  Lead Plaintiff .............................................................................................. 10

   B.  Defendants .................................................................................................. 10

IV.  SUBSTANTIVE ALLEGATIONS ................................................................... 11

   A.  Relevant Background .................................................................................. 11

      1.  Granite's Large Construction Projects .............................................. 11

      2.  The Fixed-Price Contracts ................................................................ 12

      3.  Relevant Provisions of the Fixed-Price Contracts that Limited Granite's Recovery of Cost Overruns ............................................... 14

      4.  Percentage of Completion Accounting for the Projects ................... 15

      5.  Granite's Project-Specific Accounting Determinations Were Not Disclosed .. 16

   B.  Granite Acquires Layne in Stock-for-Stock Transaction ........................... 17

   C.  Granite Manipulated Its Financial Statements and Misrepresented the Financial Results of the Projects ................................................................ 18

      1.  Analysts and Investors Believed that the Projects Were Improving ............... 19

      2.  Despite Defendants' Positive Statements Concerning the Projects, Granite Continued to Overstate Its Financial Results ................................... 20

      3.  Granite Did Not Take a Charge Even Though the I-4 Ultimate Project and Its Majority Partner, Skanska, Concluded That Accounting Principles Mandated a Charge ........................................................................................ 29

      4.  Granite Intentionally Removed Any Disclosure of "Reasonably Possible" Additional Costs ............................................................................. 30

      5.  Granite's Reported Financial Results Deviated Substantially from the Projects and Underscores Granite's GAAP Violations ..................................... 32

      6.  Granite Discloses Massive Charges in 2Q and 3Q 2019 Resulting from the Projects and Falsely Blames Unanticipated Events and Previously Unknown Costs ........................................................................................... 37

7.   The Individual Defendants Closely Tracked the Projects and Received Numerous Periodic Reports Reflecting Up-to-Date Costs, Schedules, and Profits..................................................................................40

8.   Granite's Affirmative Claims for Additional Payments Seeking to Recoup Cost Overruns Have Not Succeeded..............................................................43

D.   Percentage of Completion and Relevant Accounting Provisions Reflecting Granite's Violations of GAAP ...............................................................43

1.   Accounting Standards Codification Topic 606 ..................................44

2.   Granite Failed to Disclose Any "Reasonably Possible" Additional Costs in Violation of GAAP.................................................................51

E.   Summary of Scienter Allegations ..............................................................52

1.   Roberts Admitted that He Knew the Details About the Projects; Wall Street Analysts Continuously Scrutinized the Projects ..............................52

2.   The Projects Were Core Operations ..................................................54

3.   Granite Eliminated the Disclosure of the Reasonably Possible Costs of the Projects in Violation of GAAP.................................................55

4.   The Disparity in the Financial Results of the JVs and Granite ..........55

5.   Granite's Stock Acquisition of Layne Constituted Motive ................56

6.   Former Employees Confirm Defendants' Knowledge.......................56

7.   Granite's Scienter ...........................................................................59

V.   ACTIONABLE FALSE AND MISLEADING STATEMENTS AND OMISSIONS 59

A.   False and Misleading Statements and Omissions Made Throughout the Class Period ....................................................................................................60

1.   First Quarter 2018 False and Misleading Statements and Omissions ..............60

2.   Second Quarter 2018 False and Misleading Statements and Omissions..........63

3.   Third Quarter 2018 False and Misleading Statements and Omissions ............66

4.   Full Year and Fourth Quarter 2018 False and Misleading Statements and Omissions ...........................................................................................69

5.   First Quarter 2019 False and Misleading Statements and Omissions .............73

6.   Second Quarter 2019 False and Misleading Statements and Omissions..........76

B.  False And Misleading Statements Regarding Granite's Application of GAAP ....... 80

C.  False and Misleading Risk Factors............................................................................ 83

D.  False and Misleading SOX Certifications ................................................................ 86

VI.  LOSS CAUSATION .............................................................................................................. 86

A.  July 29, 2019 Press Release Discloses Charge Exceeding $100 Million................. 87

B.  August 2, 2019 Press Release Reporting Final Second Quarter 2019 Results ........ 89

C.  October 25, 2019 Press Release Reporting Third Quarter 2019 Results ................. 90

VII.  INAPPLICABILITY OF STATUTORY SAFE HARBOR OR BESPEAKS
CAUTION DOCTRINE........................................................................................................ 91

VIII.  PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET DOCTRINE  92

IX.  CLASS ACTION ALLEGATIONS....................................................................................... 92

X.  CLAIMS FOR RELIEF......................................................................................................... 94

XI.  JURY TRIAL DEMAND...................................................................................................... 95

XII.  PRAYER FOR RELIEF ....................................................................................................... 95

1

## GLOSSARY OF KEY TERMS

| TERM | DEFINITION |
|---|---|
| AAG or Construction AAG | The American Institute of CPAs Audit and Accounting Guide for Construction Contractors |
| AGL Constructors | The JV responsible for designing and building the Texas Project and jointly owned by Granite, Archer Western Contractors LLC, and Lane Construction Company |
| ASC | Accounting Standards Codification |
| ASC 606 or Topic 606 | ASC Topic 606 – Revenue from Contracts with Customers |
| Class | All persons and entities who purchased or otherwise acquired Granite common stock from April 30, 2018 through October 24, 2019, and were damaged thereby |
| Class Period | April 30, 2018 through October 24, 2019, both inclusive |
| Defendants | Granite, Roberts, Krzeminski, and Desai |
| Desai | Jigisha Desai, Granite's CFO since July 9, 2018 |
| FDOT | Florida Department of Transportation |
| FEs or Former Employees | Former employees who provided information on a confidential basis and individually designated by "FE __" reference |
| Fluor | Fluor Corporation and its subsidiaries, including the subsidiary that is the co-member of TZC |
| GAAP | United States Generally Accepted Accounting Principles |
| Granite/Walsh JV | The JV responsible for designing and building the PennDOT Project and jointly owned by Granite and Walsh |
| Heavy Civil Group | Granite's operating group that is responsible for the Projects |
| I-4 Mobility | I-4 Mobility Partners OpCo LLC, the concessionaire for the I-4 Ultimate Project which is charged with designing, financing, maintaining, and operating the I-4 Ultimate Project and is jointly owned by Skanska and John Laing |
| I-4 Ultimate Project | The I-4 Ultimate Improvement Project in Florida, whereby SGL Constructors was to design and build 21 miles of I-4 highway |
| I-4 Ultimate Project Contract | Concession Agreement for I-4 Ultimate Project Between Florida Department of Transportation and I-4 Mobility Partners OpCo LLC, effective September 4, 2014.  (Contract # E5W13) |
| Individual Defendants | Roberts, Krzeminski, and Desai |
| JD Edwards Accounting System | Granite's accounting system which the Company used to generate cost-to-complete analyses and progress reports regarding the Projects |
| John Laing | John Laing Investments Ltd., an investor, developer, and operator of public infrastructure projects and the co-owner of I-4 Mobility |
| JV | Joint Venture |
| Krzeminski | Laurel J. Krzeminski, Granite's CFO from November 2010 through July 8, 2018 |
| Large Project Construction | Granite's business segment in which the Company reported financial results attributable to the Projects through 2Q 2018 |
| Layne | Layne Christensen Company, acquired by Granite on 6/14/18 |

| TERM | DEFINITION |
|---|---|
| Lead Plaintiff | The Police Retirement System of St. Louis |
| NYSE | New York Stock Exchange |
| NYSTA | New York State Thruway Authority |
| NYSTA FOIL Request | Freedom of Information Law Request TZC submitted to NYSTA seeking documents concerning disputed costs |
| PennDOT | Pennsylvania Department of Transportation |
| PennDOT Agreement | The Pennsylvania Rapid Bridge Replacement Project Public-Private Transportation Partnership Agreement dated as of January 8, 2015 between the Pennsylvania Department of Transportation and Plenary Walsh Keystone Partners, LLC |
| PennDOT Project | The PennDOT Rapid Bridge Replacement Project in Pennsylvania to replace hundreds of bridges across Pennsylvania |
| Plenary Walsh Keystone Partners | The JV responsible for the PennDOT Project, composed of Granite, HDR Engineering, The Plenary Group, and Walsh |
| Primavera | The software used by Granite to track the Company's schedule for the I-4 Ultimate Project |
| Projects | The I-4 Ultimate Project, the Tappan Zee Project, the PennDOT Project, and the Texas Project |
| Roberts | James H. Roberts, Granite's CEO since September 2010 and a member of Granite's Board of Directors since 2011 |
| SGL Constructors | The JV responsible for designing and building the I-4 Ultimate Project, in which Granite has a 30% equity interest |
| Skanska | Skanska AB, a Swedish construction company and JV partner in the I-4 Ultimate Project |
| Tappan Zee Project | The Tappan Zee Bridge Hudson River Crossing Project in New York |
| Texas Contract | Development Agreement: IH 35E Managed Lanes Project between Texas Department of Transportation and AGL Constructors |
| Texas Project | The IH 35E Managed Lanes Project in Texas to rebuild 28.2 miles of highway |
| Transportation | Granite's business segment which included the Projects starting in 3Q 2018 |
| TxDOT | Texas Department of Transportation |
| TZC | Tappan Zee Constructors, the JV for the Tappan Zee Project, and whose members are Granite, Fluor, American Bridge, and Traylor |
| TZ Contract | New York State Thruway Authority Tappan Zee Hudson River Crossing Project Design-Build Project DB Contract Documents Part 1 Agreement and Part 2 DB Section 100 General Provisions |
| Walsh | JV partner in the PennDOT Project |
| WIP Reports | Work-In-Progress Reports, the monthly reports that tracked job-specific percentages of completion, original bids, and current forecasts |

Court-appointed Lead Plaintiff The Police Retirement System of St. Louis ("Lead Plaintiff") brings this action on behalf of itself and all those who purchased or otherwise acquired Granite common stock during the period of April 30, 2018 through October 24, 2019 (the "Class Period"), both inclusive, and were damaged thereby (the "Class").

Lead Plaintiff alleges claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq.,  (the "Exchange Act") against:

(1)     Granite Construction Incorporated ("Granite" or the "Company");

(2)     James H. Roberts, Granite's CEO ("Roberts");

(3)     Jigisha Desai, Granite's current CFO ("Desai"); and

(4)     Laurel J. Krzeminski, Granite's former CFO ("Krzeminski," together with Roberts and Desai the "Individual Defendants," and with Granite "Defendants").[1]

The allegations are based upon personal knowledge as to Lead Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Counsel.  Lead Counsel's investigation included, among other things, a review and analysis of Granite's SEC filings, transcripts of Granite's public conference calls, press releases issued by Granite, documents provided in response to public record requests, news reports concerning the Company, research reports issued by financial analysts, and interviews with former employees of Granite.  Lead Plaintiff believes that, after a reasonable opportunity for discovery, substantial additional evidentiary support will be available for trial that further proves the allegations in this Complaint.

## I.     NATURE OF THE ACTION

1.     Granite is a construction company that builds large infrastructure projects for public and private clients in the United States. Within the public sector, the Company concentrates on heavy-civil infrastructure projects, including the construction of streets, roads, highways, and bridges.

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed in the Glossary of Key Terms.

2.      This case arises from fraudulent statements made by Defendants regarding the accounting treatment of several of Granite's largest construction projects, which violated Generally Accepted Accounting Principles ("GAAP") and rendered Granite's financial results issued during the Class Period materially false and misleading.  Defendants knowingly inflated the Company's revenue, income, and margins, among other metrics, which came crashing down in the second and third quarters of 2019 when Granite booked charges exceeding $240 million, reducing profits dollar-for-dollar.

3.      At issue here are four of Granite's largest "mega projects," which together involved contracts worth over $7.5 billion.  The four projects are: the (i) Florida I-4 Ultimate Improvement Project; (ii) New York Tappan Zee Bridge Hudson River Crossing Project; (iii) Pennsylvania PennDOT Rapid Bridge Replacement Project; and (iv) Texas IH 35 E Managed Lanes Project (together, the "Projects," individually defined in the Glossary).

4.      The Projects were financially risky for Granite because they were based on fixed-price contracts.  Granite agreed to complete the work for a fixed price with extremely limited options to obtain additional compensation in case something went wrong, even if beyond Granite's control.  The Company thus assumed the full risk of delays, cost overruns, or inefficiencies subject to a narrow subset of exceptions specified in the agreements.  The risk was exceptionally high if Granite underbid the Projects because there was no viable mechanism to make up the cost overruns.

5.      Granite accounted for the Projects based on the percentage-of-completion method. This method compares the costs incurred at a specific point in time to the total costs to complete the project to calculate a percentage.  The percentage is then used to calculate the revenues and profits that can be recognized at such time.  Accordingly, because the determination of total costs and the resulting percentage are critical to profits, GAAP imposes rigorous rules which mandated that Granite include all costs in the percentage calculation immediately.  Defendants, however, intentionally excluded known costs from the calculation to inflate Granite's revenues and profits by hundreds of millions of dollars.

6.     Before the Class Period, the Projects began to experience problems and setbacks. Granite, however, reassured investors that it was properly accounting for those setbacks and shifting its business towards smaller, less risky projects.

7.     Nevertheless, considering the importance and risk of the so-called "legacy" Projects, they remained a key area of focus for Wall Street analysts and investors who continuously sought information from Granite.  Analysts asked about the expected timing to completion, profitability margins, revenues, costs, and numerous other details during the quarterly earnings calls.  In response, the Individual Defendants told investors that they were hands-on managers and were on top of the issues.  Roberts said that he was "personally involved" and that "every quarter … we go through a detailed cost estimate to complete every job."  And the Forms 10-Q and 10-K filed with the SEC stated that Granite followed a "detailed 'bottom up' approach" to cost estimates, and that the Company had not "identif[ied] any material [charges] that should have been recorded in a prior period."  The message Defendants sent to the market was clear: they were focused on the Projects and the accounting was proper and up to date.

8.     But the publicly issued financial statements did not accurately reflect the financial condition of the Projects.  Defendant Roberts sought to game Granite's financial disclosure requirements by concealing and delaying the Projects' negative financial results until Granite filled its portfolio with newer, less risky, and more profitable projects that would blunt the necessary write-downs and losses.  In other words, Roberts sought to delay the charges until he could report some good news, as well as enough profits that would hopefully wash out the losses.

9.     Granite also had an additional motivating factor to delay the write-downs.  In early 2018 Granite had announced a stock-for-stock acquisition of a coveted asset: a company specializing in water related projects called the Layne Christensen Company ("Layne").  Granite paid over $500 million, and in order to minimize the cost of the transaction and its dilutive effect on Granite, Defendants needed to inflate Granite's stock price.

10.     Granite's propensity to improperly accelerate revenue and delay costs was confirmed by former employees during Lead Counsel's investigation (the "Former Employees" or "FEs").  For example, FE 1 (Regional Controller at Granite from prior to the Class Period to

November 2018, additional information *infra* ¶211) confirmed that "[t]aking revenue early was standard operating procedure at Granite."  In this Former Employee's words, Granite was "very aggressive in recognizing profit and keeping it on [the books]," even when there was evidence that the income would not materialize.  Granite's approach to accounting for large construction projects was predicated on "delaying bad news" until the Company "got something resolved or got the next big project in."  The Company's "game" was to delay writing down projects with the hope that smaller, more profitable ones would be able to compensate for the cost overruns.

11.     An analysis of the Company's accounting for the Projects starkly demonstrates the "catch up" nature of the charges that Granite took in the second and third quarters of 2019.  The analysis compares the financial results of the Projects publicly reported by Granite with the financial results of the joint ventures between Granite and other construction companies that built the four Projects (the "JVs").  Granite had teamed up with other constructors in each of the Projects to form a separate legal entity – the JVs.  The JVs had their own financial statements.  And the revenues, costs and profits flowed down on a pro rata basis to each JV partner, including Granite.  The JVs thus provided an accounting baseline.

12.     Comparing the JVs to Granite shows a consistent pattern in which Granite reported vastly better results from its JVs for the first five quarters of the Class Period.  Granite then abruptly reversed course, reporting dramatically worse results than the JVs as Defendants' fraud fell apart.  While technical accounting issues could explain small discrepancies, the size and timing of the deviations between the JVs and Granite are unexplainable other than by fraud.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13.     The following chart comparing the reported profitability of the JVs with Granite in terms of cumulative net margins illustrates the point.  The chart shows that throughout 2018, and in the first quarter of 2019, Granite consistently reported that its pro rata share of the JVs was more profitable than the JVs reported.  But then the profitability supposedly flipped on its head and Granite's pro rata share of the JVs suddenly had a substantially worse margin than the JVs themselves.



14.     When Wall Street analysts asked the Company to explain the discrepancy during the Class Period, before Granite booked the charges, Granite falsely responded that that is just the way the accounting works.  Analysts and investors had no way of verifying or checking Granite's assertion because Granite's specific accounting calculations for the Projects—and, in particular, whether Granite had properly included all known costs—is confidential and not disclosed.  It is a black box.

15.     Reality caught up with Granite, however.  By the end of the Class Period, Granite took the charge it had improperly delayed in violation of GAAP.  Also catching up with Granite was the fact that it had underbid at least one of the Projects.  An internal memorandum dated October 26, 2016, by the JV in the Pennsylvania Project outlined fourteen pages of disputes,

challenges, and problems, and admitted that "*we would not have been the selected bidder had we done this correctly*."

16.     Not only were the JVs accounting for the Projects differently than Granite, but so were its JV partners.  In one instance, Granite's partner in the Florida JV, Skanska, announced a $100 million charge on October 18, 2018, a substantial portion of which, if not all, arose from cost overruns in the Florida Project.  Nevertheless, Granite's Form 10-Q filed with the SEC on October 29, 2018, stated that Granite was different than both Skanska and the JVs, that it did not need to recognize a charge, and that there was nothing material on the horizon. Specifically, the Form 10-Q reported that while the JVs recognized $47.6 million in net losses during the three quarters ended September 30, 2018, Granite's share of net losses was just $3.1 million.  In other words, Granite had failed to account for known cost overruns on the Project which inflated Granite's financial results.

17.     While the Florida Project was only one of the four Projects relevant to this case, the total cost overruns among all four exceeded $1.3 billion.  These known cost overruns ultimately caused Granite to take two separate charges totaling $242 million at the end of the Class Period.

18.     Defendants knew that Granite's financial reporting of the JVs was not accurate. Numerous Former Employees identified below confirm that the Defendants were centrally involved in the fraud and knew all the relevant facts.  Former Employees confirm that the Individual Defendants closely tracked the financial performance of each Project and received detailed, monthly "work in progress" updates showing the specific completion percentage and cost relative to the cost baseline (the "WIP Reports").  The WIP Reports—sent to Roberts, Krzeminski and Desai, as well as other members of senior management—showed total costs and cost overruns, in addition to the profit deterioration in the Projects.  Roberts also met regularly with the Projects' management and visited the Florida and New York Project sites multiple times.

19.     Specifically, according to FE 2 (a Senior Financial Reporting analyst before the Class Period through September 2019 at Granite's headquarters in Watsonville, California, additional information *infra* ¶203), FE 2 prepared dozens of reports for Roberts, Krzeminski, and Desai each quarter which reflected financial information related to the Projects, including cost

overruns and specific write-downs.  The reports also showed information on how the Projects were impacting Granite's income statement and balance sheet and how the Projects were "driving write-downs."  Defendants reviewed the reports and asked FE 2 specific questions about the bases for specific write-downs.

20.     FE 3 similarly confirmed that the Individual Defendants reviewed progress reports on the Projects every month which depicted deteriorating profit on the I-4 Ultimate and Tappan Zee Projects.  FE 3 was a Granite financial planning and analysis manager from prior to the start of the Class Period to December 2019 (additional information *infra* ¶206).  FE 3 knows that Roberts received this information because FE 3 was personally copied on emails in which the reports were circulated to Roberts as well as Krzeminski, and Desai (depending on which individual held the CFO role).  The reports showed for every month, job by job, the percent complete, the original bid of the job, and the total cost for each job.

21.     FE 4 further corroborated the knowledge of the Individual Defendants.  FE 4 was Granite's Vice President, Operational Finance and Corporate Controller from prior to the start of the Class Period to December 2018 (additional information *infra* ¶208).  FE 4 stated that the Projects were "discussed extensively at the board level and the disclosure committee level," and with the CEO and CFO.

22.     By early 2019, Granite had reached a crucial juncture.  Until then, Granite had historically disclosed a limited range of additional costs that were "reasonably possible" and had the "potential to adversely impact gross profit," giving investors comfort that any cost overruns on the Projects were within a known range.  But the disclosed range of possible cost overruns was false because it was materially understated.  At no time during the Class Period did Granite disclose an upper limit higher than $47 million. Yet, Defendants knew that the actual cost overruns were nearly $340 million.

23.     Even worse, in February 2019, Granite simply removed any disclosure of such "reasonably possible" additional costs from its 2018 10-K and its quarterly financial reports for the rest of the Class Period.  The deletion of this disclosure and the absence of any additional costs that were "reasonably possible" told investors that there were no more known cost overruns that

had not been already reflected in the financial statements.  Given that the accounting for cost overruns was entirely opaque, the only possible reading was that any reasonably possible known cost overrun was zero.

24.     That was not true, however.  On July 29, 2019, Granite disclosed a massive charge that exceeded $100 million on the four Projects – far greater than any "reasonably possible" amount disclosed during the Class Period.  On August 2, 2019, Granite specified the precise amount: a $143.7 million pre-tax charge ($106.7 million after tax), driven by a $161.1 million reduction in gross profit due to cost overruns on its large projects, of which the four Projects accounted for $153.6 million.  Granite characterized the charge in its press release "[a]s a result of *independent second quarter 2019 events* related to four legacy, unconsolidated heavy civil joint venture projects."

25.     It is extremely unlikely that four independent projects that the Company repeatedly stated were nearly complete, in four different regions of the country, would all simultaneously incur costs, in the same quarter, exceeding $150 million.  Former Employees directly contradict this explanation and state that the charge consisted of costs known to Defendants that arose before the second quarter of 2019.  According to FE 5 (a Granite Engineer III on the Florida Project from prior to the Class Period to October 2019, additional information *infra* ¶210) the charge included the cost overrun in the Florida Project that Skanska had written down in October 2018. Tellingly, Defendants refused to identify any specific events or issues in the second quarter of 2019 that caused the charges, other than to say that they received "a recent unfavorable court ruling on a project dispute."  That is one event, not four.  Indeed, FE 5 confirmed that Granite did receive an unfavorable court ruling, but then improperly used it as an excuse to include previously known cost overruns.

26.     After the July 29, 2019 disclosure of the charge due to cost overruns, Roberts falsely told investors that Granite had covered all costs and no more charges were forthcoming. On the earnings call on August 2, 2019 Roberts said: "We also believe that we have covered our current challenges and future risks…. [a]nd I don't see significant costs. But of course, there will

be some as we move forward. But we have embedded that." In other words, Roberts was telling investors that Granite had taken into account ("embedded") all known cost overruns.

27.     This also was not true. The very next quarter Granite took another massive charge of $80.7 million, the bulk of which again related to the four Projects. Neither Granite nor Roberts even attempted to explain how the charge in the third quarter squared with Roberts' prior statements that the second quarter charge had "covered" "current challenges," and that "significant costs" as of the second quarter had been "embedded" in the financial statements.

28.     As a result of the second and third quarter 2019 charges, Granite's stock price plummeted, damaging investors. Prior to the first corrective disclosure on July 29, 2019, Granite's stock price was $44.47. By the end of the Class Period, on October 24, 2019, the price had dropped to $26.25.

## II.     JURISDICTION AND VENUE

29.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa). The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and the rules and regulations promulgated thereunder, including Rule 10b-5 (17 C.F.R. §240.10b-5). In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

30.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

31.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa). In addition, venue is proper pursuant to 28 U.S.C. § 1391. Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District. In addition, Granite maintained its corporate headquarters and principal executive offices in this District throughout the Class Period.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.   PARTIES

**A.   Lead Plaintiff**

32.     Court-appointed Lead Plaintiff, The Police Retirement System of St. Louis, is a single employer defined benefit pension plan that has provided pension benefits to the City of St. Louis' police officers since 1957.  As of December 31, 2018, Lead Plaintiff managed roughly $800 million in total assets on behalf of nearly 3,200 active and retired St. Louis police officers and their beneficiaries.  As set forth in the certification attached as Exhibit A, Lead Plaintiff purchased Granite stock on the New York Stock Exchange ("NYSE") during the Class Period and was damaged by Defendants' violations of the federal securities laws alleged herein.

**B.   Defendants**

33.     Defendant Granite is a U.S. infrastructure construction company with a national workforce of more than 7,200 employees and combined annual revenues of over $3 billion.  The Company is incorporated in Delaware with its principal executive offices at 585 West Beach Street, Watsonville, California 95076.  Granite common stock trades on the NYSE under the ticker symbol "GVA."

34.     Defendant Roberts has served as Granite's President and Chief Executive Officer since September 2010, and as a member of Granite's Board of Directors since 2011.  Roberts signed Granite's 2018 Form 10-K, and signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements of each Form 10-Q and Form 10-K Granite filed during the Class Period.  Roberts, therefore, is responsible for the false and misleading statements and omissions contained in each of Granite's Forms 10-Q and 10-K that Granite filed during the Class Period.  Roberts also made false and misleading statements on numerous conference calls with investors and analysts.  During his tenure at Granite, Roberts had the power and authority to, and in fact did, approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

35.     Defendant Krzeminski served as Granite's Executive Vice President and Chief Financial Officer from June 2010 through July 8, 2018.  Krzeminski signed and certified Granite's

financial statements on Form 10-Q for the first quarter of 2018 that Granite filed with the SEC and, thus, is responsible for the false and misleading statements and omissions contained therein. Krzeminski also made false and misleading statements on a conference call with investors and analysts.  During her tenure at Granite, Krzeminski possessed the power and authority to, and in fact did, approve and control the contents of the Company's Form 10-Q filed with the SEC for the first quarter of 2018 alleged herein to be false and misleading.

36.     Defendant Desai has served as Granite's Senior Vice President and Chief Financial Officer since July 9, 2018.  Desai signed and certified each Form 10-Q and 10-K filed with the SEC during the Class Period after July 9, 2018 and, thus, is responsible for the false and misleading statements and omissions contained therein.  Desai also signed Forms 8-K filed with the SEC on April 26 and August 2, 2019 announcing Granite's financial results for the first and second quarter of 2019, respectively, and is responsible for the false and misleading statements and omissions contained therein.  Further, Desai made false and misleading statements on numerous conference calls with investors and analysts.  During her tenure at Granite, Desai possessed the power and authority to, and in fact did, approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

## IV.     SUBSTANTIVE ALLEGATIONS

37.     The allegations in this Complaint are based on Lead Counsel's investigation, which included interviews with numerous former Granite employees who have provided information supporting Lead Plaintiff's allegations.   The Former Employees provided information on a confidential basis and are described below by job description, title, responsibility, and period of employment, thereby providing sufficient detail to establish their reliability and personal knowledge.   Allegations attributed to a particular Former Employee are referenced by the employee's "FE __" designation or job description.

### A.     Relevant Background

#### 1.     Granite's Large Construction Projects

38.     In the wake of the financial crisis and by late 2011, the Company was facing intense competition while private sector work had dried up and its stock price had fallen over 75% from

its pre-crisis peak.  Under the stewardship of the Company's recently appointed CEO, Defendant Roberts, Granite embarked on a rapid expansion into fixed-price "mega projects" with public entities.  Guided by Roberts, Granite aggressively bid on the projects and secured a series of mega deals valued at over $7.5 billion.

39.     In Granite's Annual Report for 2013, Roberts described how the Company's "performance was disappointing" because of a "slower-than-expected economic recovery [and] operational challenges."  Roberts emphasized, however, the significant "opportunities" presented by "three Large Projects [later four] that helped us reach a record backlog of $2.5 billion, up 48 percent from $1.7 billion in 2012."  The $2.5 billion "backlog" referred to work that Granite had yet to complete and would be booked as revenue once completed.

**2.     The Fixed-Price Contracts**

40.     Each of the four Projects involved a fixed-price contract between the JV (of which Granite was a minority partner) and the relevant state transportation authority.  In a fixed-price contract, Granite agrees on a set price for the contracted services at the outset of a project.  Because the price is fixed and does not depend on the resources used or time expended, the risk of any cost overruns or delays compared to the initial cost estimate is borne by Granite and the JV partners.  As such, the profitability of a fixed-price contract depends on Granite's ability to manage costs and efficiently perform the work.

41.     Granite thus assumed significant risk when entering into the contracts.  Nevertheless, Granite and its partners, through the JVs, submitted extremely aggressive fixed-price bids to win the Projects, underbidding competitors by $1 billion on the Tappan Zee Project and approximately $860 million on the I-4 Ultimate Project alone. These two projects stand at the center of the Company's fraud.

42.     Granite reported the financial results of the Projects in the Large Project Construction segment and the Heavy Civil operating group (the "Heavy Civil Group") until the third quarter of 2018 (Granite had three reportable business segments and four operating groups).  Starting in the third quarter of 2018, Granite announced that it would revise its reportable segments

and that it would include the Projects in the Transportation segment – not Large Project Construction.

### a.      The I-4 Ultimate Project in Florida

43.     On April 24, 2014, Granite announced that the Florida Department of Transportation ("FDOT") had selected the Company, together with Skanska and the Lane Construction Company ("Lane"), to lead the I-4 Ultimate Project.  Granite's JV team for the I-4 Ultimate Project was named "SGL Constructors."  For a price of $2.3 billion, SGL Constructors agreed to design and build 21 miles of I-4 interstate highway in Orlando.  This included reconstructing 15 major interchanges, building over 140 bridges, adding four toll lanes, and completely rebuilding the general use lanes along the entire I-4 corridor.  Currently, the project is roughly 70% complete.  Granite has a 30% equity interest in the project.

44.     SGL Constructors, which is charged with building the I-4 Ultimate Project, is part of a broader team on the I-4 Ultimate Project named I-4 Mobility Partners ("I-4 Mobility").  I-4 Mobility is the concessionaire for the project and responsible for designing, financing, maintaining and operating the I-4 Ultimate Project.  I-4 Mobility is jointly owned by Skanska and John Laing.

### b.      The Tappan Zee Project in New York

45.     On December 17, 2012, Granite announced that the New York State Thruway Authority ("NYSTA") had awarded a $3.14 billion design-build contract for the Tappan Zee Project to Tappan Zee Constructors ("TZC"). Design-build is a project delivery method in which the design and construction services are contracted by a single entity. The members of the TZC JV are Granite, Fluor, American Bridge Company, and Traylor Bros., Inc.

46.     The Tappan Zee Project would replace the 3.1-mile-long Tappan Zee Bridge, which connects Rockland and Westchester Counties in New York, and was expected to be completed in 2017.  While the new bridge has opened, work continues to this day.  Granite has a 23.3% equity interest in the project.

### c. The PennDOT Project in Pennsylvania

47. Granite announced on October 27, 2014 that the Pennsylvania Department of Transportation ("PennDOT") had selected Granite's JV team for the PennDOT Rapid Bridge Replacement Project for a total price of $1.1 billion. The members of the JV, named "Plenary Walsh Keystone Partners," are Granite, HDR Engineering, The Plenary Group, and The Walsh Group ("Walsh"). Granite and Walsh serve as the design-build contractor on the project ("Granite/Walsh JV"). Under the terms of the contract, Granite and Walsh were responsible for replacing 558 structurally deficient bridges across Pennsylvania. Granite has a 40% interest in the project.

### d. The Texas Project

48. On December 13, 2012, Granite announced that the Texas Department of Transportation ("TxDOT") had selected the JV formed by Granite, Archer Western Contractors, and Lane, named "AGL Constructors," to rebuild 28.2 miles of highway in Texas at a price of $1.2 billion. Granite has a 35% interest in the project.

### 3. Relevant Provisions of the Fixed-Price Contracts that Limited Granite's Recovery of Cost Overruns

49. Pursuant to the fixed-price nature of the contracts, the Projects required Granite to perform and satisfy client demands prior to any determination of whether the demands were included within the scope of work. Roberts explained as much on the Company's August 2, 2019 earnings call: "we are contractually obligated to continue work on the jobs, and to recognize the associated costs regardless of whether we agree that the work we have been directed to perform is within the scope of our contracts." These provisions significantly increased the risk Granite would incur cost overruns on these large projects.

50. In addition, the contracts for the Projects sharply limited Granite's ability to recover cost overruns. For example, in the contract for the Tappan Zee Project, Granite agreed not to make any "monetary claim[s] for … any extra/additional costs attributable to any delays, inefficiencies, or interferences in the performance of the Contract" relating to "extra [w]ork which does not delay

the critical path or affect the overall completion of the [c]ontract," or to "[c]orrecting any materials or [w]ork rejected" by the NYSTA, among other conditions.[2]

51.   On the I-4 Ultimate Project, in the event that any work done on the project was "not in conformity with the Contract Documents," Granite was "not [] entitled to any Extra Work Costs, Delay Costs, … time extension or any other relief" in correcting those deficiencies.[3]   Likewise, the contract for the Texas Project required Granite to correct any nonconforming work, as determined solely by the TxDOT, at Granite's "cost and without any adjustment to the Price or any Completion Deadline or any other relief."[4]   And as for the PennDOT Project, in the event that Granite had understated costs, it would "not be entitled to any compensation or other relief from the Department in relation to any loss or damage that it suffers as a result of such error or omission."[5]

52.   In sum, these contracts carefully and explicitly protected the state public authorities from the risk of cost overruns and shifted that risk to the JVs and their members, including Granite.

### 4.   Percentage of Completion Accounting for the Projects

53.   Granite claimed to recognize revenue from each Project under an accounting method known as "percentage of completion."   Under that method, GAAP required Granite to divide its actual costs incurred by the total estimated costs on the Project to arrive at the percentage of completion for the Project.   Then Granite was required to multiply that fraction with the Project's transaction price.   That result is the amount of revenue that Granite is allowed to recognize on the Project.

---

[2] New York State Thruway Authority Tappan Zee Hudson River Crossing Project Design-Build Project DB Contract Documents Part 1 Agreement and Part 2 DB Section 100 General Provisions, effective November 21, 2012 (the "TZ Contract") at DB 109-16.
[3] Concession Agreement for I-4 Ultimate Project Between Florida Department of Transportation and I-4 Mobility Partners OpCo LLC, effective September 4, 2014 (Contract # E5W13) (the "I-4 Ultimate Project Contract") at Section 4.3.2.
[4] Development Agreement: IH 35E Managed Lanes Project between Texas Department of Transportation and AGL Constructors dated as of May 17, 2013 (the "Texas Contract") at Section 5.6.1.
[5] The Pennsylvania Rapid Bridge Replacement Project Public-Private Transportation Partnership Agreement dated as of January 8, 2015 between the Pennsylvania Department of Transportation and Plenary Walsh Keystone Partners, LLC (the "PennDOT Agreement") at Article 16.6.

$$\text{Revenue} = \text{Transaction price} \times \frac{\text{Actual costs incurred}}{\text{Total estimated costs}}$$

54.     As alleged in detail in Section IV.D below, Granite manipulated the Projects' transaction price and percentage of completion to overstate revenues and profit.

55.     Critically, these Projects were integrated joint ventures, meaning that Granite's financial interest in the Projects (including its share of profits and losses) was tied to its ownership stake in each Project.  In other words, if the Projects experienced a loss, Granite would recognize a pro-rata portion of the loss based on its pro rata ownership in the Projects.

56.     For each Project, one partner is the designated sponsor.  The sponsor provides all administrative and accounting support for the project.  Granite was not the sponsor for any of the Projects and, instead, received detailed financial statements directly from the sponsoring partner.  The provision of this financial information (which was prepared in accordance with governing accounting standards and was audited) was intended to ensure that all participants in each joint venture, including Granite, received consistent information about the Project's progress towards completion so that each partner could appropriately account for the Project's revenues, costs, and profits.

57.     The Projects were highly material to Granite's balance sheet and income statement.  Granite's financial statements disclosed the aggregate financial results of the Projects as "unconsolidated joint ventures."  Such large projects with unconsolidated JVs had contracts with a combined value of $11.5 billion, of which Granite's share was $3.3 billion (as of September 30, 2019), and contributed up to 17.5% of Granite's overall trailing twelve months ("TTM") revenue during the Class Period.  The four Projects at issue here comprised the overwhelming majority of Granite's unconsolidated JVs, with a total contract value of $7.5 billion, of which Granite's share was $2.3 billion.

**5.     Granite's Project-Specific Accounting Determinations Were Not Disclosed**

58.     From the outset, the Projects experienced cost overruns and delays.  While there were some limited news reports regarding the problems, Granite refused to discuss specific Projects with investors, citing confidentiality provisions.  And Granite certainly did not disclose

the effect of the cost overruns on its financial statements or the reality that the cost overruns were not included in its accounting for the Projects. The specific accounting determination of costs and revenue for each Project was a black box.

59. For instance, by March 2018, news reports indicated that Granite and TZC were contemplating bringing a $900 million claim against the NYSTA relating to the cost overruns and scheduling delays. However, the NYSTA specifically denied that any valid claim existed and emphasized that all invoices from TZC to date had been fully paid. The disclosure of a potential claim of approximately $900 million by the JV in no way revealed Granite's accounting treatment with respect to the claim, or the revenues and costs Granite booked for the Tappan Zee Project. Investors and the public had no way of knowing that Granite had not properly incorporated the cost overruns and $900 million claim into the Company's accounting.

60. Likewise, on December 9, 2013, just eight months after work began on the Tappan Zee Project in April 2013, TZC asked for a project extension due to a construction accident. When TZC was driving a pile (a large post-like foundation) into the ground, the pile struck an unknown object causing damage to the pile and, thus, requiring additional time and cost to complete the project. TZC asked for another extension in January 2014 due to a blizzard. The NYSTA denied both requests on the basis that they were not allowed under the contract. Nevertheless, TZC still pushed the project completion date back multiple times on its own accord, without NYSTA approval and without any assurance that the costs could be recovered. Investors again had no way of knowing the specific accounting treatment of these issues.

**B.    Granite Acquires Layne in Stock-for-Stock Transaction**

61. On February 14, 2018, Granite announced the acquisition of Layne, a leading water management, construction, and drilling company, in a $565 million stock merger transaction. Granite ultimately granted Layne shareholders $376 million in Granite stock and Granite assumed $189 million in Layne debt.

62. From Granite's perspective, it was critical that the acquisition close and be a success. It would further diversify the Company's business and allow it to tap the growing market for water and wastewater infrastructure needs. It would also provide Granite with additional scale

and a new source of revenue to offset the drag that the large projects—Roberts' own initiative—were having on Granite's business. Indeed, Granite had long coveted an expansion into water and wastewater infrastructure. After the acquisition, Layne represented 14% of the Company's pro forma revenues—compared to 30% from Large Project Construction, down from 35% prior to the acquisition.

63.     Had Granite timely disclosed the true impact that the Projects were having on its business when purchasing Layne, Granite would have risked being forced to pay significantly more stock for Layne because the primary consideration for the deal was Granite stock. The price of that stock would have declined significantly, however, had Granite announced that it needed to take a material charge on the Projects. What's more, because Layne was a public company, Layne shareholders were required to approve the acquisition, an approval that would have been jeopardized had Granite announced a charge amid the acquisition.

**C.     Granite Manipulated Its Financial Statements and Misrepresented the Financial Results of the Projects**

64.     Following the announcement of the merger with Layne in February 2018, Granite claimed that the financial results of the Projects were improving when, in fact, the opposite was true. On April 30, 2018, the Company announced earnings for its first quarter of 2018 and touted that it had turned the corner on the Projects. The Company touted an increase in Large Project Construction revenue of 20% over the prior year, that the segment's gross profit had increased by nearly 800% (to $20.4 million from $2.6 million the prior year), and that the segment's profit margins had similarly spiked to 8.2% compared to just 1.2% the year before.

65.     Granite specifically attributed the improvement to the fact that "work on under-performing, mature projects [i.e., the Projects] had less impact" on the Company's business and that "[a] strong ramp-up of activity at newer projects … mitigat[ed] some of the continued negative impact from challenging projects."

66.     Krzeminski joined in the praise, stating on April 30, 2018 that the improvement in Granite's Large Project Construction segment was the result of "a reduced pace of mature underperforming projects, which lessened their drag on quarterly results." Krzeminski similarly

touted Granite's "consistent cost control" as a driver of its recent success, a critical fact for investors given the historical drag of the Projects on Granite's earnings.

67.     Granite critically assured investors that it did not need to take a charge on the Projects even though the JVs themselves were incurring significant losses.  For instance, in the Company's quarterly report filed on Form 10-Q on May 1, 2018, Granite stated that it realized net income from the unconsolidated JVs of $2.6 million for the three months ended March 31, 2018, even though the joint ventures for the Projects incurred a net loss of $141 million during that period.  Granite stated this was due to "differences between our estimated total revenue and cost of revenue when compared to that of our partners," without explaining those differences.  The Company further assured investors in the same 10-Q that the Project costs underlying the reported financial results were "materially reliable" and stemmed from a detailed "bottom up" approach imbued with the Company's experience.

### 1.     Analysts and Investors Believed that the Projects Were Improving

68.     Analysts were impressed. Canaccord Genuity issued an analyst report on April 30, 2018 explaining that Granite's "core business continues to improve," as is "the qualitative outlook [] for large projects."  Canaccord Genuity specifically noted that "challenged large projects were a significant drag to 2017 results" and that it was encouraged by Granite's "significant improvements in Large Project segment margins," as well as "the benefit from the completion of challenged large projects in the first half" of 2018.  Cowen issued a similar report on April 30, 2018, stating that Granite "is managing underperforming projects well," and that improved performance in the segment was largely due to "a more modest headwind from underperforming projects being accelerated."  Macquarie Research also issued a report that day, explaining that "the outlook for [Granite] continues to look robust" and "the large [project] construction segment, which had some project issues in the past, continues to improve to ~8% [margins] compared to ~1% last year."

**2. Despite Defendants' Positive Statements Concerning the Projects, Granite Continued to Overstate Its Financial Results**

69.     Analysts and investors did not know, however, that Granite's statements were false. The Projects were still plagued by a myriad of issues that increased costs.  Yet, the Company failed to properly account for those massive and continuing cost overruns in violation of GAAP, which required Granite to book the costs when known or incurred.  By April 30, 2018, the I-4 Ultimate Project, Tappan Zee Project, PennDOT Project, and the Texas Project had experienced cost overruns of $100 million, $900 million, $340 million, and $25 million respectively.

**a.     The I-4 Ultimate Project**

**i.     Cost Overruns and Delays**

70.     The I-4 Ultimate Project was significantly over-budget because of cost overruns and delays, according to FE 5, who was a Granite engineer from prior to the start of the Class Period to October 2019 and was assigned to work on the I-4 Ultimate Project throughout FE 5's employment.  FE 5 held the titles of Engineer II and Engineer III during the Class Period, and was a project engineer for structures, walls and drainage.

71.     FE 5 specifically stated that the I-4 Ultimate Project experienced problems in 2017 that caused the project to be delayed for eight to nine months, ultimately resulting in the JV requesting a 245-day project extension and filing a $100 million claim with the FDOT arising from cost overruns and schedule delays.  As discussed further below, the JV for the I-4 Ultimate Project filed the claim on June 11, 2018 based on costs incurred in 2017.

72.     The JV incurred costs in 2017 when attempting to construct a deep foundational structure known as a "drilled shaft" that is used to support heavy loads.  The JV was drilling deep holes to install piles (large post-like foundations) to support the highway structures in the Orlando area and encountered a geotechnical issue – an unstable, pre-existing subsurface condition which prevented the piles from being installed, resulting in the failure of the drilled shaft.  Two such failures occurred in May and August 2017.

73.     Additional Former Employees confirm that the JV had incurred significant costs in 2017 that were known to Granite.  According to FE 6, in January 2018, the I-4 Ultimate Project had already incurred $100 million in cost overruns due to the drilled shaft failure, among other

contributing factors.  FE 6 worked at Granite from prior to the start of the Class Period to March 2019, and was a preconstruction coordinator on the I-4 Ultimate Project until January 2018.  FE 6's role involved coordinating design work, plan sets, shop drawings, and requests for inquiries ("RFIs") with the designers for the project.  FE 6 reported to Richard Rodriguez, who reported to Preconstruction Coordinator Manager Chris Robinette.

74.     FE 6 specifically stated that by January 2018, FE 6 knew that Granite's cost estimate was materially understated.  According to FE 6, Granite was scrutinizing "every dime" spent on the Project given that "everything was trending in the negative," costs had significantly exceeded expectations, and the Company had fallen far behind schedule.  FE 5 similarly stated that Granite's initial cost estimate for the I-4 Ultimate Project was not even realistic in the first place.

75.     FE 5 added that Granite was also experiencing significant cost overruns on the I-4 Ultimate Project from increased steel prices and labor costs.  The Project required several million tons of steel that was more expensive to procure than the cost estimates.  Further, employee turnover on the I-4 Ultimate Project was as high as 40%, and Granite was experiencing severe labor shortages in Florida. This significantly increased overtime payments to the employees it was able to retain.  As a result, according to FE 5, when Granite announced the 2Q 2019 charge, the majority related to the I-4 Ultimate Project.

76.     A third Former Employee, FE 3, confirmed that by 2018 Granite knew that it was likely to take a significant charge on the I-4 Ultimate Project.  FE 3 was a Granite financial planning and analysis manager from prior to the start of the Class Period to December 2019.  FE 3 oversaw a team of between two and five analysts (varying over time) and reported to Vice President, Operational Finance and Corporate Controller Brad Graham.

ii.     The $100 Million Claim Against FDOT

77.     On June 28, 2018, Moody's reported that I-4 Mobility had filed a claim on June 11, 2018 with FDOT for $100 million in additional compensation to attempt to recoup cost overruns arising from a 245-day time delay.  The Moody's report was the first public indication of this claim, which Granite has never publicly disclosed.  Despite the public report, investors had no way

of knowing how this claim was reflected in Granite's financial statements, or whether Granite had included those cost overruns or disputed costs in its calculation of revenue and percentage of completion of the I-4 Ultimate Project.

78.     While the claim has never been publicly revealed, Lead Plaintiff obtained a copy of the claim, which confirms that the drilled shaft failures occurred in May and August 2017, and conclusively establishes that the I-4 Ultimate Project faced over $100 million in additional costs at the time.  Specifically, on June 11, 2018, I-4 Mobility sent a letter to the FDOT, with over 600 pages of attachments and enclosures.  The letter asserted that the FDOT owed "**$100,393,430** in additional compensation and a 245 Day Time Extension related to impacts arising from the drilled shaft failure and second drilled shaft failure in Area 2" (emphasis in original).  The letter further explained that the "drilled shaft failures and the impacts of those failures are more fully detailed in the enclosed submission from the design-build contractor, SGL Constructors," and that the overall claim for $100 million and a 245-day extension included "requests for relief for Concessionaire-Related Entities SGL Constructors, as the Design-Build Contractor."

79.     The June 11, 2018 letter continued: "As may be seen from the enclosed documents, the drilled shaft issues in Area 2 caused a two hundred and forty-five (245) calendar day compensable delay."   I-4 Mobility, SGL Constructors, and a third firm (Volkert) claimed compensation in the following amounts (emphasis in original):

|  | Additional Compensation | Description |
|---|---|---|
| I4MP | $800,034 | Compensation due per CA Section 10.1.5.10(1&2) for I4MP labor, indirect costs and expenses due to Relief Event Delay |
| I4MP | $35,290,542 | Compensation due per CA Section 10.2.2 for Delayed Availability Payments caused by 245 days of compensable delay, limited to 180-days of compensable damages as discussed in narrative |
| I4MP | [$14,507,117] | ESTIMATED compensation due per CA Section 10.2.3 for Delayed Final Acceptance Payments due to Relief Event (actual costs will be invoiced monthly when applicable) |
| I4MP Subtotal | $50,597,693 |  |
| SGL | $48,095,818 | Extra Work Costs and Delay Costs 245 days of compensable delay to Project SC/FA |

| Volkert | $1,699,979 | Extra Work Costs and Delay Costs |
|---|---|---|
| **Total Certified Amount** | **$100,393,490** | Certified amount claimed by I4MP and Concessionaire-Related Entities SGL and Volkert (includes ESTIMATE for CA Section 10.2.3 compensation) |
| **Certified Time Impact Analysis** | **245 Calendar Days** | Movement of scheduled milestone dates of Scheduled Substantial Completion Date / Final Acceptance Deadline / Long Stop Date.  BWE dates are discussed in the Time Impact Analysis |

80.     The letter further explained that the calculations "are based on the current funding position and a forecast of cash flows for the remainder of the construction period based on achievement of Substantial Completion 245 days beyond the Baseline Substantial Completion Date and a resulting delay to Final Acceptance Deadline."

81.     Enclosed with the letter was a submission from SGL Constructors, consisting of a June 8, 2018 letter that copied Granite executive Bob McTavish.  SGL's claim "[was] based on the extra work and delay stemming from the impact associated with the failure of two (2) method drilled shafts and the impossibility to construct drilled shafts, in general, pursuant to the specifications set forth in the original Technical Requirements."

82.     Exhibit D to SGL Constructors' letter added that on "May 20, 2017, upon advancing the project's drilled-shaft Test Hole (Method Shaft) excavation, SGL experienced a catastrophic loss of the shaft."  And on "August 12, 2017, upon advancing the 2nd Method Shaft excavation, SGL again experienced a loss of the shaft for similar reasons as the original failure." Consistent with the I-4 Mobility letter, SGL Constructors stated that the "April 2018 update [for the I-4 Ultimate Project] indicates a completion date *245 days behind schedule* due to this delay" (emphasis in original), leaving no doubt that the I-4 Ultimate Project was radically delayed at the start of the Class Period.

83.     Notably absent from the I-4 Mobility and SGL Constructors letters was any plausible explanation for how the discrete drilling issue could single-handedly generate over eight months of delay and more than $100 million of additional costs.  Indeed, the submissions show that the actual drilling failures were quickly remediated and resulted in only minor equipment and material losses.  For example, SGL Constructors reported that, in September 2017, "[d]elays associated with the drilled shaft failures were substantially mitigated" by a redesign.

84.     Instead, the single largest component of SGL Constructors' $48.1 million claim (by an order of magnitude) was not related to the drilling failure at all.  SGL Constructors sought over $40 million in "Time Impact" and stated it was largely based on SGL [sic] finite level of resources across the entire Project."  Simply put, SGL Constructors was padding its claim with unrelated cost overruns, and the drilling issue served as a convenient pretext.

| 4. **Compensation Sought**: | |
|---|---|
| Summary of Costs: | |
| Design: | $ 598,172 |
| Labor: | $ 500,306 |
| Materials: | $ 1,448,883 |
| Equipment: | $ 436,172 |
| Subcontractors: | $ 2,508,177 |
| Bonus Work Element (Inability to Achieve): | $ 1,500,000 |
| Time Impact: | $ 40,826,201 |
| Bond: | $ 277,907 |
| **TOTAL** | **$ 48,095,818** |

### iii.     Skanska Announces $100 Million Charge Related to the I-4 Ultimate Project

85.     On October 18, 2018, Skanska, the majority partner on the I-4 Ultimate Project, announced that it would take a $100 million charge on two public-private partnerships in the U.S. due to lower production rates and delays.  While Skanska did not publicly reference the I-4 Ultimate Project, its only two substantial public-private partnership projects in the U.S. are the I-4 Ultimate Project and some work at New York's LaGuardia Airport. Skanska simultaneously announced that the head of its civil engineering business in the U.S. would step down immediately and that the company would no longer bid on large public-private partnership projects, such as the I-4 Ultimate Project, in the U.S.

86.     According to FE 5, Skanska's charge included a substantial portion arising from the I-4 Ultimate Project.  Granite, instead, decided not to recognize its portion of the charge at that time.  Rather, FE 5 stated that it was not until a year later, in July and August 2019, after Granite received an unfavorable court ruling relating to another Project, that Granite booked the I-4 Ultimate Project charge by lumping it together with charges related to the other Projects.

87.     Likewise, FE 1 stated that Skanska was "doing the right thing" when it took the write-down.  FE 1 served as a Regional Controller at Granite from January 2018 to November 2018.  In that capacity, FE 1 oversaw the accounting for the Central Region of the Large Projects Group.  FE 1 participated in quarterly conference calls with the Controllers for the other Projects, including Gabrielle Boozer ("Boozer") and Mike Barker (the Texas Project was in FE 1's division).  FE 1 participated in the conference calls when presenting FE 1's quarterly memos on the project risk of the Texas Project.  FE 1 reported to Division Controller Boozer and Vice President, Large Project Groups, Central Region Bill Heathcott.  In turn, Boozer and Heathcott reported to Senior Vice President Dale Swanberg, who reported to Roberts.

88.     According to FE 1, Granite's approach to accounting for all the Projects (including the I-4 Ultimate Project) was predicated on "delaying bad news" until the Company "got something resolved or got the next big project in."  FE 1 specifically recounted that Granite's "game" was to delay writing down projects with the hope that smaller, more profitable projects would be able to compensate for the losses.  Application of GAAP, FE 1 stated, required Granite to "drop the hammer" and take write-downs on the Projects, but the Company was "definitely not doing that."

89.     FE 1 believed that Granite was "very aggressive in recognizing profit and keeping it on [the books]" even when there was evidence that the income would not materialize.  Overall, the Company employed a "money hungry" approach, and it was "standard operating procedure at Granite" to "tak[e] revenue early."  According to FE 1, Granite was "aggressively writing [projects] up," and then waiting for them to "catch up" or liabilities to "work themselves out." Granite simply recorded the revenue, but "ignored liabilities" that should have been recorded which would have reduced the revenue or required a charge.

90.     In FE 1's words, it was clear that Granite "slow walked information to the shareholders."  However, when FE 1 raised concerns, Granite fired FE 1 for asking too many questions and pushing back on activity FE 1 deemed concerning.

**b.     The Tappan Zee Project**

91.     On April 12, 2018, TZC submitted a Freedom of Information Law request to NYSTA (the "NYSTA FOIL Request")—which remained confidential until after the end of the Class Period—seeking documents concerning specific disputed costs, including documents regarding "NYSTA's Project 'Oversight' role"; "[d]iffering site conditions encountered by TZC"; "[p]ile inspection, testing and welding criteria directed by NYSTA"; "[n]oise shrouds and bubble curtains required by NYSTA"; a "marine incident" on March 12, 2016; a "crane incident" on July 19, 2016; several weather events in January, October, and November 2014; the overall "impact of weather on the project schedule" from 2014 to 2018; and "[c]hanges with respect to demolition of the existing Tappan Zee Bridge."

92.     The NYSTA FOIL Request also references TZC's "Dispute Submission with Demand for Payment dated March 15, 2018," confirming that TZC had incurred and formally requested compensation for these increased costs no later than March 15, 2018.  Granite never specifically disclosed the March 15, 2018 claim.

93.     Consistent with the March 2018 claim, FE 3 confirmed that the Tappan Zee Project experienced significant cost overruns from the beginning, that the Company's management was more optimistic than operations with regard to costs, and that by 2018 Granite knew that it was likely to take a significant charge on the Tappan Zee Project.

**c.     The PennDOT Project**

94.     The PennDOT Project also had incurred substantial known cost overruns for which Granite did not properly account under GAAP.  Granite had underbid the PennDOT Project to win the work and could not complete it for the contract price. The Granite/Walsh JV responsible for this Project internally admitted in an October 26, 2016 memorandum from Arik Quam ("Quam"), the Business Group Leader, that it "did not do enough to price each bridge site[']s unique characteristics that would add costs to each bridge site—*we would not have been the selected bidder had we done this correctly*."  The Granite/Walsh JV "[took] for granted that these little bridges would not have issues and would get done on time." And it "[a]ccepted the risk of unforeseen conditions – Differing Site Conditions."

95.     Quam further explained that (i) the "plans and forms and processes were not fully vetted" and the "Project Schedule is too complex and aggressive"; (ii) the Granite/Walsh JV "[d]id not adjust to realistic durations until later in the project which affected prioritization on the downstream activities"; (iii) according to PennDOT, the contract allowed "no change orders" because it was "a lump sum contract with NO change orders"; (iv) a Pennsylvania official, "Deputy Sec Ritzman[,] had told [the Granite/Walsh JV] that during the budgeting process [Ritzman] was told not to budget anything for change orders"; and (v) the Granite/Walsh JV had experienced "significant increases in construction costs, design cost," and "schedule duration" arising from project modifications.

96.     Further complicating the PennDOT Project, according to FE 2, when Granite bid on the project Granite assumed that it would be able to do the majority of the work itself without much need for subcontractors.  (FE 2 was a Senior Financial Reporting Analyst from prior to the Class Period through September 2019, *see infra* ¶203.)  However, in order to meet the project schedule and deadlines, Granite was forced to subcontract a significant amount of work, leading to significant cost overruns almost immediately.

97.     Failure to meet the schedule for a Project had significant negative financial implications. It triggered liquidated damages provisions, financial penalties and led to significant cost overruns in the form of increased labor and overtime costs.  For instance, in a September 5, 2016 "Weekly Update" from Quam, the Granite/Walsh JV internally admitted (but did not publicly disclose) that it was woefully behind schedule and on the precipice of incurring millions of dollars in penalties:

---

d)  Project Schedule
  (a) Substantial Completions (Total to Date Shown)
    (i)  August 2016        61 vs 143 in our contract, penalty almost $500,000 for the month!
    (ii) September 2016     83 projected vs 195 in our contract, penalty will be $650,000 for the month!
    (iii)October 2016       105 projected vs 248 in our contract, penalty will be almost $900,000 for the month!

---

98.     In fact, by August 2016, the Granite/Walsh JV knew that it faced potential damages of $45 million that it would seek to pass along to the project's architect, HDR, by withholding further payments to HDR.  On August 31, 2016, it sent HDR—copying Granite executives Mike Donnino and Bob McTavish—a formal "Notice of Payment Withholding," asserting that the JV "has suffered substantial damages estimated in the amount of $45M as a result of design related schedule delays and design quantity growth."  As Quam's September 5, 2016 "Weekly Update" further explained:

> We have informed HDR thru letter and discussion that we are doing [sic] to stop paying them on the PA Bridge project in order to withhold and offset against the potential damages of the quantity growth and schedule delays.  Those 2 impacts could approach $45 million.  HDR has been paid $97M and their contract is expected to be around $140M in the end.

99.     In April 2017, the Granite/Walsh JV reached a settlement with PennDOT in which the Granite/Walsh JV recovered less than 23% of its $340 million in purported claims associated with overruns and schedule delays on the Project.  The fact that the Granite/Walsh JV had $340 million in purported claims was confidential and non-public at the time.

### d.     The Texas Project

100.    In FE 1's capacity as Regional Controller at Granite from January 2018 to November 2018, FE 1 wrote quarterly memoranda on the Texas Project to assess its risks and liabilities.  To write the memoranda, FE 1 needed to access cost estimates which were maintained by the "Chief Estimator" in a binder.  When preparing the memos, however, FE 1 was frequently told by the Chief Estimator that the costs "had not been updated."  FE 1 was forbidden from travelling to the project site to ask questions or make assessments of FE 1's own, thus forcing FE 1 to rely on the non-updated, stale cost information to write the memoranda.  According to FE 1, Granite's project risk was "really easy to manipulate" given that the costs for the Texas Project were not updated and FE 1 was not allowed to visit the project site.

101.    Another Former Employee's account is consistent with FE 1.  FE 7 was employed by Granite from prior to the start of the Class Period until January 2018, including as Controller

for the Large Projects Group, Central Region from the end of 2009 until January 2018 in the Company's Lewisville, Texas Office, which was the headquarters for the Large Projects Group. FE 7 stated that the Texas Project was expected to lose $25 million in 2018, and confirmed that Granite made "management adjustments" to costs in the overall Central Region Large Project budget, which included the Texas Project.

### 3. Granite Did Not Take a Charge Even Though the I-4 Ultimate Project and Its Majority Partner, Skanska, Concluded That Accounting Principles Mandated a Charge

102.     On October 26, 2018—just one week after Skanska booked its charge relating to the I-4 Ultimate Project—Granite announced earnings for the third quarter of 2018.  FE 4, (Granite's Vice President, Operational Finance and Corporate Controller from prior to the start of the Class Period to December 2018, additional information *infra* ¶208), confirmed that Roberts and Desai knew about Skanska's write-down.  Nevertheless, the Company's Form 10-Q filed with the SEC on October 29, 2018, continued to state that Granite was different than both Skanska and the JVs, that Granite did not need to recognize a charge, and that there was nothing material on the horizon.  Specifically, the Form 10-Q reported that while the JVs recognized ***$47.6 million and $162.0 million in net losses*** during the three and nine months ended September 30, 2018, Granite's share of net losses was ***just $3.1 million and $16.5 million*** respectively.  What's more, the Form 10-Q stated that, as of September 30, 2018, there were only four projects for which additional costs were reasonably possible, and that the aggregate range of additional costs was ***"zero to $45.0 million."***

103.     Granite's reported figures for the JVs in its filings with the SEC were directly contrary to the facts at the time and to its own internal conclusions.  Granite knew that it needed to take a charge on the I-4 Ultimate Project, and knew that the Project had experienced $100 million in cost overruns by the start of the Class Period.  In addition, TZC had filed a $900 million claim on the Tappan Zee Project in March 2018 to recover for cost overruns incurred on that Project, the Texas Project had incurred $25 million in cost overruns, and the PennDOT Project had incurred $340 million in cost overruns of which PennDOT had only agreed to pay 23%.

104.    Unaware of Granite's fraud, investors cheered the news and the Company's stock price rallied over 11% in response, from a close of $40.56 per share on October 25, 2018 to $45.22 per share on October 26, 2018 on heavy trading volume of 1.1 million shares.

### 4.    Granite Intentionally Removed Any Disclosure of "Reasonably Possible" Additional Costs

105.    As GAAP required, Granite had historically disclosed a range of "reasonably possible" additional Project costs, meaning that Granite believed the costs were more than 50% likely.  The Company also disclosed the absence or inability to estimate such costs when that was the case.  For example, Granite's 3Q 2017 10-Q stated:  "As of September 30, 2017, there were projects for which additional costs, including liquidated damages, were reasonably possible but the range of costs was not estimable."

106.    In Granite's 2017 10-K, Granite stated:  "As of December 31, 2017, there were three projects for which additional costs were reasonably possible in excess of the probable amounts included in the cost forecast.  The reasonably possible aggregate range that has the potential to adversely impact gross profit during the year ended December 31, 2018 was zero to $44.0 million."

107.    Granite made similar disclosures for the first three quarters of 2018.

        a.    1Q 2018 10-Q:  "As of March 31, 2018, there were four projects for which additional costs were reasonably possible in excess of the probable amounts included in the cost forecast.  The reasonably possible aggregate range that has the potential to adversely impact gross profit during the year ended December 31, 2018 was zero to $47.0 million."

        b.    2Q 2018 10-Q:  "As of June 30, 2018, there were three projects for which additional costs were reasonably possible in excess of the probable amounts included in the cost forecast.  The reasonably possible aggregate range that has the potential to adversely impact gross profit during the year ended December 31, 2018, was zero to $15.0 million."

        c.    3Q 2018 10-Q:  "As of September 30, 2018, there were four projects for which additional costs were reasonably possible in excess of the probable amounts included in the

cost forecast.  The reasonably possible aggregate range that has the potential to adversely impact gross profit is zero to $45.0 million."

108.  Granite's prior disclosures of "reasonably possible" additional costs were themselves false and understated because, during the first three quarter of 2018, Granite knew of far greater additional costs.

109.  However, for 4Q 2018, 1Q 2019 and 2Q 2019, Granite failed to disclose any "reasonably possible aggregate range" of additional costs at all, falsely suggesting to investors that no further costs were reasonably possible, and no charges were being contemplated.

110.  Granite's disclosure and omission of "reasonably possible" additional costs is summarized below:

| 3Q 2017 | 4Q 2017 | 1Q 2018 | 2Q 2018 | 3Q 2018 | 4Q 2018 | 1Q 2019 | 2Q 2019 |
|---------|---------|---------|---------|---------|---------|---------|---------|
| Reasonably possible range not estimable | $0-$44.0 million | $0-47.0 million | $0-$15.0 million | $0-$45.0 million | **Omitted** | **Omitted** | **Omitted** |

111.  The factually unwarranted removal of any "reasonably possible aggregate range" of costs violates GAAP, as discussed below, and indicates that Granite intentionally concealed known costs to avoid the resulting negative impact on revenues and profits.  FE 4 supports this allegation.  FE 4 was Granite's Vice President, Operational Finance and Corporate Controller at the Company's headquarters in Watsonville, California from prior to the start of the Class Period to December 2018.  FE 4 also served as Chairman of Granite's disclosure committee.

112.  FE 4 confirmed that there was "no basis for removing the disclosure," because costs had only increased between 3Q 2018 and 4Q 2018, and Granite's disclosure thus "should have continued to escalate in amount."  FE 4 also noted that there had been "huge growth" between Granite's final risk disclosure in 3Q 2018, of $45 million, and Granite's 2Q 2019 write-down of $161.1 million in gross profit.  According to FE 4, Granite's removal of the disclosure for 4Q 2018 and 1Q 2019 falsely suggested that Granite no longer had any risk of "reasonably possible" additional costs.  In FE 4's words, Granite's removal of the disclosure indicated to investors that the risk "no longer exists or that it is immaterial."  FE 4 explained that Granite should have

continued to warn investors of the Projects' risks at year end 2018 and for 1Q 2019 and the Company failed to do so.

113.    FE 4 further confirmed that Granite's quarterly disclosure of "reasonably possible" additional costs was a topic of discussion at quarterly disclosure committee meetings and that, based on FE 4's prior experience on the disclosure committee, the disclosure committee would have discussed the removal of the disclosure for 4Q 2018, 1Q 2019, and 2Q 2019.

114.    In 2Q 2019—two quarters after Granite first omitted any "reasonably possible" costs that could negatively impact gross profits—Granite took a charge of $143.7 million pre-tax that started to reveal the fraud.  That charge was driven by a $161.1 million reduction in gross profit for five projects, of which four of them accounted for $153.6 million (*i.e.*, more than 95%). This amount far exceeded any of Granite's publicly disclosed "reasonably possible" costs or charges in prior quarters, and nearly doubled Granite's charges in the entirety of 2018.

115.    Moreover, Granite's 2Q 2019 Form 10-Q again failed to disclose any "reasonably possible aggregate range" of additional costs.  In the very next quarter, however, Granite took another charge of $80.7 million due to further increased costs and decreased gross profits for six projects.

### 5.    Granite's Reported Financial Results Deviated Substantially from the Projects and Underscores Granite's GAAP Violations

116.    As mentioned above, Granite participated in the Projects through four JVs, which Granite reported in its financial statements on an unconsolidated basis. Typically, each design-build joint venture prepares its own financial statements, which are often audited by an outside firm.  For example, the PennDOT Agreement expressly required the relevant JV to provide financial statements prepared "using GAAP or equivalent accounting principles … and audited by an independent certified public accountant."   The financial statements of the JVs were also provided to the members of the JVs, including Granite as a minority partner.

117.    The JVs provided financial results to Granite via monthly Profit and Loss ("P&L") statements that tracked financial performance against the budgeted costs.  The monthly P&L

statement is a JV reporting tool intended to permit JV partners like Granite to have current information concerning the financial performance of a project.

118.    FE 8 confirmed that Granite received periodic financial data for the JVs from the majority partners.  FE 8 served as a Consolidation Accountant II at Granite from July 2017 to October 2018 at the Company's headquarters in Watsonville, California.  FE 8 and a colleague reviewed and analyzed such financial data, including for the I-4 Ultimate and Tappan Zee Projects, and their analysis resulted in Excel spreadsheets.  These spreadsheets specifically indicated the estimated total cost for each Project, the actual cost incurred, and Granite's ownership percentage in the Project.  Crucially, each Project's estimated total cost was a figure that started with the majority partners' estimated total cost, but then Granite internally adjusted that figure on a monthly basis.  FE 2 confirmed that Granite's general ledger included an account that recorded the discrepancies between the majority JV partner's total estimated costs and Granite's estimated costs.

119.    Granite's 2018 10-K stated that Granite accounted for its "share of the operations of unconsolidated construction joint ventures on a pro rata basis."  And as noted above, the JVs were integrated joint ventures, meaning that Granite's financial interest in each Project JV reflected its ownership stake in the entire associated Project.  In these circumstances, with proper and consistent application of GAAP, Granite and its JV partners should have maintained consistent pro rata shares of the JVs' revenues, cost of revenue, and net income.

120.    Instead, Granite's accounting for its interests in the Projects deviated substantially from other JV partners and the JVs themselves.  Granite never explained the bases for any deviations other than to state that they existed.  During much of the Class Period, there was a significant discrepancy between (a) the JVs' revenues, cost of revenue, and net income/net loss, and (b) Granite's purported pro rata share of those metrics.  This deviation—which inflated Granite's revenue before abruptly reversing course in 2Q 2019—underscores Granite's violations of GAAP.

121.    Specifically, Granite historically claimed about 30% of the JVs' revenue, which was generally in excess of $430 million per quarter from 2015 through 2017.  In 1Q 2018, however,

the JVs' revenue dropped to $239 million, and Granite suddenly claimed 49% of that revenue—a 63% increase relative to its historical share of 30%.  Similarly, Granite historically claimed about 30% of the JVs' cost of revenue, and in 1Q 2018 continued to do so—despite claiming 49% of revenue.  This led to a massive disparity in the bottom line.  While the JVs sustained a massive ***$141 million loss*** in 1Q 2018, as a result of its accounting maneuvers Granite recorded a ***$2.6 million gain***.

122.    Granite continued to claim disproportionate shares of the JVs' income through the remainder of 2018 and 1Q 2019.  Overall, for FY2018 Granite's JVs recognized a total net loss of $240.3 million, yet Granite recognized just $22.6 million, or 9.4%, of those losses in its own income statement.  Granite's overall share of the JVs' net assets remained relatively constant through the Class Period and does not explain these deviations.

123.    As a result of these discrepancies, Granite purported to recognize net margins that were substantially better that those of the JVs.  Net margins reflect net income divided by total revenue.  It is a critically important metric because it depicts the percentage of profit or loss that the JVs and Granite were recognizing on the Projects.  This pattern is set forth below, on a trailing twelve months basis.

|  | 1Q18 | 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | 3Q19 |
|---|---|---|---|---|---|---|---|
| **JV Net Margin** | (4.7%) | (4.4%) | (9.4%) | (15.6%) | (5.5%) | (8.2%) | (6.6%) |
| **Granite Net Margin From JVs** | (2.3%) | (3.9%) | (3.2%) | (4.7%) | (4.9%) | (30.6%) | (43.6%) |

124.    The same information presented as a bar graph starkly demonstrates the "catch up" charges that Granite needed to take in 2Q19 and 3Q19 as a result of delaying the charges since 1Q18.  From 1Q18 to 1Q19, Granite inappropriately reported net margin from the JVs at a rate in excess of the JVs overall, only to erase all of that profit (and more) in 2Q19 and 3Q19:



125.    The chart above specifically shows that in 2Q 2019, in light of the radical decrease in Granite's share of the JVs' revenue and sharp increase in Granite's portion of costs, Granite's TTM net margin for the JVs plummeted from -5.3% to -31.2%.  In 3Q 2019, the figure further dropped to -44.1%.

126.    The next chart also illustrates the longer-term trend of Granite's overstated cumulative margins relative to the JVs. Granite's cumulative net margin went from 0.6% in 1Q 2019 to -4.6% in 2Q 2019, and further declined to -6.0% in 3Q 2019.



127.    These facts underscore that Granite materially overstated its revenues and profits during the Class Period and then had to take massive charges to catch up.  Importantly, while Granite publicly disclosed certain information about the JVs' financials, those limited disclosures did not reveal that Granite had consistently manipulated its purportedly "pro rata" JV accounting to overstate its revenues and margins relative to Granite's JV partners.

128.    Indeed, when the analyst firm CFRA Research ("CFRA") first raised the disturbing asymmetry in Granite's JV accounting in July 2019, Granite deflected the issue.  CFRA's July 10, 2019 report observed that Granite appeared "to be recognizing a minimal share" of the JVs' recent losses, and that Granite's attribution of the issue to "differences in forecasts" with the JV partners "raise[d] concern[s] that [Granite] may be deferring project write-downs."  In response to CFRA, a Granite representative denied any unusual accounting, stating:

> This represents differences between Granite's estimate to complete vs. our partners on a particular project which occurs quite often in practice, and *it could just be timing.*  As an old accounting professor told me, "*the books of the world do not balance.*"

129.    However, during the 2Q 2019 earnings call just weeks later, Roberts admitted to investors that the issues that led to the $161.1 million charge were "apparent to [Granite]" by "the end of June [2019.]"  Thus, Granite concededly knew that it was on the verge of taking massive

charges when it falsely suggested to CFRA that the discrepancy between the accounting of Granite and its JV partners was nothing to be concerned about.

> **6.**     **Granite Discloses Massive Charges in 2Q and 3Q 2019 Resulting from the Projects and Falsely Blames Unanticipated Events and Previously Unknown Costs**

130.    On July 29, 2019, Granite reported preliminary results for its second quarter of 2019 and announced that it had incurred after-tax charges ranging between $104-$108 million for *all four* of the Projects—ultimately resulting in a pre-tax charge of $143.7 million.  According to Granite, the charges stemmed from cost overruns, which were exacerbated by schedule delays, execution of a significant amount of disputed work, and a recent unfavorable court ruling on a project dispute.

131.    While the Company did not break out the specific portions of the 2Q19 charge by project, FE 2 said that the charge related to the Tappan Zee Bridge Project, the PennDOT Project, and the I-4 Ultimate Project.  FE 2 knew that losses on these jobs were included in the charge because FE 2 was responsible for creating the internal management reports to analyze the second quarter results, which FE 2 then emailed to Roberts and Desai.  FE 5 confirmed that the majority of the charge resulted from cost overruns on the I-4 Ultimate Project, and another substantial portion stemmed from cost overruns and the related dispute on another Project.  FE 3 further corroborated that the charge consisted primarily of write-downs on the I-4 Ultimate Project as well as the Tappan Zee Project.

132.    On August 2, 2019, the Company reported results for its second quarter of 2019 and announced that it was forced to take a $143.7 million pre-tax charge ($106.7 million after tax). Granite confirmed that the charge was driven by four projects bid between 2012 and 2014 that were each over $1 billion in value, in an unconsolidated JV, subject to a fixed-price design build contract, and for which Granite was a minority partner.  The I-4 Ultimate Project, Tappan Zee Project, PennDOT Project, and Texas Project are the only four projects that satisfy those criteria. This $143.7 million pre-tax charge is roughly eight times larger than the average quarterly charge that Granite recognized in the Transportation or Large Project Construction segments in prior quarters during the Class Period.

133.     Granite falsely attempted to blame the charge on recent events and unanticipated costs.  According to Roberts, "[t]hrough our quarterly project review and estimate to complete updates, our teams reported in late June that they had experienced increased project completion costs in the second quarter of 2019."  Desai similarly attempted to falsely blame the charge on "significant unanticipated project costs."

134.     Neither Roberts nor Desai, however, attempted to explain how four unrelated projects that the Company repeatedly stated were nearly complete, in four different states, with different JV partners, and after years of construction, could all have incurred massive, unexpected charges in the same three-month period.  The reality is that Granite and the Individual Defendants simply threw in the kitchen sink.  FE 5, in fact, confirmed that Granite lost a claim on a Project, and then just added additional charges from known cost overruns from the other Projects.

135.     Likewise, FE 4 mocked the notion that the charges were unanticipated and had suddenly materialized in the second quarter of 2019, after the Company intentionally removed its GAAP-required disclosure describing the risk of the Projects in the fourth quarter of 2018.  FE 4 stated: "*[o]n any planet, in any universe, does someone think that the reasonably possible risk went away" between the period that Granite failed to warn investors [4Q18] and when the company took charges in Q2 2019 and Q3 2019?  "It did not," FE 4 stated.  "[T]he risk did not go away."  "[T]he reasonably possible risk was escalating.*"

136.     Analysts were surprised.  On the Company's earnings call for the second quarter of 2019 held on August 2, 2019, an analyst from Goldman Sachs asked Granite: "Can you give us a rough understanding out of the project write-downs this quarter, what proportion of that was to the single project, that's only 60% complete versus the other three that are over 90% complete?  And can you say more about your review process this quarter and what triggered the review?  I certainly understand the comments on rainfall and litigation, but this is a really big adjustment and presumably you were contemplating making the adjustment last quarter to some extent, *because I don't think I saw any big catalysts this quarter outside the litigation so maybe can you talk about your process there as well*."

137. Roberts parried in response, stating that the Company would not talk about individual projects. A Goldman Sachs analyst then insisted, stating, "the implications for the stock are really different if a big chunk of the charges comes from a project that's only two-thirds complete versus the ones that are scheduled to reach completion this year." Roberts answered that the issues were "cumulative in these four projects" and that Granite uncovered the cost overruns from performing "standard protocol issues that we are doing every quarter on these large projects."

138. Jarred by the magnitude of the charge, during the same call, an analyst from Cowen asked: "And then what gives you comfort that the current projects don't need to be adjusted further? Or do you feel like the write-downs and everything that's been taken is enough to cover anything that might pop up in the future?"

139. Roberts' response was categorical and affirmative: ***"Yes. We're confident that we have covered the current challenges and future risks in the forecast, that we have provided for not just the four legacy projects, but for all our work."*** Indeed, according to Roberts, Granite had ***"covered our current challenges and future risks in the heavy civil group adjustments that we made in those four legacy projects that we announced."***

140. Roberts' statement was quickly revealed to be false. On October 25, 2019, Granite announced results for its third quarter of 2019 and reported another $69.3 million loss in its Heavy Civil Group, which was driven by an $80.7 million decrease to project profitability on the Projects (on top of the $161.1 million decrease in the prior quarter). Granite claimed that this loss and decrease to project profitability resulted from increased project completion costs, schedule delays, lower productivity, and performance of a significant amount of disputed work—the same types of issues that had long plagued the Projects and drove the charge announced just three months before.

141. At the same time, Granite announced that it had terminated Dale A. Swanberg, Senior Vice President and Large Projects Group Manager, who had been charged with overseeing the Projects.

142. Analysts were surprised and not pleased given Roberts' categorical statements in the prior quarter that Granite had already booked all necessary charges. Cowen issued a report dated October 25, 2019, stating that the continued losses in Granite's Heavy Civil Group were

"Hurting Credibility" given that it had been "under the impression most of this was absorbed last [quarter]."

**7.     The Individual Defendants Closely Tracked the Projects and Received Numerous Periodic Reports Reflecting Up-to-Date Costs, Schedules, and Profits**

143.    The Former Employees corroborate that the Individual Defendants knew of the cost overruns long before Granite's 2Q and 3Q 2019 charges.  FE 4 stated that the troubled Projects were "***discussed extensively at the board level and the disclosure committee level***," and that Roberts and Krzeminski were involved in the discussions as well.  In addition, Defendants were routinely on-the-ground at each of the Project sites during the Class Period.  According to FE 5, the Company maintained seven offices in Florida to accommodate the I-4 Ultimate Project, including a four-story hub office in Maitland, Florida.  FE 5 stated that the Company's executives, including Roberts, together with those from the other I-4 Ultimate Project partners, regularly attended quarterly meetings at the Maitland hub office to discuss the financial and operational status, including the $100 million claim and associated cost overruns.  FE 5 knows that Roberts attended the quarterly meetings based on FE 5's discussions with a project manager.  FE 6 similarly stated that Roberts visited the I-4 Ultimate Project office in Orlando, Florida, and met with the project executive and project managers at the site.

144.    Granite used a software system named Primavera to track the Company's progress against the schedule for the I-4 Ultimate Project, according to FE 5.  Primavera is an enterprise portfolio management software system that provides clear visibility into a project's status, including schedule delays and cost overruns.  FE 5 further stated that the Company consistently ran and updated cost-to-complete analyses on the JD Edwards accounting system (the "JD Edwards Accounting System").  The cost-to-complete analyses showed the percentage of completion as well as the level of costs incurred and expected to be incurred on the projects.  FE 5 stated that Granite executives had access to all the data and could log-in to the system any time.

145.    Further, according to FE 5, Roberts, Krzeminski and Desai regularly received reports concerning the Company's cost-to-complete analysis.  FE 5 frequently prepared cost

1  estimates and knew that executives reviewed the estimates given that the $2.3 billion I-4 Ultimate

2  Project was highly material to Granite.

3      146.   Similarly, according to FE 2, FE 2 prepared a plethora of reports related to the

4  Projects which FE 2 emailed directly to Roberts, Krzeminski and Desai, and in some cases

5  personally delivered the reports in binders.  These reports included cost overruns incurred on the

6  Projects, cost changes relating to the Projects, as well as the specific write-downs booked on the

7  Projects.  The reports also included information on how the Projects were impacting Granite's

8  income statement and balance sheet and how the Projects were "driving write-downs."  FE 2 knew

9  the Defendants reviewed the reports because they asked FE 2 about the basis for specific write-

10 downs.

11     147.   FE 2 also confirmed that Roberts was directly involved in Granite's decision to take

12 the 2Q 2019 charge.  FE 2 received an email drafted by Roberts, but circulated by his

13 administrative assistant Jessicah Picard, which described the write-down, the reasons underlying

14 the decision, and that it would be publicly disclosed in the not yet filed quarterly report.

15     148.   What's more, according to FE 5, the $100 million claim relating to cost overruns

16 on the I-4 Ultimate Project was widely talked about within the Company.  FE 5 reiterated that such

17 a significant claim could not have been filed without key input of the JV partners and their senior

18 management. In addition, according to FE 5, Roberts, Krzeminski and Desai attended annual town

19 hall meetings at Granite's offices in Tampa and Orlando to discuss Granite's financial

20 performance.  FE 6 described a similar meeting during which Roberts acknowledged that the I-4

21 Ultimate Project was losing money, and that it was well known that the amount was approximately

22 $100 million.  That meeting occurred in the Fall of 2017 in the main conference room of Granite's

23 headquarters for the I-4 Ultimate Project, on the second floor of the two-story building.  Roughly

24 50 people were present at the meeting.

25     149.   FE 3 similarly explained that Roberts reviewed the WIP Reports—progress reports

26 on the Projects every month which showed deteriorating profit on the I-4 Ultimate and Tappan

27 Zee Projects.  FE 3 knows that Roberts reviewed this information because FE 3 was personally

28 copied on emails in which the WIP Reports were circulated to Roberts as well as Krzeminski, and

Desai (depending on which individual held the CFO role).  According to FE 3, the WIP Reports were generated and circulated monthly.  They were created in Excel and sourced from the JD Edwards Accounting System.  The WIP Reports showed for every month, job by job, the percent complete, the original bid of the job, and what the total cost was for each job.

150.    Roberts publicly confirmed his knowledge and access to the Projects' cost overruns.  He admitted on the August 2, 2019 call that "every quarter … we go through a detailed cost estimate to complete every job."  Roberts then added that for "the project that is two-thirds complete[,] I will say we have a good relationship with the owner….  And I believe that the work we're doing with that owner has progressed nicely, in the last three months, in the last quarter."  And he admitted that he was "***personally involved***" in "one of [Granite's] biggest" disputes, "***working in the middle of it with the upper echelon*** of … one of our major owners."

151.    Likewise, FE 6 recounted how FE 6 tracked cost overruns on the I-4 Ultimate Project and that approximately $100 million in losses was no secret.  FE 6 stated that FE 6 tracked the cost overruns in Excel spreadsheets that were maintained on Skanska servers.  According to FE 6, it was well-known within Granite that the Company was losing money on the I-4 Ultimate Project.

152.    According to FE 8, the related analyses showing discrepancies between the Company's baseline costs and the JVs' incurred costs were saved to an internal folder at Granite that was accessible to Granite senior executives, including Defendants.

153.    Finally, according to FE 1, Roberts "knew" that Granite was delaying write-downs and aggressively recognizing revenue.  It was "standard operating procedure" at Granite to prematurely recognize revenue, and the Company's "corporate office" told FE 1 to "make sure" FE 1 "massaged things" in quarterly reports FE 1 prepared regarding the Texas Project.  FE 1 further recounted that it was Granite's "culture" to pressure employees to present the projects in the most favorable light and the whole process of identifying cost overruns was "heavily managed."

**8.      Granite's Affirmative Claims for Additional Payments Seeking to Recoup Cost Overruns Have Not Succeeded**

154.      On November 19, 2019, TZC filed a lawsuit in New York State Supreme Court, County of Albany, against NYSTA seeking documents responsive to the NYSTA FOIL Request to support TZC's $900 million claim for additional payment.  A NYSTA spokesperson cited by *Engineering News-Record* on November 20, 2019 confirmed that TZC had submitted its claim in 2018 and revised it in 2019.  The NYSTA spokesperson further confirmed to *Engineering News-Record* that there was no basis to TZC's claim, dismissing it as an "ineffective negotiating tactic," and insisting that "[t]he project remains within its $3.98 billion budget."  Remaining within budget in the context of a fixed-price contract means that the cost overruns resulted in charges, eliminating profits dollar-for-dollar.

155.      *Engineering News Record* further reported on November 20, 2019, that Florida transportation officials for the I-4 Ultimate Project have still yet to agree to the JV's demand of $100 million in additional payments and requested time extension.  An industry management consultant reiterated Granite's inability to recover for cost overruns for the I-4 Ultimate Project, which applies equally to all the JVs at issue in this case: "You own it so no change orders."

**D.      Percentage of Completion and Relevant Accounting Provisions Reflecting Granite's Violations of GAAP**

156.      Granite fraudulently recognized revenue for the Projects in violation of GAAP in two distinct ways:  (1) prematurely including revenue from disputed claims against customers where recovery was not probable or where it was likely that a significant revenue reversal would occur; and (2) inflating the Projects' percentage of completion by ignoring the Projects' cost overruns.

157.      These widespread and significant GAAP violations allowed Granite to prematurely recognize and overstate significant revenue and profits during the Class Period.  Granite's GAAP violations involved improperly failing to book its portion of charges arising from over $1.3 billion in JV-level Project costs and claims:  specifically, (i) $900 million in connection with the Tappan Zee Project, (ii) at least $100 million in connection with the I-4 Ultimate Project, (iii) $263 million in connection with the PennDOT Project, and (iv) $25 million in connection with the Texas

Project.  Based on Granite's equity interest in each Project, Granite's share of these additional

costs and claims was at least $338.5 million, as follows:

| Project | JV Cost Overruns/Claims | Granite JV Interest | Granite Share |
|---|---|---|---|
| Tappan Zee | $900 million | 23.3% | $209.7 million |
| I-4 Ultimate | $100 million ($48.1 million on behalf of SGL Constructors) | 30% | $14.4 million |
| PennDOT | $340 million[6] | 40% | $105.6 million |
| Texas | $25 million | 35% | $8.75 million |
| **Total** | **>$1.3 billion** | **N/A** | **$338.5 million** |

158.    Underscoring Granite's GAAP violations, Granite consistently overstated its

profits and underestimated liabilities relative to its partners in the JVs.  Indeed, according to FE 7,

Granite's majority partner in the Tappan Zee Project, Fluor, took a substantial write-down on the

Project in late 2017, over 18 months before Granite.  Similarly, Granite's majority partner in the

I-4 Ultimate Project, Skanska, properly recognized the impact of the known costs and delays and

took a $100 million write-down in October 2018, nearly a year before Granite.

**1.    Accounting Standards Codification Topic 606**

159.    Accounting Standards Codification ("ASC") Topic 606 governed Granite's

revenue recognition during the Class Period.  According to Granite's 1Q18 10-Q, the "core

principle of Topic 606 is that revenue will be recognized when promised goods or services are

transferred to customers in an amount that reflects consideration for which entitlement is expected

in exchange for those goods or services."  Granite further stated that, "Topic 606 provides for a

five-step model for recognizing revenue from contracts with customers: (a) identify the contracts;

---

[6] Less $76 million from settlement of the claim.

(b) identify performance obligations; (c) determine the transaction price; (d) allocate the transaction price; and (e) recognize revenue."

160.    Under Topic 606, the basic formula for Granite's revenue recognition on the Projects was:

$$\text{Revenue} = \text{Transaction price} \times \frac{\text{Actual costs incurred}}{\text{Total estimated costs}}$$

161.    In other words, revenue is recognized by multiplying the transaction price of the Project by its percentage of completion (actual costs incurred divided by total estimated costs). Manipulation of any of these elements dramatically affects Granite's revenue and profit.

**a.    Granite Improperly Inflated Transaction Price**

162.    Under ASC 606-10-05-4, the transaction price "is the amount of consideration in a contract to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer."

163.    As explained above, each Project is a fixed-price arrangement in which the total contract price was agreed in advance and does not change.  When unanticipated costs arise, the contractor (*i.e.*, the JVs) may attempt to recover such costs from the customer through a "change order" or a "claim."  (ASC 606-10-25-10.)  However, customers are not required to accept such "change orders," leaving contractors with a significant risk that they will be forced to bear unanticipated costs, reducing or even eliminating any profits.  What's more, Granite was "contractually obligated to continue work on the jobs, and to recognize the associated costs regardless of whether we agree that the work we have been directed to perform is within the scope of our contracts," as Roberts confirmed on the Company's August 2, 2019 earnings call.

164.    The American Institute of CPAs Audit and Accounting Guide for Construction Contractors ("Construction AAG") provides industry-specific GAAP guidance and specifies that the transaction price "must be revised each period throughout the life of the contract when events occur and as uncertainties are resolved.  The major factors that must be considered in determining total estimated revenue include (a) the basic contract price, (b) contract options, (c) change orders,

(d) claims, and (e) contract provisions for penalty and incentive payments, including award fees and performance incentives."  (Section 2.29.)

165.    Further, under ASC 606-10-32-11, entities are permitted to include unapproved claims or change orders in the transaction price "*only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur* when the uncertainty associated with the variable consideration is subsequently resolved."  In assessing the probability of a significant reversal, under ASC 606-10-32-12, "an entity shall consider both the likelihood and the magnitude of the revenue reversal.  Factors that could increase the likelihood or the magnitude of a revenue reversal" include:

    a)  "The amount of consideration is highly susceptible to factors outside the entity's influence. Those factors may include volatility in a market, the judgment or actions of third parties, weather conditions, and a high risk of obsolescence of the promised good or service.

    b)  The uncertainty about the amount of consideration is not expected to be resolved for a long period of time.

    c)  The entity's experience (or other evidence) with similar types of contracts is limited, or that experience (or other evidence) has limited predictive value."

166.    Granite purported to follow these accounting standards in determining the Projects' transaction price.  For example, Granite stated in its 1Q 2018 10-Q that "[c]hanges are made to the transaction price from unapproved change orders to the extent the amount can be reliably estimated and recovery is probable."  Granite further stated that "[c]hanges are made to the transaction price from affirmative claims with customers to the extent it is probable that a claim settlement with a customer will result in additional revenue and the amount can be reasonably estimated.  A reduction to costs related to affirmative claims with non-customers with whom we have a contractual arrangement ('back charges') is recognized when the estimated recovery is probable and the amount can be reasonably estimated."

167.    Granite violated these GAAP standards by improperly including substantial consideration from claims and disputed work in its calculation of the I-4 Ultimate and Tappan Zee Projects' transaction price, while knowing that such amounts could not be "reliably" (or "reasonably") estimated and knowing that recovery was not "probable."  These violations allowed

Granite to inflate its transaction price for these Projects and prematurely recognize material amounts of revenue and profit.

168.    <u>I-4 Ultimate Project</u>:  On the I-4 Ultimate Project, Granite knew that recovery on its $48.1 million claim against the FDOT was not probable because there was no contractual basis to allocate the risk of subsurface geotechnical issues to the FDOT.  Under the governing agreement between FDOT and I-4 Mobility, which then contracted with SGL to complete the work, I-4 Mobility agreed that it would "not be entitled to any monetary compensation or time extension for any Delays or Delay impacts except with respect to Relief Event Delays."  (I-4 Ultimate Project Contract Section 10.1.5.2.)  The contract separately provided an exclusive list of "Relief Events" that could give rise to compensable "Relief Event Delays."  (*Id.* at Appendix 1 Section 2 at pages 51-53.)  The list of "Relief Events" is limited to events like "FDOT-Caused Delays," "Release of Contaminated Materials by FDOT," and "Change[s] in Law," but nowhere mentions the discovery of pre-existing geotechnical issues as potentially giving rise to a claim for additional compensation.  (*See id.*)

169.    Accordingly, Granite could not treat as "probable" any recovery for costs allegedly incurred from delays associated with unanticipated subsurface geotechnical issues, let alone "reliably" or "reasonably" estimate that recovery.  Further, the submissions by I-4 Mobility and SGL Constructors failed to identify any plausible basis for $100 million in losses arising from the drilling issues, which were quickly remediated and accounted for just $7 million of the claim related to "Design," "Labor," "Materials," "Equipment," "Subcontractors," and "Bonus Work Element (Inability to Achieve)."  Instead, as explained above, I-4 Mobility and SGL Constructors padded their claim to recover costs arising from unrelated delays.

170.    <u>Tappan Zee Project</u>:  Similarly, on the Tappan Zee Project, the underlying contract provisions sharply constrained TZC's ability to seek any compensation for any cost overruns and delays, let alone an additional $900 million on top of the total contract price.  For example, TZC agreed that "no time extension will be allowed" for delays resulting from TZC's "inefficient operation," and further agreed "to make no monetary request for … any extra/additional costs, any

delays, inefficiencies or interferences in the performance of the [Tappan Zee Project] caused by or attributable to" TZC's own inefficiencies.  (TZ Contract at DB 108-6.)

171.    TZC further agreed that certain events were categorically "non-compensable delays" for which TZC "agree[d] to make no monetary claim for … any extra/additional costs attributable" to those events, including delays associated with "work or the presence on the Project Site of any third party, including that of other contractors or personnel employed by the Authority," supply shortages, weather events, or any work rejected by the NYSTA as non-conforming with the agreed-upon specifications.  (*Id.* at DB 109-16.)  Moreover, TZC expressly agreed that it could "not maintain a Dispute for costs associated with the acceleration" of work to maintain the project's schedule absent narrow circumstances, further limiting any potential recovery.  (*Id.* at DB 109-10.1.)

172.    Importantly, the very costs that TZC is now disputing are "non-compensable" on their face.  For example, among the categories of documents TZC is seeking as related to its dispute with the NYSTA are documents concerning "NYSTA's Project 'Oversight' role," and those concerning the "impact of weather on the project schedule."  (*See* NYSTA FOIL Request, *supra*.) But TZC expressly agreed that costs related to the presence of NYSTA personnel at the project site and those stemming from adverse weather were unrecoverable by TZC.  (*See* TZ Contract at DB 109-16.)   Further, while TZC also seeks documents concerning "NYSTA's direction to accelerate the Project," (*see* NYSTA FOIL Request, *supra*), TZC has not met the restrictive contractual requirements to obtain extra compensation for any accelerated work, and any purported "acceleration" was simply to maintain the Project's existing schedule.  (*See* TZ Contract at DB 109-10.1.)

173.    In sum, Granite knew that the contract for the Tappan Zee Project strictly limited TZC's ability to recover cost overruns, change orders, and costs associated with delays as the governing agreement expressly provided that the JV would bear all risks of increased costs related to weather, labor issues, and work necessary to maintain the original Project schedule. Accordingly, Granite knew that any recovery of the $900 million in claims TZC submitted to the NYSTA could not reasonably or reliably be estimated or deemed probable because the likelihood

of recovery was remote.  That the Company was recording "tens of millions of dollars" (according to FE 7) in recognized claims in early 2017 on the Tappan Zee Project, before TZC had even commenced its dispute, further demonstrates the impropriety of the Company's accounting with regard to the Tappan Zee Project.

174.    What's more, on both the I-4 Ultimate and Tappan Zee Projects, it was highly likely (and at minimum, probable) that increasing transaction prices based on the disputed work would later result in a significant revenue reversal once the uncertainty associated with the variable consideration was resolved.  The disputed matters met several of the risk factors under ASC 606-10-32-12 for significant revenue reversal:  the amount of any consideration Granite hoped to receive was highly susceptible to the actions of third parties and other matters outside Granite's influence; the uncertainty was not expected to be resolved for a long period, given the exhaustive dispute resolution procedures set forth in the Contracts; and Granite had only limited experience, with limited predictive value, on similar contracts.

175.    Granite's inclusion of substantial consideration in the transaction price for the I-4 Ultimate Project and the Tappan Zee Project thus violated ASC 606-10-32-14 (because Granite failed to "update the estimated transaction price … to represent faithfully the circumstances present at the end of the reporting period and the changes in circumstances during the reporting period"); ASC 606-10-32-11 (because Granite had no basis to claim it was "probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration" was resolved); and ASC 606-10-32-12 (because Granite failed adequately to recognize "both the likelihood and the magnitude of the revenue reversal").  The individuals involved in these violations included Roberts, Krzeminski, and Desai.

**b.    Granite Improperly Inflated the Percent Complete (Actual Costs Incurred Divided By Total Estimated Costs)**

176.    Using Granite's method of accounting, revenue for each period was determined by multiplying the transaction price for a given project by Granite's then-current percent of the project that was complete:  (a) actual costs incurred divided by (b) total estimated costs.  Desai explained during the August 2, 2019 earnings call that the "percentage of completion method calculates

project revenue as a percentage of actual costs incurred divided by total estimated cost forecast on the job. This percentage is then applied to total estimated revenue for the job to determine revenue for the period." (See formula *supra* ¶53.)

177.    With respect to the numerator—actual costs incurred—Granite stated in its 1Q 2018 10-Q that "[a]ll contract costs, including those associated with affirmative claims, change orders and back charges, are recorded as incurred."  With respect to the denominator—total estimated costs—Granite stated that "[t]he accuracy of our revenue and profit recognition in a given period depends on the accuracy of our estimates of the cost to complete each project.  Cost estimates for all of our significant projects use a detailed "bottom up" approach, and we believe our experience allows us to create materially reliable estimates."  (1Q 2018 10-Q.)  Granite further confirmed in its 1Q 2018 10-Q that "revisions to estimated total costs are reflected as soon as the obligation to perform is determined to be probable."

178.    As with the transaction price, Granite's determination of actual and estimated costs is subject to important constraints.  Under ASC 606-10-25-35, as "circumstances change over time, an entity shall update its measure of progress to reflect any changes in the outcome of the performance obligation."  And under ASC 606-10-25-36, "[a]n entity shall recognize revenue for a performance obligation satisfied over time only if the entity can reasonably measure its progress toward complete satisfaction of the performance obligation. An entity would not be able to [do so] if it lacks reliable information that would be required to apply an appropriate method of measuring progress."

179.    Accordingly, once Granite incurred or knew of costs, GAAP required Granite immediately to revise its estimated total costs.

180.    Granite violated these standards by ignoring the Projects' known costs and excluding them from total estimated costs.  These violations allowed Granite to prematurely recognize material amounts of revenue by overstating the percentage of the Projects that were complete.  Further, not only did Granite materially overstate its revenue, but because the Projects' actual costs dramatically exceeded Granite's intentionally understated figures, any profits evaporated.

181.   Granite specifically violated ASC 606-10-25-35 (because Granite failed to properly "update its measure of progress to reflect any changes in the outcome of the performance obligation"); and ASC 606-10-25-36 (because Granite recognized revenue despite failing to "reasonably measure" progress toward completion based on "reliable information").

182.   The individuals involved in these violations included Roberts, Krzeminski, and Desai.

### 2.   Granite Failed to Disclose Any "Reasonably Possible" Additional Costs in Violation of GAAP

183.   Granite historically disclosed a range of additional costs that purportedly were "reasonably possible," but removed this disclosure in 4Q 2018 and 1Q and 2Q 2019, despite knowing that costs had increased and the Project JVs had asserted or threatened over $1.3 billion in claims to recover these additional costs.  Granite then took massive back-to-back quarterly charges in 2Q 2019 and 3Q 2019.

184.   Granite's removal of the disclosure violated GAAP because ASC 450-20-50 requires disclosure of reasonably possible losses, including an "estimate of the possible loss or range of loss."  SEC staff have also noted that "[v]ague or overly broad disclosures that speak merely to litigation, tax, or other risks in general, without providing any information about the specific loss contingencies being evaluated are not sufficient."  SEC Staff, Remarks at the University of Southern California Leventhal School of Accounting SEC and Financial Reporting Conference, May 27, 2004.

185.   By the start of the Class Period, if not earlier, Defendants knew that Granite had already incurred additional costs of at least $338.5 million in connection with the Projects.  As explained in detail above, the Tappan Zee, I-4 Ultimate, and PennDOT Projects were then the subject of over $1.3 billion in pending or threatened claims for cost overruns, of which Granite's share was $329.75 million.  The Project JVs' claim submissions and internal documents quantified the precise dollar amount of costs that these claims sought to recover.  Granite also knew of at least $8.75 million in losses on the Texas Project.

186.    These known facts established both the existence and amount of Granite's reasonably possible additional costs, and ASC 450 required Granite to disclose them.  No subjective judgment was required for Granite to disclose the fact that it faced $338.5 million in additional costs in connection with the various claims the Project JVs had already threatened or asserted.  Nonetheless, after disclosing $45.0 million in reasonably possible additional costs in 3Q18, Granite simply removed any disclosure in 4Q18 and 1Q and 2Q19.

187.    Defendants' ASC 450 violations thus concealed a loss contingency of at least $338.5 million that was known to Granite, Roberts, and Desai.  And notably, Granite's 2Q19 and 3Q19 charges—totaling $242 million—were within this range of reasonably possible loss.

**E.    Summary of Scienter Allegations**

188.    Set forth below is a summary of the key allegations that support scienter.

**1.    Roberts Admitted that He Knew the Details About the Projects; Wall Street Analysts Continuously Scrutinized the Projects**

189.    Roberts spoke repeatedly about the status of the Projects, the pending disputes, and the specifics of Granite's accounting.  For example, on the February 20, 2019 earnings call, an analyst asked whether the costs associated with work on one project would continue into 2019.  Roberts said that those costs had been "baked into the guidance" that the Company had provided, claiming that "whether we progress a little faster or a little slower, do a little better or a little worse, it's inside of the … guidance already provided."

190.    When Granite took its 2Q 2019 charge, on August 2, 2019, Roberts explained to an analyst that "***every quarter … we go through a detailed cost estimate to complete every job.***"  Roberts further admitted on October 25, 2019, that he had personal knowledge of the Projects and was "***personally involved***" in "one of [Granite's] biggest" disputes, "***working in the middle of it with the upper echelon*** of … one of our major owners."  Roberts also confirmed his direct involvement in the dispute resolution process before the Class Period, responding on October 27, 2017, to an analyst question about large project disputes directed to Krzeminski by stating "that's more in my path than Laurel's [Krzeminski]."

191.    Roberts even assured investors that no more charges were forthcoming on August 2, 2019, after Granite had just announced the $106 million write-down.  On the earnings call an analyst from Cowen asked: "And then what gives you comfort that the current projects don't need to be adjusted further? Or do you feel like the write-downs and everything that's been taken is enough to cover anything that might pop up in the future?" Roberts' response was categorical and affirmative:  ***"Yes.  We're confident that we have covered the current challenges and future risks in the forecast, that we have provided for not just the four legacy projects, but for all our work."*** Indeed, according to Roberts, Granite had ***"covered our current challenges and future risks in the heavy civil group adjustments that we made in those four legacy projects that we announced."*** Roberts knew, or was severely reckless in not knowing, that just the next quarter Granite would have to take a charge exceeding $80 million.

192.    Roberts similarly spoke directly to the accounting implications of Project disputes. On the 3Q 2019 earnings call, after the end of the Class Period, Roberts complained that the "gap between revenue associated with disputed work and the recognition of costs is ever widening," such that the "process … to recover claim revenue significantly lags the cost recognition process" and "the claim process amplifies project losses due to timing misalignment between revenues and costs."  During the same call, Roberts admitted that the amount associated with pending disputes was "huge," with "hundreds of millions involved," and an "overall value … well over $1 billion."

193.    Roberts assured Wall Street that he knew the details of the Projects because analysts consistently focused on them as a major driver of Granite's financial performance.  On Granite's 1Q 2018 earnings call, for example, Jerry Revich from Goldman Sachs specifically asked about the expected "timing" to complete "three large projects," and Daniel Scott of MKM Partners and Alex Rygiel of B. Riley both asked about expectations for margin improvements in the Large Project Construction segment.  Similarly, on Granite's 2Q 2018 earnings call, Michael Dudas from Vertical Research Partners asked about the acceleration of revenue in the Large Project Construction segment and the status of the Tappan Zee Project, Jerry Revich inquired about further progress on three large projects and margin expectations for 2019, and Joseph Giordano from Cowen likewise asked about margin expectations for the Large Project Construction segment.

194.   On Granite's October 10, 2018 call after its announcement that it had changed the reporting segments, Satyadeep Jain from Vertical Research Partners asked about the classification of the "three underperforming projects." On Granite's 3Q 2018 earnings call, Brent Thielman of D.A. Davidson asked about "the problem large projects."  And on Granite's 4Q 2018 earnings call, Alex Rygiel asked when "Granite expect[ed] the last project that's below 90% complete to be finished," while William Newby from D.A. Davidson inquired about that project's percentage of Granite's 2019 revenue guidance, as well as the remaining issues, dispute resolution, and timing to complete the "two that are over 90% complete."

## 2.   The Projects Were Core Operations

195.   The Projects' significance to Granite's financial position constituted core operations of the Company.  Granite reported that for 2018 its unconsolidated joint ventures provided over $522 million in revenue, or over 25% of the $2.0 billion of revenue in Granite's Transportation segment (which itself comprised 59.5% of Granite's overall revenue for the year). The four Projects also accounted for a substantial majority of Granite's stated revenue from unconsolidated joint ventures.  Their total contract value of $7.5 billion was about 66% of the $11.5 billion combined total for Granite's unconsolidated joint ventures (as of the end of the Class Period).

196.   In light of the size of the Projects, the impact of Granite's accounting violations was massive.  In 2Q 2019, Granite disclosed a $161.1 million reduction in gross profit for five projects, of which the four Projects' reduction in profit was ***$153.6 million***—far exceeding any of Granite's publicly reported estimates or charges in prior quarters, and nearly doubling Granite's charges in the entirety of 2018.  In 3Q 2019, Granite disclosed an additional $80.7 million reduction in gross profit for six projects, of which the four Projects again accounted for a vast majority.  Moreover, these staggering reversals drove an enormous decrease in Granite's overall revenues and profits.  Granite suffered a $52.4 million loss in 2Q 2019 (relative to an $80.3 million profit a year earlier), and a $91.4 million profit in 3Q 2019 (relative to $144.5 million a year earlier).

### 3. Granite Eliminated the Disclosure of the Reasonably Possible Costs of the Projects in Violation of GAAP

197.     Further underscoring Granite's scienter is the Company's violation of ASC 450 by changing its financial disclosures in two key quarters before Granite's write-downs.  Specifically, during the first three quarters of the Class Period (1Q through 3Q 2018), the Company disclosed in its quarterly reports filed with the SEC a "reasonably possible" range of losses that it expected to incur on the Projects.  However, Granite removed any reference to a reasonably possible range in 4Q18 and 1Q19 (the quarters immediately preceding the write-downs in 2Q and 3Q19), as well as in 2Q19, indicating to investors that any potential additional losses were immaterial.

198.     Granite knew or recklessly disregarded that the reasonably possible range of additional loss had not diminished.  Rather, the range of additional loss had increased, and was known by Granite, Roberts, and Desai—based primarily on precise dollar amounts asserted in claims threatened or filed by the Project JVs—to be at least $338.5 million.  As such, ASC 450 required disclosure of the reasonably possible range of loss.

199.     That Granite removed the ASC 450-mandated disclosure just two quarters before taking consecutive write-downs totaling $242 million supports a strong inference that Granite, Roberts, and Desai intentionally attempted to conceal the level of losses that the Company incurred on the Projects.

### 4. The Disparity in the Financial Results of the JVs and Granite

200.     The wide disparity between the net income (or minimal losses) that Granite reported on the Projects as compared to the significant losses being recognized by the JVs further supports scienter.  The Projects were integrated JVs, meaning that Granite's financial interest in the Projects, including its share of profits and losses, was tied to its ownership stake in each Project.  However, rather than report financial results consistent with the JVs, Granite consistently manipulated its percentage of completion accounting, ignored known cost overruns, and made management adjustments to the costs incurred by the JVs in order to overstate the Company's revenue, profit, and margins.  That Granite repeatedly deviated from the financial information sent to it by the JVs throughout the Class Period and in a manner that consistently favored Granite

demonstrates that the Company made an intentional or reckless decision to overstate its revenue, profits, and margins.

**5.      Granite's Stock Acquisition of Layne Constituted Motive**

201.    Defendants were also motivated to make false statements to inflate the price of Granite stock in order to consummate the Layne acquisition.  Granite sought to acquire a new source of revenue in 2018 to offset the Projects' significant drag on its business.  Because the Layne transaction would be a stock-for-stock acquisition, Granite also needed to maintain or increase its share price to minimize the costs and dilution effect, and to ensure that Layne's shareholders would approve the transaction.

202.    During the February 16, 2018 earnings call, a large Layne shareholder specifically asked Roberts why Granite proposed to acquire Layne for stock, rather than cash; in response, Roberts emphasized his desire to keep "dry powder available" to pursue post-merger growth plans for both companies.  Indeed, Granite's share price reached a ten-year peak of $67.64 on January 16, 2018, shortly before the Layne acquisition was announced, and was $57.40 as of the transaction's June 14, 2018 closing.  At the end of the Class Period Granite's stock price closed at $26.25, causing a loss that exceeded 50% to Layne shareholders who acquired and held Granite stock.

**6.      Former Employees Confirm Defendants' Knowledge**

203.    FE 2 was a Senior Financial Reporting analyst from prior to the start of the Class Period to September 2019 at Granite's headquarters in Watsonville, California and was responsible for Granite's consolidated internal reporting.  In that capacity, FE 2 reviewed Granite's consolidated financial statements, and then analyzed the information and broke it down into different iterations including by Company group, region and project.  FE 2 reported to Anita Clerisse, Senior Manager, Financial Reporting, who reported to Brad Graham or Mike Barker (depending when each served as Corporate Controller).

204.    FE 2 stated that FE 2 prepared dozens of reports for Roberts, Krzeminski, and Desai each quarter which reflected financial information related to the Projects.  These included cost overruns incurred on the Projects, cost changes relating to the Projects, as well as the specific

Project write-downs.  The reports also included information on how the Projects were impacting Granite's income statement and balance sheet and how the Projects were "driving write-downs." According to FE 2, Defendants reviewed the reports because they asked FE 2 about the basis for specific write-downs.

205.    FE 2 also said that the 2Q19 charge related to the Tappan Zee Project, the PennDOT Project, and the I-4 Ultimate Project.  FE 2 knew that losses on these jobs comprised the charge because FE 2 was responsible for creating the internal management reports to analyze the second quarter 2019 results, which FE 2 then emailed to Roberts and Desai.

206.    FE 3 worked as a Granite financial planning and analysis manager from prior to the start of the Class Period to December 2019.  FE 3 oversaw a team of between two and five analysts (varying over time) and reported to Vice President, Operational Finance and Corporate Controller Brad Graham.

207.    FE 3 stated that by 2018 Granite knew that it was likely to take a significant charge on the I-4 Ultimate Project.  FE 3 corroborated that the 2Q19 charge consisted primarily of write-downs on the I-4 Ultimate Project as well as the Tappan Zee Project.  FE 3 explained that Roberts reviewed WIP Reports on the Projects every month which depicted their progress and deteriorating profit on the I-4 Ultimate and Tappan Zee Projects.  FE 3 knows that Roberts reviewed this information because FE 3 was personally copied on emails in which the WIP Reports were circulated to Roberts as well as Krzeminski, and Desai (depending on which individual held the CFO role).  According to FE 3, the WIP Reports were generated and circulated monthly.  They were created in Excel and sourced from the JD Edwards Accounting System.  The WIP Reports showed for every month, job by job, the percent complete, the original bid of the job, and what the total cost was for each job.

208.    FE 4 was Granite's Vice President, Operational Finance and Corporate Controller at the Company's headquarters in Watsonville, California from prior to the start of the Class Period to December 2018.  FE 4 also served as Chairman of Granite's disclosure committee.

209.    FE 4 confirmed that there was "no basis for removing the disclosure" in 4Q 2018 relating to the "reasonably possible" costs of the Projects because the costs had only increased

between 3Q 2018 and 4Q 2018.  Granite's disclosure, thus, "should have continued to escalate in amount."  FE 4 also said that there was "huge growth" between Granite's final risk disclosure in 3Q 2018, of $45 million, and Granite's 2Q 2019 write-down of $161.1 million.  According to FE 4, Granite's removal of the disclosure for 4Q 2018 and 1Q 2019 falsely suggested that Granite no longer had any risk of "reasonably possible" additional costs.  In FE 4's words, Granite's removal of the disclosure indicated to investors that the risk "no longer exists or that it is immaterial."

210.    FE 5 was a Granite engineer from prior to the start of the Class Period to October 2019 and was assigned to the I-4 Ultimate Project throughout FE 5's employment.  FE 5 held the titles of Engineer II and Engineer III, and was a project engineer for structures, walls and drainage. According to FE 5, (i) when Granite received an unfavorable court ruling relating to another Project in July 2019, Granite decided to book the I-4 Ultimate Project charge by lumping it together with charges related to the other Projects, and (ii) the majority of the 2Q 19 charge resulted from cost overruns on the I-4 Ultimate Project, while another substantial portion stemmed from cost overruns and a related dispute on another Project.

211.    FE 1 served as a Regional Controller at Granite from January 2018 to November 2018.  In that capacity, FE 1 oversaw the accounting for the Central Region of the Large Projects Group.  FE 1 reported to Division Controller Gabrielle Boozer and Vice President, Large Project Groups, Central Region Bill Heathcott.  In turn, Boozer and Heathcott reported to Senior Vice President Dale Swanberg, who reported to Roberts.

212.    FE 1 stated that Skanska was "doing the right thing" when it took the write-down in October 2018 relating to the I-4 Ultimate Project.  In contrast, Granite's approach to accounting for all the Projects (including the I-4 Ultimate Project) was predicated on "delaying bad news" until the Company "got something resolved or got the next big project in."  FE 1 specifically recounted that Granite's "game" was to delay writing down projects with the hope that smaller, more profitable projects would be able to compensate for the losses.  Application of GAAP, FE 1 stated, required Granite to "drop the hammer" and take write-downs on the Projects, but the Company was "definitely not doing that."

**7.      Granite's Scienter**

213.     Granite possessed scienter for two independent reasons. First, the Individual Defendants who acted with scienter were senior executives with binding authority over the Company and acted within the scope of their apparent authority.  The scienter of the Individual Defendants is imputed to the Company.

214.     Second, certain allegations herein establish Granite's corporate scienter based on (i) the state of mind of senior executives (other than the Individual Defendants) whose intent can be imputed to the Company, and/or on (ii) the knowledge of senior executives who approved the statements alleged herein despite knowing the statements' false and misleading nature. It can be strongly inferred that senior executives at Granite possessed scienter such that their intent can be imputed to the Company.  Given the significance of the Projects to Granite, the material impact of premature revenue recognition, inflated profits, and understated costs on Granite's financial statements, and the necessary involvement of numerous Granite departments and personnel— including project managers and accounting and finance personnel who approved the improper accounting—additional executives unknown at this time and sufficiently senior to impute their scienter to Granite also knew of the fraudulent scheme alleged herein.

215.     As-yet unidentified Granite senior executives also approved the false statements despite knowing of their false and misleading nature.  As alleged above, Granite had extensive processes to track the Projects' financial performance on a regular basis, and the Projects were highly significant to Granite's financial results.  From this, it can be strongly inferred that senior executives at Granite approved the false and misleading statements in Granite's financial statements concerning the revenues, costs, and profits associated with the Projects, while knowing that those figures were materially inaccurate and violated applicable accounting standards.

**V.      ACTIONABLE FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

216.     For the avoidance of doubt, all the statements and omissions that Lead Plaintiff alleges to be actionable are included in this section titled "Actionable False and Misleading Statements and Omissions" and reproduced in Exhibit B.  Lead Plaintiff is not alleging that any statements or omissions excluded from this section are actionably false and misleading.

217.     Defendants' statements and omissions were materially false and misleading because Granite violated GAAP in failing to properly account for the Projects' substantial cost overruns, which exceeded $1.3 billion during the Class Period, specifically,

i.    The Tappan Zee Project had incurred $900 million in cost overruns; the PennDOT Project had incurred $340 million in cost overruns; the I-4 Ultimate Project was preparing to file a claim to recover cost overruns, including $48.1 million on behalf of SGL Constructors and, on June 11, 2018, filed the claim; the I-4 Ultimate Project had incurred at least $100 million in cost overruns; and the Texas Project had incurred $25 million in cost overruns;

ii.   Granite's share of the cost overruns was at least $338.5 million;

iii.  The cost overruns were known to Defendants at the time they made the statements or omissions; and

iv.   The recovery for claims associated with cost overruns was not probable, and recognizing revenue for such claims was likely to result in a significant revenue reversal.

These facts and allegations are incorporated into the grounds for falsity of each of the actionable statements and omissions in this section titled "Actionable False and Misleading Statements and Omissions."

A.    **False and Misleading Statements and Omissions Made Throughout the Class Period**

1.    **First Quarter 2018 False and Misleading Statements and Omissions**

218.     On April 30, 2018, Granite held an investor call to report earnings for its first quarter of 2018 (the "April 2018 Earnings Call").  On May 1, 2018, Granite filed its 1Q18 financial statements on Form 10-Q with the SEC (the "1Q18 10-Q").

219.     On the April 2018 Earnings Call, Krzeminski stated:

Large Projects segment revenues increased 20% year-over-year in the first quarter to $248.4 million.  First quarter gross profit margin of 8.2% reflects nearly 700 basis points of year-over-year improvement.

These statements were materially false and misleading because Granite's reported revenues and margins in the Large Project Construction segment were inflated by the Company's improper accounting for the Projects, which violated GAAP by inflating the Projects' transaction price and ignoring cost overruns exceeding $1.3 billion that were known to Krzeminski at the time.

220.    The 1Q18 10-Q stated, regarding Granite's Large Project Construction segment, that:

> The changes in project profitability from revisions in estimates, both increases and decreases, which individually had an impact of $1.0 million or more on gross profit, were decreases of $7.9 million and $13.0 million for the three months ended March 31, 2018 and 2017, respectively….

These statements were materially false and misleading because Granite's reported $7.9 million decrease to project profitability during the three months ended March 31, 2018 rested on Granite's improper accounting for the Projects, which violated GAAP by inflating the Projects' transaction price and ignoring cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Krzeminski at the time.  As such, Granite materially understated its reported $7.9 million decrease to project profitability during this period.  Had Granite properly accounted for the Projects, its $7.9 million decrease to project profitability would have been materially larger.

221.    The 1Q18 10-Q further stated, regarding the Large Project Construction segment, that:

> As of March 31, 2018, there were four projects for which additional costs were reasonably possible in excess of the probable amounts included in the cost forecast.  The reasonably possible aggregate range that has the potential to adversely impact gross profit during the year ended December 31, 2018 was zero to $47.0 million.

These statements were materially false and misleading because Granite's "reasonably possible aggregate range that has the potential to adversely impact gross profit during the year ended December 31, 2018" was magnitudes larger, at the time, than the reported "zero to $47.0 million." At the time, Granite's known share of "additional costs" was at least $338.5 million.  In addition, the statements were predicated on the Company's improper accounting for the Projects, which violated GAAP by ignoring cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Krzeminski at the time.

222.    The 1Q18 10-Q stated, regarding the Large Project Construction segment, that:

> Large Project Construction revenue for the three months ended March 31, 2018 increased by $41.4 million, or 20.0%, when

compared to 2017 primarily due to increased beginning backlog and progress on new projects in our Heavy Civil operating group.

* * *

Large Project Construction gross profit for the three months ended March 31, 2018 increased by $17.8 million, or over 100%, when compared to 2017.  Large Project Construction gross profit as a percentage of segment revenue for the three months ended March 31, 2018 increased to 8.2% from 1.2% when compared to 2017.

These statements were materially false and misleading because Granite's reported improvements in revenue, gross profit, and margins in the Large Project Construction segment were predicated on the Company's improper accounting for the Projects, which violated GAAP by inflating the Projects' transaction price and ignoring cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Krzeminski at the time.

223.    With regard to the financial results of the unconsolidated JVs specifically, including those related to the Projects alleged above, the 1Q18 10-Q claimed that Granite held a $415 million interest in the assets of the JVs as of March 31, 2018.  This statement was materially false and misleading because Granite's claimed $415 million interest rested on inflation of the Projects' transaction price and ignored cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Krzeminski at the time, in violation of GAAP.

224.    The 1Q18 10-Q further claimed that Granite's $415 million interest in the assets of the JVs as of March 31, 2018, included "$65 million … related to Granite's share of estimated cost recovery of customer affirmative claims" as of March 31, 2018.  These statements were materially false and misleading because Granite's recovery of $65 million in customer affirmative claims was not probable and recognizing revenue on such claims was likely to result in a significant revenue reversal, precluding revenue recognition pursuant to GAAP.

225.    The 1Q18 10-Q also claimed that Granite held a $182 million interest in the liabilities of the JVs as of March 31, 2018.  These statements were materially false and misleading because Granite's $182 million interest rested on inflation of the Projects' transaction price and ignored cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Krzeminski at the time, in violation of GAAP.

226.    The 1Q18 10-Q also claimed that Granite held a $118 million interest in the revenue from the JVs, a $114 million interest in the cost of revenue from the JVs, and a $4.0 million interest in the gross profit of the JVs, each as of March 31, 2018.  These statements were materially false and misleading because Granite's stated interests rested on inflation of the Projects' transaction price and ignored cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Krzeminski at the time, in violation of GAAP.

227.    The 1Q18 10-Q stated, regarding net income from the JVs, that:

> During the three months ended March 31, 2018 and 2017, unconsolidated construction joint venture net (loss) income was $(141.0) million and $8.6 million, respectively, of which our post-adjustment share was net income of $2.6 million and $1.5 million, respectively.

These statements were materially false and misleading because Granite's claimed post-adjustment share of net income of $2.6 million rested on the inflation of the Projects' transaction price and ignored cost overruns exceeding $1.3 billion that were known to Roberts and Krzeminski at the time, in violation of GAAP.

**2.     Second Quarter 2018 False and Misleading Statements and Omissions**

228.    On August 8, 2018, Granite held an investor earnings call for the second quarter of 2018 ("2Q18") (the "August 2018 Earnings Call").  That same day Granite filed its 2Q18 financial statements on Form 10-Q with the SEC (the "2Q18 10-Q").

229.    On the August 8, 2018 Earnings Call, Defendant Roberts stated:

> Rounding our operational performance review, we look now to the Large Project Construction segment, which produced steady revenue improvement and modestly improved second quarter profit performance from last year.

These statements were materially false and misleading because Granite's reported improvements in revenue and profit performance in the Large Project Construction segment were inflated by the Company's improper accounting for the Projects, which violated GAAP by inflating the Projects' transaction price and ignoring cost overruns exceeding $1.3 billion that were known to Roberts at the time.

230.    On the August 2018 Earnings Call, Defendant Desai stated:

> Large Project Segment revenues increased 7.7% year-over-year in the second quarter to $273.9 million with segment gross profit and margin both finishing slightly better than last year.

These statements were materially false and misleading because Granite's reported improvements in revenue, gross profit, and margins in the Large Project Construction segment were predicated on the Company's improper accounting for the Projects, which violated GAAP by inflating the Projects' transaction price and ignoring cost overruns exceeding $1.3 billion that were known to Desai at the time.

231.   The 2Q18 10-Q stated, regarding Granite's Large Project Construction segment, that:

> The changes in project profitability from revisions in estimates, both increases and decreases, which individually had an impact of $1.0 million or more on gross profit, were net decreases of $30.3 million and $39.8 million for the three and six months ended June 30, 2018, respectively.

These statements were materially false and misleading because Granite's reported $30.3 million net decrease to project profitability during the three months ended June 30, 2018 rested on Granite's improper accounting for the Projects, which violated GAAP by inflating the Projects' transaction price and ignoring cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time.  As such, Granite materially understated its reported $30.3 million net decrease to project profitability during this period.  Had Granite properly accounted for the Projects, its $30.3 million decrease to net project profitability would have been materially worse.

232.   The 2Q18 10-Q stated, regarding Granite's Large Project Construction segment, that:

> As of June 30, 2018 there were three projects for which additional costs were reasonably possible in excess of the probable amounts included in the cost forecast.  The reasonably possible aggregate range that has the potential to adversely impact gross profit during the year ending December 31, 2018, was zero to $15.0 million.

These statements were materially false and misleading because Granite's "reasonably possible aggregate range that has the potential to adversely impact gross profit during the year ended December 31, 2018" was magnitudes larger, at the time, than the reported "zero to $15.0 million."

At the time, Granite's known share of "additional costs" was at least $338.5 million.  In addition, these statements were predicated on the Company's improper accounting for the Projects, which violated GAAP by ignoring cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time.

233.    As to the revenue attributed to its Large Project Construction segment, Granite disclosed in the 2Q18 10-Q that:

> Large Project Construction revenue for the three and six months ended June 30, 2018 increased by $19.5 million, or 7.7%, and $60.9 million, or 13.2%, respectively, when compared to 2017 primarily due to increased beginning backlog and progress on new projects in our Heavy Civil operating group.
>
> *         *         *
>
> Large Project Construction gross profit for the three and six months ended June 30, 2018 increased by $0.8 million, or over 100%, and $18.7 million, or over 100%, respectively, when compared to 2017. Large Project Construction gross profit as a percentage of segment revenue for the three and six months ended June 30, 2018 increased to 0.5% from 0.2% and from 0.7% to 4.2%, respectively, when compared to 2017.

These statements were materially false and misleading because Granite's reported improvements in revenue and gross profit in the Large Project Construction segment were predicated on the Company's improper accounting for the Projects, which violated GAAP by inflating the Projects' transaction price and ignoring cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time.

234.    With regard to the financial results of the unconsolidated JVs specifically, including those related to the Projects alleged above, the 2Q18 10-Q claimed that Granite had a $431 million interest in the assets of the JVs as of June 30, 2018.  This statement was materially false and misleading because Granite's claimed $431 million interest rested on inflation of the Projects' transaction price and ignored cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time, in violation of GAAP.

235.    In the 2Q18 10-Q, Granite further claimed that its $431 million interest in the assets of the JVs as of June 30, 2018, included "$65.8 million … related to Granite's share of estimated

cost recovery of customer affirmative claims" as of June 30, 2018. These statements were materially false and misleading because Granite's recovery of $65.8 million in customer affirmative claims was not probable and recognizing revenue on such claims was likely to result in a significant revenue reversal, precluding revenue recognition pursuant to GAAP.

236. The 2Q18 10-Q also claimed that Granite held a $193 million interest in the liabilities of the JVs as of June 30, 2018. These statements were materially false and misleading because Granite's $193 million interest rested on inflation of the Projects' transaction price and ignored cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time, in violation of GAAP.

237. The 2Q18 10-Q also claimed that Granite held a $110 million interest in the revenue from the JVs, a $127 million interest in the cost of revenue from the JVs, and a ($18 million) interest in the gross loss of the JVs, each for the three months ended June 30, 2018. These statements were materially false and misleading because Granite's stated interests rested on inflation of the Projects' transaction price and ignored cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time, in violation of GAAP.

238. The 2Q18 10-Q stated, regarding net income from the JVs, that:

> During the three and six months ended June 30, 2018, unconsolidated construction joint venture net income (loss) was $26.5 million and ($114.4) million, respectively, of which our post-adjustment share were net losses of ($17.7) million and ($ 13.4) million, respectively.

These statements were materially false and misleading because Granite's claimed post-adjustment share of net income (loss) of ($17.7) million and ($13.4) million rested on Granite's GAAP violations, which inflated the Projects' transaction price and ignored cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time.

### 3. Third Quarter 2018 False and Misleading Statements and Omissions

239. On October 26, 2018, Granite held an investor earnings call for the third quarter of 2018 ("3Q18") (the "October 2018 Earnings Call"). On October 29, 2018, Granite filed its 3Q18 financial statements on Form 10-Q with the SEC (the "3Q18 10-Q").

240. On the October 2018 Earnings Call, Defendant Desai stated:

> In the third quarter, Transportation segment revenue decreased 2.2% year-over-year to $610.8 million.  On a year-to-date basis, segment revenue has increased 3.5% from 2017 to $1.47 billion.  Quarterly gross profit increased 8.3% year-over-year with gross profit margin of 11.6%, up more than 100 basis points from last year.  Year-to-date gross profit increased 15.4% with a resulting gross profit margin of 9.4%, up about 100 basis points from 2017.

These statements were materially false and misleading because Granite's reported revenue, gross profit, and margins in the Transportation segment were inflated by the Company's improper accounting for the Projects, which violated GAAP by inflating the Projects' transaction price and ignoring cost overruns exceeding $1.3 billion that were known to Desai at the time.

241. With regard to Granite's transportation segment, the 3Q18 10-Q stated that:

> The changes in project profitability from revisions in estimates, which individually had an impact of $5.0 million or more on gross profit, were decreases of $19.3 million and $57.8 million for the three and nine months ended September 30, 2018, respectively….

These statements were materially false and misleading because Granite's reported $19.3 million and $57.8 million decreases to project profitability for the three and nine months ended September 30, 2018, respectively, rested on Granite's improper accounting for the Projects, which violated GAAP by inflating the Projects' transaction price and ignoring cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time.  As such, Granite materially understated its reported $19.3 million and $57.8 million decreases to project profitability for the three and nine months ended September 30, 2018.  Had Granite properly accounted for the Projects, its $19.3 million and $57.8 million decreases to project profitability would have been materially larger.

242. The 3Q18 10-Q further stated regarding Granite's Transportation segment that:

> As of September 30, 2018 there were four projects for which additional costs were reasonably possible in excess of the probable amounts included in the cost forecast.  The reasonably possible aggregate range that has the potential to adversely impact gross profit is zero to $45.0 million.

These statements were materially false and misleading because the Company's "reasonably possible aggregate range" of probable additional costs "that has the potential to adversely impact gross profit" as of September 30, 2018 were materially and significantly larger at the time than the reported "zero to $45.0 million." At the time, Granite's known share of "additional costs" was at least $338.5 million. In addition, the statements were predicated on the Company's improper accounting for the Projects, which violated GAAP by ignoring cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time.

243.   As to the revenue attributed to Granite's Transportation segment, the 3Q18 10-Q stated that:

> Transportation revenue for the three and nine months ended September 30, 2018 decreased by $13.9 million, or 2.2%, … compared to 2017.

> Transportation gross profit for the three and nine months ended September 30, 2018 increased by $5.4 million, or 8.3%, and $18.5 million, or 15.4%, respectively, when compared to 2017.

These statements were materially false and misleading because Granite's reported decrease in revenue was materially understated and the Company's reported improvements in gross profit for the three and nine months ended September 30, 2018 were materially overstated, each by the Company's improper accounting for the Projects, which violated GAAP by inflating the Projects' transaction price and ignoring cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time.

244.   With regard to the financial results of the unconsolidated JVs specifically, including those related to the Projects alleged above, the 3Q18 10-Q claimed that Granite held a $442 million interest in the assets of the JVs as of September 30, 2018. This statement was materially false and misleading because Granite's claimed $442 million interest rested on inflation of the Projects' transaction price and ignored cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time, in violation of GAAP.

245.   The 3Q18 10-Q further claimed that Granite's $442 million interest in the assets of the JVs as of September 30, 2018 included "$67.1 million … related to Granite's share of estimated

cost recovery of customer affirmative claims," as of September 30, 2018.  These statements were materially false and misleading because Granite's recovery of $67.1 million in customer affirmative claims was not probable and recognizing revenue on such claims was likely to result in a significant revenue reversal, precluding revenue recognition pursuant to GAAP.

246.     The 3Q18 10-Q also claimed that Granite held a $180 million interest in the liabilities of the JVs as of September 30, 2018.  These statements were materially false and misleading because Granite's $180 million interest rested on inflation of the Projects' transaction price and ignored cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time, in violation of GAAP.

247.     The 3Q18 10-Q also claimed that Granite held a $151 million interest in the revenue of the JVs, a $155 million interest in the cost of revenue from the JVs, and a ($4.02 million) interest in the gross loss of the JVs, each for the three months ended September 30, 2018.  These statements were materially false and misleading because Granite's stated interests rested on inflation of the Projects' transaction price and ignored cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time, in violation of GAAP.

248.     With regard to net income from the JVs, the 3Q18 10-Q stated that:

> During the three and nine months ended September 30, 2018, unconsolidated construction joint venture net losses were $(47.6) million and ($162.0) million, respectively, of which our post-adjustment share were net losses of ($3.1) million and ($16.5) million, respectively.

These statements were materially false and misleading because Granite's claimed post-adjustment share of net losses of ($3.1) million and ($16.5) million for the three and nine months ended September 30, 2018, respectively, rested on Granite's GAAP violations, which inflated the Projects' transaction price and ignored cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time.

**4.     Full Year and Fourth Quarter 2018 False and Misleading Statements and Omissions**

249.     On February 20, 2019, Granite filed a Form 8-K with the SEC which included a press release disclosing its fourth quarter and full year 2018 financial results (the "4Q18 Press

Release") as an exhibit and held an investor earnings call (the "February 2019 Earnings Call"). On February 22, 2019, Granite filed its FY 2018 financial statements on Form 10-K with the SEC (the "2018 10-K").

    250.    On the February 2019 Earnings Call, Defendant Desai stated:

> In the fourth quarter Transportation segment revenue decreased 3.8% year-over-year to $504 million.  In spite of the late year drag, full-year segment revenue increased to $1.98 billion, up 1.5% from last year.

> Quarterly gross profit increased 2.8% year-over-year with a gross profit margin of 10.2%, up 66 basis points from last year.  We created solid leverage in this segment with the gross profit increasing 11.7% in 2018 and the gross profit margin up 88 basis points year-over-year to 9.6%.

These statements were materially false and misleading because Granite's reported improvements in full-year revenue and fourth quarter and full-year gross profit and margin in the Transportation segment were materially overstated, and its reported decline in fourth quarter revenue was materially understated, by the Company's improper accounting for the Projects, which violated GAAP by inflating the Projects' transaction price and ignoring cost overruns exceeding $1.3 billion that were known to Desai at the time.

    251.    The 2018 10-K stated, regarding Granite's Transportation segment, that:

> The changes in project profitability from revisions in estimates, which individually had an impact of $5.0 million or more on gross profit, were decreases of $86.5 million, $67.2 million and a net decrease of $33.0 million for the years ended December 31, 2018, 2017 and 2016, respectively….

These statements were materially false and misleading because Granite's reported $86.5 million decrease to project profitability for the year ended December 31, 2018 rested on Granite's improper accounting for the Projects, which violated GAAP by inflating the Projects' transaction price and ignoring cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time.  As such, Granite materially understated its reported $86.5 million decrease to project profitability for the year ended December 31, 2018.  Had Granite properly accounted for the Projects, its $86.5 million decrease to project profitability would have been materially larger.

252.    The 2018 10-K omitted any disclosure of projects for which additional costs were reasonably possible, or the reasonably possible aggregate range of such additional costs, contrary to GAAP's disclosure requirement.  This material omission violated ASC 450 and was materially false and misleading because it falsely suggested to investors that no further costs were reasonably possible, and no charges were being contemplated.   In reality, Granite's reasonably possible aggregate range of additional costs included cost overruns of at least $338.5 million that were known to Granite, Roberts, and Desai at the time.

253.    The 2018 10-K further stated, regarding Granite's changes in project profitability from revisions in estimates, that:

> Included in the tables above for the years ended December 31, 2018, 2017 and 2016 is the impact to gross profit from changes in estimated contract revenue and costs of $18.2 million, $34.3 million and $51.3 million, respectively, related to revisions in estimates from the estimated cost recovery of customer affirmative claims and back charges.

These statements were materially false and misleading because "the impact to [Granite's] gross profit from changes in estimated contract revenue and costs … [r]elated to revisions in estimates from the estimated cost recovery of customer affirmative claims" was magnitudes larger at the time than the reported "$18.2 million" because Granite had violated GAAP by inflating the Projects' transaction price and ignoring cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time.  Had Granite properly accounted for the Projects, the $18.2 million impact would have been materially worse.

254.    As to the revenue, gross profit, and margin attributed to Granite's Transportation segment, the 2018 10-K stated that:

> Transportation revenue in 2018 increased $29.3 million, or 1.5%, compared to 2017 due to entering the year with greater contract backlog in the Heavy Civil, California and Midwest operating groups as well as improved success rate on bidding activity in the California and Midwest groups….

> Transportation gross profit for the year ended December 31, 2018 increased by $19.9 million, or 11.7%, when compared to 2017 primarily due to increased revenue volume and margin improvement in our California operating group due to an increase in highway

> rehabilitation work partially offset by a decline in our Northwest operating group from reduced revenue volume and in our Heavy Civil operating group from a net negative impact from revisions in estimates …. Transportation gross margin as a percentage of segment revenue for 2018 increased to 9.6% from 8.7% in 2017.

These statements were materially false and misleading because Granite's reported increases in revenue, gross profit, and margins in the Transportation segment were materially inflated, each by the Company's improper accounting for the Projects, which violated GAAP by inflating the Projects' transaction price and ignoring cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time.

255.     With regard to the financial results of the unconsolidated JVs specifically, including those related to the Projects alleged above, the 2018 10-K claimed that Granite had a $426 million interest in the assets of the JVs for the year ended December 31, 2018. This statement was materially false and misleading because Granite's claimed $426 million interest rested on inflation of the Projects' transaction price and ignored cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time, in violation of GAAP.

256.     The 2018 10-K further claimed that Granite's $426 million interest in the assets of the JVs for the year ended December 31, 2018 included "$78.1 million … related to Granite's share of estimated cost recovery of customer affirmative claims" for the year ended December 31, 2018. These statements were materially false and misleading because Granite's recovery of $78.1 million in customer affirmative claims was not probable and recognizing revenue on such claims was likely to result in a significant revenue reversal, precluding revenue recognition pursuant to GAAP.

257.     The 2018 10-K also claimed that Granite held a $155 million interest in the liabilities of the JVs for the year ended December 31, 2018. These statements were materially false and misleading because Granite's claimed interests rested on inflation of the Projects' transaction price and ignored cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time, in violation of GAAP.

258.    The 2018 10-K also claimed that Granite held a $522 million interest in the revenue from the JVs, a $547 million interest in the cost of revenue from the JVs, and a ($25 million) interest in the gross loss of the JVs, each for the year ended December 31, 2018.  These statements were materially false and misleading because Granite's stated interests rested on inflation of the Projects' transaction price and ignored cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time, in violation of GAAP.

259.    With regard to net income from the JVs, the 2018 10-K stated that:

> During the years ended December 31, 2018, 2017 and 2016, unconsolidated construction joint venture net (loss) income was ($240.3) million, $62.2 million and $41.8 million, respectively, of which our share was ($22.6) million, ($14.4) million and $15.6 million, respectively.

These statements were materially false and misleading because Granite's claimed post-adjustment share of net losses of ($22.6) million rested on Granite's GAAP violations, which inflated the Projects' transaction price and ignored cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time.

### 5.    First Quarter 2019 False and Misleading Statements and Omissions

260.    On April 26, 2019, Granite filed a Form 8-K with the SEC which included a press release disclosing its first quarter 2019 ("1Q19") financial results (the "1Q19 8-K") as an exhibit, and held an investor earnings call (the "April 2019 Earnings Call").  Also on April 26, 2019, Granite filed its 1Q19 financial statements on Form 10-Q with the SEC (the "1Q19 10-Q").

261.    With regard to Granite's Transportation segment, the 1Q19 Press Release stated that:

> Revenue decreased to $338.2 million, compared to $359.1 million last year.
>
> Quarterly gross profit decreased to $21.3 million from $31.5 million last year, with gross profit margin of 6.3 percent compared to 8.8 percent last year.

On the April 2019 Earnings Call, Defendant Desai stated:

> Transportation segment revenues declined about 6%, with weather headwinds, especially in California, the largest driver of the revenue and of the year-over-year margin decrease to 6.3%.

These statements in the 1Q19 Press Release and the April 2019 Earnings Call were materially false and misleading because Granite's reported revenue, gross profit, and margins in the Transportation segment were inflated by the Company's improper accounting for the Projects, which violated GAAP by inflating the Projects' transaction price and ignoring cost overruns exceeding $1.3 billion. Had Granite properly accounted for the Projects, its revenue, gross profit, and margin declines would have been materially larger.

262. The 1Q19 10-Q omitted any disclosure of projects for which additional costs were reasonably possible, or the reasonably possible aggregate range of such additional costs, contrary to GAAP's disclosure requirement. This material omission violated ASC 450 and was materially false and misleading because it falsely suggested to investors that no further costs were reasonably possible, and no charges were being contemplated. In reality, Granite's reasonably possible aggregate range of additional costs included cost overruns of at least $338.5 million that were known to Granite, Roberts, and Desai at the time.

263. The 1Q19 10-Q stated, with regard to revisions to estimates impacting Granite's Transportation segment, that:

> The changes in project profitability from revisions in estimates including estimated cost recovery of customer affirmative claims and back charges, which individually had an impact of $5.0 million or more on gross profit, were decreases of $5.7 million and $5.3 million for one project during each of the three months ended March 31, 2019 and 2018, respectively.

These statements were materially false and misleading because Granite's reported $5.7 million and $5.3 million decreases to project profitability during the three months ended March 31, 2019 and 2018, respectively, rested on Granite's improper accounting for the Projects, which violated GAAP by inflating the Projects' transaction price and ignoring cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time. As such, Granite materially understated its reported $5.7 million and $5.3 million decreases to project profitability for the three months ended March 31, 2019 and 2018, respectively. Had Granite properly accounted for the Projects, its $5.7 million and $5.3 million decreases to project profitability would have been materially worse.

264.   As to the revenue and gross profit attributed to Granite's Transportation segment, the 1Q19 10-Q stated that:

> Transportation revenue for the three months ended March 31, 2019 decreased by $20.9 million, or 5.8%, when compared to 2018.
>
> * * *
>
> Transportation gross profit for the three months ended March 31, 2019 decreased by $10.2 million, or 32.5%, when compared to 2018.

These statements were materially false and misleading because Granite's reported revenue and gross profit were inflated by the Company's improper accounting for the Projects, which violated GAAP by inflating the Projects' transaction price and ignoring cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time. Had Granite properly accounted for the Projects, its revenue and gross profit declines would have been materially worse.

265.   With regard to the financial results of the unconsolidated JVs specifically, including those related to the Projects alleged above, the 1Q19 10-Q claimed that Granite had a $458 million interest in the assets of the JVs as of March 31, 2019. This statement was materially false and misleading because Granite's claimed $458 million interest rested on inflation of the Projects' transaction price and ignored cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time, in violation of GAAP.

266.   The 1Q19 10-Q claimed that Granite's $458 million interest in the assets of the JVs as of March 31, 2019 included "$80.8 million … related to Granite's share of estimated cost recovery of customer affirmative claims," as of March 31, 2019. These statements were materially false and misleading because Granite's recovery of $80.8 million in customer affirmative claims was not probable and recognizing revenue on such claims was likely to result in a significant revenue reversal, precluding revenue recognition pursuant to GAAP.

267.   The 1Q19 10-Q also claimed that Granite held a $160 million interest in the liabilities of the JVs as of March 31, 2019. These statements were materially false and misleading because Granite's claimed $160 million interest rested on inflation of the Projects' transaction

price and ignored cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time, in violation of GAAP.

268.    The 1Q19 10-Q further stated that Granite had a $132 million interest in the revenue from the JVs, a $131 million interest in the cost of revenue from the JVs, and a $1.0 million interest in the gross profits of the JVs, each as of March 31, 2019.  These statements were materially false and misleading because Granite's stated interests rested on inflation of the Projects' transaction price and ignored cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time, in violation of GAAP.

269.    With regard to net income from the JVs, the 1Q19 10-Q stated that:

> During the three months ended March 31, 2019 and 2018, unconsolidated construction joint venture net income/(loss) was $5.2 million and $(141.0) million, respectively, of which our share was net income of $0.5 million and $2.6 million, respectively.

These statements were materially false and misleading because Granite's claimed post-adjustment share of net income of $0.5 million and $2.6 million rested on Granite's GAAP violations, which inflated the Projects' transaction price and ignored cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time.

**6.    Second Quarter 2019 False and Misleading Statements and Omissions**

270.    On August 2, 2019, Granite filed a Form 8-K with the SEC which included a press release disclosing its second quarter 2019 ("2Q19") financial results (the "2Q19 8-K") as an exhibit, and held an investor earnings call (the "August 2019 Earnings Call").  On August 6, 2019, Granite filed its 2Q19 financial statements on Form 10-Q with the SEC (the "2Q19 10-Q").

271.    With regard to Granite's Transportation segment, the 2Q19 8-K stated that:

> Second quarter 2019 revenue was $404.0 million, compared to $502.7 million in last year's quarter. This quarter's results included a revenue reduction of $114.2 million due to increased project costs on four legacy, unconsolidated Heavy Civil joint venture projects, and corresponding reductions in project percent completion. . .
>
> Including charges of $143.7 million on four legacy, unconsolidated Heavy Civil joint venture projects, second quarter 2019 gross loss was $99.9 million.

These statements were materially false and misleading because Granite's reported revenue was inflated and gross loss was understated by the Company's improper accounting for the Projects, which violated GAAP by inflating the Projects' transaction price and ignoring cost overruns exceeding $1.3 billion that were known to Granite, Roberts, and Desai at the time. While Granite announced significant charges and revenue reduction on the JVs at this time, the Company still failed to recognize the full extent of the material cost overruns the Projects had experienced, as demonstrated by the fact that the Company subsequently took additional charges.

272. On the August 2019 Earnings Call, Defendant Desai stated:

> Second quarter 2019 results included non-cash pre-tax charges of $143.7 million or $106.7 million after tax. These costs are reflected in the transportation segment with both a reduction of revenue of $114.2 million, and increased cost of $29.5 million.

> . . . In the second quarter, transportation segment revenue was $404 million, which includes the reduction in revenue of $114.2 million.

> On a year-to-date basis, revenue was $742.2 million including the revenue reduction down from $861.9 million last year.  Quarterly gross loss of $99.9 million include charges compared to gross profit of $36 million in the prior year.  On a year-to-date basis, gross loss was $78.6 million compared to gross profit of $67.4 million in the prior year.

These statements were materially false and misleading because Granite's reported revenue and gross loss were inflated by the Company's improper accounting for the Projects, which violated GAAP by inflating the Projects' transaction price and ignoring cost overruns exceeding $1.3 billion that were known to Desai at the time.  While Granite announced significant charges and revenue reduction on the JVs at this time, the Company still failed to recognize the full extent of the cost overruns the Projects had experienced, as demonstrated by the additional charges the Company subsequently announced.

273. In response to a question from an analyst at Vertical Research as to the ongoing costs associated with Granite's large projects, on the August 2019 Earnings Call, Defendant Roberts responded:

> We also believe that we have covered our current challenges and future risks in the heavy civil group adjustments that we made in those four legacy projects that we announced on Monday. . .  And I

don't see significant costs.  But of course, there will be some as we
move forward.  But we have embedded that.

These statements were materially false and misleading because Granite had still failed to recognize

the full extent of the cost overruns the Projects had experienced, as demonstrated by the additional

charges the Company subsequently announced.  As such, Roberts' statements that Granite had

"covered our current challenges and future risks in the heavy civil group," "do[es] not expect any

additional … contributions for these legacy projects," and had "embedded" any additional risk,

were materially false and misleading.

274.   The 2Q19 10-Q omitted any disclosure of projects for which additional costs were

reasonably possible, or the reasonably possible aggregate range of such additional costs, contrary

to GAAP's disclosure requirement.  This material omission violated ASC 450 and was materially

false and misleading because it falsely suggested to investors that no further costs were reasonably

possible, and no charges were being contemplated.   In reality, Granite's reasonably possible

aggregate range of "additional costs" included cost overruns of at least $338.5 million that were

known to Granite, Roberts, and Desai at the time, whose full extent was not reflected in the

Company's 2Q19 charges.

275.   The 2Q19 10-Q stated, with regard to revisions to estimates impacting Granite's

Transportation segment, that:

> For the three and six months ended June 30, 2019, revisions in
> estimates, including estimated cost recovery of customer affirmative
> claims and back charges, that individually had an impact of $5.0
> million or more on gross profit resulted in decreases to gross profit
> and loss before (benefit from) provision for income taxes of $161.1
> million and $167.8 million, respectively, and decreases in net loss
> of $120.2 million and $125.4 million ($2.57 and $2.68 per share),
> respectively….

These statements were materially false and misleading because Granite had still failed to recognize

the true extent of the cost overruns the Projects experienced, as demonstrated by the additional

charges the Company subsequently announced.  As such, Granite's reported $161.1 million and

$167.8 million decrease to project profitability during the three months and six months ended June

30, 2019, respectively, still failed to reflect the known cost overruns on the Projects.  Had Granite

properly accounted for the Projects, the decreases to project profitability would have been materially worse.

276.    As to the revenue and gross loss attributed to Granite's Transportation segment, the 2Q19 10-Q stated that:

> Transportation revenue for the three and six months ended June 30, 2019 decreased by $98.7 million, or 19.6%, and $119.7 million, or 13.9%, respectively, when compared to 2018.
>
> *              *              *
>
> Transportation gross loss for the three and six months ended June 30, 2019 increased by $135.8 million, or over 100%, and $146.1 million, or over 100%, respectively, when compared to 2018.

These statements were materially false and misleading because Granite materially overstated its reported revenue and understated its gross loss for Granite's Transportation segment by still failing to recognize the full extent of the cost overruns the Projects had experienced, as demonstrated by the additional charges the Company subsequently announced.  Had Granite properly accounted for the Projects, its decline in revenue and increase in gross loss would have been materially worse.

277.    With regard to the financial results of the unconsolidated JVs specifically, including those related to the Projects alleged above, the 2Q19 10-Q claimed that Granite had a $470 million interest in the assets of the JVs as of June 30, 2019.  This statement was materially false and misleading because Granite's claimed $470 million interest continued to rest on inflation of the Projects' transaction price and ignored known cost overruns, and Granite had still failed to recognize the full extent of the cost overruns the Projects had experienced, as demonstrated by the additional charges the Company subsequently announced.

278.    The 2Q19 10-Q Granite further claimed that its $470 million interest in the assets of the JVs as of June 30, 2019 included "$89.4 million … related to Granite's share of estimated cost recovery of customer affirmative claims" as of June 30, 2019.  These statements were materially false and misleading because Granite's recovery of $89.4 million in customer affirmative claims was not probable and recognizing revenue on such claims was likely to result in a significant revenue reversal, precluding revenue recognition pursuant to GAAP.  Further,

Granite had still failed to recognize the full extent of the cost overruns the Projects had experienced, as demonstrated by the additional charges the Company subsequently announced.

279.   The 2Q19 10-Q also claimed that Granite held a $287 million interest in the liabilities of the JVs as of June 30, 2019.  These statements were materially false and misleading because Granite's claimed $287 million interest continued to rest on inflation of the Projects' transaction price and ignored known cost overruns, and Granite had still failed to recognize the full extent of the cost overruns the Projects had experienced, as demonstrated by the additional charges the Company subsequently announced.

280.   The 2Q19 10-Q also stated that Granite had a $37 million interest in the revenue from the JVs, a $144 million interest in the cost of revenue from the JVs, and a ($107 million) interest in the gross loss of the JVs, each for the three months ended June 30, 2019.  These statements were materially false and misleading because Granite's claimed interest in revenue, cost of revenue, and gross losses continued to rest on inflation of the Projects' transaction price and ignored known cost overruns, and Granite had still failed to recognize the full extent of the cost overruns the Projects had experienced, as demonstrated by the additional charges the Company subsequently announced.

281.   With regard to net income from the JVs, the 2Q19 10-Q stated that:

> During the three and six months ended June 30, 2019, unconsolidated construction joint venture net loss was ($18.9) million and ($13.7) million, respectively, of which our share was net loss of ($106.3) million and ($105.8) million, respectively….

These statements were materially false and misleading because Granite's claimed share of net loss of $106.3 million continued to rest on Granite's GAAP violations, which inflated the Projects' transaction price and ignored known cost overruns, and Granite had still failed to recognize the full extent of the cost overruns the JVs had experienced, as demonstrated by the additional charges the Company subsequently announced.

**B.    False And Misleading Statements Regarding Granite's Application of GAAP**

282.   In each of Granite's 1Q, 2Q, and 3Q 2018 10-Qs and the 2018 10-K, Defendants stated:  "We recognize revenue in accordance with ASC Topic 606."  These statements were

materially false and misleading because, as alleged in detail in Section IV.D above, Granite violated Topic 606 by:  (1) prematurely including revenue from disputed claims against customers where recovery was not probable or where it was likely that a significant revenue reversal would occur; and (2) inflating the Projects' percentage of completion by ignoring the Projects' known cost overruns.

283.   Similarly, in each of Granite's 1Q, 2Q, and 3Q 2018 10-Qs, the 2018 10-K, and the 2Q 2019 10-Q, Defendants made substantively identical statements that "[o]ur profit recognition related to construction contracts is based on estimates of transaction price and costs to complete each project."  These statements were materially false and misleading because, as alleged in detail in Section IV.D above, Granite manipulated transaction price and Project costs, in violation of GAAP, to prematurely recognize revenue and overstate profit while understating costs.

284.   In each of Granite's 1Q, 2Q, and 3Q 2018 10-Qs and the 2018 10-K, Defendants made substantively identical statements that "[c]hanges are made to the transaction price from affirmative claims with customers to the extent that additional revenue on a claim settlement with a customer is probable and estimable."  These statements were materially false and misleading because, as alleged in detail in Section IV.D above, Granite improperly inflated the Projects' transaction price by including substantial consideration from claims against customers on the I-4 Ultimate and Tappan Zee Projects, while knowing in each case that recovery was not "probable" and/or "estimable."

285.   Similarly, in each of Granite's 1Q, 2Q, and 3Q 2018 10-Qs and the 2018 10-K, Defendants stated that "[c]hanges are made to the transaction price from unapproved change orders to the extent the amount can be reliably estimated and recovery is probable."  These statements were materially false and misleading because, as alleged in detail in Section IV.D above, Granite improperly inflated the Projects' transaction price by including substantial consideration from unapproved change orders from which recovery was not "probable" and/or the amount could not be "reliably estimated."

286.   In each of Granite's 1Q, 2Q, and 3Q 2018 10-Qs and the 2018 10-K, Defendants also stated:

> Revenue in our [Large Project Construction and, subsequently, Transportation] segments is ordinarily recognized over time as control is transferred to the customers by measuring the progress toward complete satisfaction of the performance obligation(s) using an input (i.e., "cost to cost") method.

These statements were materially false and misleading because, as alleged in detail in Section IV.D above, Granite manipulated and overstated its percentage of completion for the Projects, such that Granite's revenue recognition did not properly reflect "progress toward complete satisfaction of the performance obligation(s)" or the transfer of control to Granite's customers.

287.   In each of Granite's 1Q, 2Q, and 3Q 2018 10-Qs and the 2018 10-K, Defendants also stated:

> All contract costs, including those associated with affirmative claims, change orders and back charges, are recorded as incurred and revisions to estimated total costs are reflected as soon as the obligation to perform is determined.

These statements were materially false and misleading because, as alleged in detail in Section IV.D above, Granite did not update its estimated total costs "as soon as the obligation to perform is determined," but instead ignored known cost overruns to prematurely recognize revenue and overstate profits.

288.   In each of Granite's 1Q, 2Q, and 3Q 2018 10-Qs and the 2018 10-K, Defendants also made substantively identical statements that:

> Cost estimates for all of our significant projects use a detailed "bottom up" approach, and we believe our experience allows us to create materially reliable estimates.

These statements were materially false and misleading because, as alleged in detail in Section IV.D above, Granite did not determine estimated total costs with a "detailed 'bottom up' approach," and did not seek to "create materially reliable estimates," but instead ignored known cost overruns to prematurely recognize revenue and overstate profits.

289.   In each of Granite's 1Q, 2Q, and 3Q 2018 10-Qs, the 2018 10-K, and the 2Q 2019 10-Q, Defendants also made substantively identical statements that "[w]hen we experience significant changes in our estimates of costs to complete, we undergo a process that includes

reviewing the nature of the changes to ensure that there are no material amounts that should have been recorded in a prior period rather than as revisions in estimates for the current period."  These statements were materially false and misleading because, as alleged in detail in Section IV.D above, Granite did not properly ensure that "there are no material amounts that should have been recorded in a prior period," but instead ignored known cost overruns to prematurely recognize revenue and overstate profits.

290.    Similarly, in each of Granite's 1Q, 2Q, and 3Q 2018 10-Qs, the 2018 10-K, and the 1Q and 2Q 2019 10-Qs, Defendants also made substantively identical statements that "[i]n our review of the revisions in estimates" for the prior three-month or one-year period, "we did not identify any material amounts that should have been recorded in a prior period" (with the exception of a $4.3 million "correction" identified in 2Q 2019).  These statements were materially false and misleading because, as alleged in detail in Section IV.D above, Granite intentionally ignored "material amounts that should have been recorded in a prior period," by ignoring known cost overruns to prematurely recognize revenue and overstate profits.

291.    In each of Granite's 1Q, 2Q, and 3Q 2018 10-Qs, the 2018 10-K, and the 1Q and 2Q 2019 10-Qs, Defendants also made substantively identical statements that "[i]n addition to matters that are considered probable for which the loss can be reasonably estimated, disclosure is also provided when it is reasonably possible and estimable that a loss will be incurred or when it is reasonably possible that the amount of a loss will exceed the amount recorded."  These statements were materially false and misleading because, as alleged in detail in Section IV.D above, Granite failed to disclose at least $338.5 million in known "additional cost" overruns and, in 4Q18 and 1Q and 2Q19, failed to disclose any "reasonably possible" cost overruns, in violation of GAAP and the Company's stated accounting policies.

C.    **False and Misleading Risk Factors**

292.    In each Form 10-Q filed during the Class Period and the 2018 10-K, Granite included certain risk factors, and/or stated that there had been no material changes to certain risk factors included in prior SEC filings, that Defendants claimed could cause Granite's actual results to differ materially from the results contemplated by Defendants or otherwise adversely affect

Granite's business.  Specifically, Granite's Q1, Q2, and Q3 2018 10-Qs each stated that there had not been any material changes to the risk factors included in Granite's Form 10-K for the year ended December 31, 2017 (the "2017 10-K") that are alleged to be false and misleading as set forth in this section.  The 2018 10-K included the risk factors that are alleged to be false and misleading as set forth in this section, and the Q1 and Q2 2019 10-Qs each stated that there had been no material changes to those risk factors included in the 2018 10-K.

293.    Among the risk factors stated in the 2017 and 2018 10-Ks were those regarding risks associated with fixed-price contracts like those governing the JVs:

> ***Fixed price and fixed unit price contracts subject us to the risk of increased project cost.***  As more fully described in "Contract Provisions and Subcontracting" under "Item 1. Business," the profitability of our fixed price and fixed unit price contracts can be adversely affected by a number of factors that can cause our actual costs to materially exceed the costs estimated at the time of our original bid.  This could result in reduced profits or a loss for that project and there could be a material adverse impact to our financial position, results of operations, cash flows and liquidity. [Emphasis in original.]

These statements were materially false and misleading because by stating that Granite's business and the JVs presented only prospective risks to the Company, Defendants concealed the fact that those risks had already materialized.  In reality, Defendants knew at the time of these statements that the Projects' known cost overruns exceeding $1.3 billion, which already had reduced profits or losses and had a material adverse impact on Granite's financial condition.

294.    In the 2017 and 2018 10-Ks, Granite further stated that many of its contracts could lead to contractual penalties for delays:

> ***Many of our contracts have penalties for late completion.***  In some instances, including many of our fixed price contracts, we guarantee that we will complete a project by a certain date. If we subsequently fail to complete the project as scheduled we may be held responsible for costs resulting from the delay, generally in the form of contractually agreed-upon liquidated damages. To the extent these events occur, the total cost of the project could exceed our original estimate and we could experience reduced profits or a loss on that project and there could be a material adverse impact to our financial position, results of operations, cash flows and liquidity.  [Emphasis in original.]

These statements were materially false and misleading because by stating that increased costs resulting from delays posed only prospective risks to the Company, Defendants concealed the fact that those risks had already materialized.   In reality, Defendants knew at the time of these statements that the Projects had incurred cost overruns exceeding $1.3 billion that would already have caused reduced profits or losses and had a material adverse impact on Granite's financial condition.

295.   Granite also stated certain risks associated with affirmative claims, like those it had made with regard to certain of the Projects alleged herein, in the 2017 and 2018 10-Ks, which risks did not materially change as stated in each Form 10-Q filed during the Class Period:

> Our failure to adequately recover on affirmative claims brought by us against project owners or other project participants (e.g., back charges against subcontractors) for additional contract costs could have a negative impact on our liquidity and future operations.

These statements were materially false and misleading because by stating that the failure to adequately recover on affirmative claims presented only prospective risks to the Company, Defendants concealed the fact that those risks had already materialized.   In reality, and as Granite knew at the time of these statements, recovery on its affirmative claims was not probable and recognizing revenue on such claims was likely to result in a significant revenue reversal, precluding revenue recognition pursuant to GAAP.

296.   In the 2017 and 2018 10-Ks, Granite also stated certain risks associated with its accounting estimates:

> Accounting for our revenues and costs involves significant estimates. . . .   Although we believe we have sufficient experience and processes to enable us to formulate appropriate assumptions and produce reasonably dependable estimates, these assumptions and estimates may change significantly in the future and could result in the reversal of previously recognized revenue and profit.   Such changes could have a material adverse effect on our financial position and results of operations.

These statements were materially false and misleading because by stating that changes to estimates presented only prospective risks to the Company, Defendants concealed the fact that those risks

had already materialized.   In reality, as alleged in detail in Section IV.D above, Granite intentionally recognized revenue on affirmative claims where recovery was not probable and recognizing revenue on such claims was likely to result in a significant revenue reversal, and understated the Projects' costs by ignoring over $1.3 billion in cost overruns known to Granite, Roberts, and Desai at the time, both in violation of GAAP.

**D.      False and Misleading SOX Certifications**

297.   In Granite's Forms 10-Q and 10-K filed during the Class Period, in the section titled "Controls and Procedures," Roberts, Krzeminski, and Desai affirmed that they had conducted an evaluation of "the effectiveness of our disclosure controls and procedures" under the Exchange Act, and that Granite's "disclosure controls and procedures were effective …."  In addition, the Forms 10-Q and 10-K contained SOX certifications signed by Roberts, Krzeminski and Desai attesting to the Form's accuracy with respect to the financial reporting, and the disclosure of all fraud.

298.   These statements regarding the Company's disclosure controls and the SOX certifications were false and misleading because contrary to their SOX certifications, Defendants Roberts, Krzeminski and Desai knew that the Forms contained false and/or misleading statements of material fact and that the financial statements and other financial information included in the Forms violated GAAP and did not fairly present in all material respects the financial condition and results of operations of the Company during the Class Period.

## VI.      LOSS CAUSATION

299.   Defendants' fraudulent conduct directly and proximately caused Lead Plaintiff and the Class to suffer substantial losses as a result of purchasing or otherwise acquiring Granite common stock at artificially inflated prices during the Class Period.

300.   Defendants, through their materially false and misleading statements and omissions set forth above, concealed the truth that Granite's financial statements violated GAAP and did not reflect Granite's known cost overruns with regard to the Projects, and that Granite had improperly recognized revenue on claims where recovery was not probable, and recognizing revenue was likely to result in a significant revenue reversal.  By concealing the true costs to Granite associated

with the Projects, Defendants also concealed the numerous related risks associated with their false and misleading statements and omissions, including, but not limited to, the risks that Granite would need to take a material charge to its earnings to correct for its improper accounting related to the Projects.  The concealed risks bear directly on Granite's ability to generate and sustain profits from its business.

301.    Beginning in July 2019, the concealed risks began to materialize through a series of negative events and disclosures that revealed, on a piecemeal basis, the false and misleading nature of Defendants' Class Period statements and omissions.  Despite these partially corrective events and disclosures, Granite's stock price remained artificially inflated and was prevented from declining to its true value by Defendants continuing to make materially false and misleading statements that had the effect of, at least temporarily, concealing the fraud, until the end of the Class Period.  As the relevant truth leaked out into the market from July 2019 to October 2019, the Class suffered losses, which were foreseeable and caused by the materialization of the risks that Defendants' fraudulent conduct concealed from investors, as set forth below.

**A.    July 29, 2019 Press Release Discloses Charge Exceeding $100 Million**

302.    On July 29, 2019, after the close of trading on the NYSE, Granite filed a press release with the SEC that reported the Company's preliminary results for 2Q19 and announced that it expected to incur after-tax charges in the range of $104-$108 million on all four of the Projects.  In the press release, Granite stated that the charges were "related to 1) increased project completion costs, which were exacerbated by schedule delays and execution of a significant amount of disputed work, and 2) a recent unfavorable court ruling on a project dispute."  Granite further stated that the charges were the result of "independent second quarter 2019 events," in a false and misleading attempt to reassure investors that the problems with the Projects were limited to events that had materialized in 2Q19, and not before.

303.    In that same press release, Granite further announced that it would accelerate its strategic review of the Heavy Civil Group (which included the Projects) "with a clear objective to expedite the Company's plan to reduce risk and exposure to large, complex projects."  In addition,

the Company slashed its full-year 2019 adjusted EBITDA margin guidance from 8.5%-9.5% to 4.0%-5.0 % because of the financial impact of the charges.

304.    On this news, the price of Granite stock declined significantly, from $44.47 per share at the close of trading on July 29, 2019 to $36.49 per share at the close of trading on July 30, a decline of nearly 18%, on extremely heavy trading volume of nearly 2.6 million shares.

305.    News agencies reported that the drop was due to Granite's announced charges and its corresponding poor financial performance for 2Q 2019.  The Motley Fool issued an article on July 30, 2019, titled "Why Shares of Granite Construction Are Crumbling on Tuesday," explaining that the stock price decline was due to the announced charges: "Shares of Granite Construction (NYSE: GVA) traded down more than 18% on [July 30] after the general contractor and construction material producer warned that charges related to issues at key large projects would wipe out second-quarter profits."  The article added, "Granite said the charges stem from four projects bid between 2012 and 2014 that have experienced increase project completion costs and 'a recent unfavorable court ruling on a project dispute.' The company did not reveal any further details."  In a July 30, 2019 article titled, "Granite Construction Plummets in Worst Session in 20 Years," Bloomberg reported that Granite "fell the most intraday since early 1999 after posting disappointing second quarter results."  The article noted that B. Riley FBR had "slashed its target to $41 from $53."

306.    Analysts acknowledged that the announcement of the charge called into question the propriety of Granite's accounting for the Projects.  In a July 30, 2019 report, Cowen noted that, "[t]here are some funky accounting mechanics at work here given the percentage of completion method required," highlighting that "before yesterday from an accounting perspective, these projects were essentially 'complete' and incremental costs were booked with zero associated revenue."  Cowen thus suggested that because the projects were essentially complete there should not have been a financial impact. Nonetheless, Cowen stated that they would wait to "make appropriate adjustments post 2Q earnings on Friday [when Granite was going to issue final results], but it's conceivable that despite the disappointment here, near-term estimates post 2019 may not have to change materially given the nature of the business."

**B.      August 2, 2019 Press Release Reporting Final Second Quarter 2019 Results**

307.      On August 2, 2019, before the start of trading, the Company filed the 2Q19 Press Release reporting the Company's final 2Q19 results and that the Company was taking a $106.7 million after-tax charge "related to four legacy, unconsolidated Heavy Civil joint venture projects."  As a result of the charge, Granite also announced that its reported revenue of $789.5 million included "$114.2 million in revenue reduction due to charges" related to "corresponding reductions in project percent completion."  As Defendant Desai explained on the 2Q19 earnings conference call held that same day, the charge purportedly stemmed from "unanticipated project costs, which increased the denominator [in the percentage of completion analysis] thus lowering the project completion percentage and thereby reducing revenue."  As discussed above, however, Defendants knew of these costs for years and failed to include them in the percentage of completion analysis.

308.      Due to the impact of the charges, the Company reported an overall $97.8 million net loss for 2Q19, compared to a net loss of $8.4 million for 2Q18.  On a year-to-date basis, Granite experienced a net loss of $132.4 million due to the charges (compared to a net loss of just $19.8 million over the prior year).

309.      News of Granite's 2Q19 financial results caused the price of Granite stock to decline from $34.00 per share at the close of trading on August 1, 2019 to $31.22 per share at the close of trading on August 2, 2019, a decline of over 8%, on significant volume of roughly 1.3 million shares.  Had Defendants fully disclosed the true extent of the known cost overruns associated with the Projects, the stock price would have declined even further.

310.      At the end of trading on August 2, 2019, Bloomberg issued an article titled, "Granite Construction Wrap: Earnings, Streak."  It explained that the charges and lower earnings had caused the drop in the price of the stock:  "Granite Construction Inc. reported EPS and sales below estimates, and extended its losing streak.  Its shares fell 8.2 percent in the last session, compared with a 0.7 percent fall in the S&P 500 Index….  The Company had a loss of $1.83 a share on a comparable basis for the last quarter, versus the estimate loss of 62 cents, and sales of

$789.5 million, versus the $942.3 million estimate." It then concluded by saying that Granite "is lower for the fifth straight day, extending the longest losing streak since the period ended May 29, 2018."

311.    Other news outlets noted the miss in Granite's earnings. Yahoo! Finance published an article titled, "Granite Construction (GVA) Reports Q2 Loss, Lags Revenue Estimates," which stated that Granite's reported "loss of $0.57" per share had "deliver[ed] a surprise of -159.09%" compared to analyst expectations.

312.    Analysts responded negatively to news of the charge. In an August 2, 2019 report titled, "Large contract indigestion," Macquarie Research slashed its price target for the Company from $64 per share to $40 per share, noting that earnings had suffered from "after-tax charges of $107m, or ($2.28) per share due [to] cost overruns on four legacy projects."

**C.    October 25, 2019 Press Release Reporting Third Quarter 2019 Results**

313.    Finally, on October 25, 2019, before the start of trading, Granite filed a press release with the SEC announcing its financial results for the third quarter of 2019. In that press release, Defendants reported net income of only $20.5 million, a year-over-year decline of $35.2 million. Defendant Roberts stated that the Company's "operational performance was dampened by a negative contribution from the Heavy Civil operating group primarily driven by disputed work." With regard to the Transportation segment in particular, Granite reported third quarter 2019 revenue of $598.6 million, a year-over-year reduction of $12.2 million, "which included $69.3 million of Heavy Civil operating group losses." Granite also announced Transportation segment year-to-date gross loss of $65 million, compared to gross profit of $138.4 million the prior year, which resulted from "[c]hallenges related to project in our Heavy Civil operating group." Granite also stated that it would not provide guidance for the remainder of 2019.

314.    On this news, the price of Granite stock declined from $36.90 per share at the close of trading on October 24, 2019, to $26.25 per share at the close of trading on October 25, 2019, a decline of almost 29% on heavy trading volume of over 5.3 million shares.

315.    The Motley Fool issued an article on October 25, 2019 called, "Why Anheuser-Busch InBev, PG&E, and Granite Construction Slumped Today." Under the sub-heading,

"Granite Crumbles," the article said, "shares of Granite Construction dropped almost 29%. The company posted 3% top-line growth in its third quarter financial report, sending revenue to a new record.  However, net income plunged more than 60% from year-ago levels.  CEO James Roberts blamed work disputes and cost overruns in its heavy civil operating group for weighing down what was strong core performance elsewhere, as good weather combined with strength in infrastructure construction demand."

316.    Analysts were shocked by these disclosures as Defendants had previously indicated that the JVs' negative financial effects were behind the Company.  In an October 25, 2019 report titled, "3Q Miss, 2020 Guide Looks Disappointing – Heavy Civil Hurting Credibility," Cowen wrote, "GVA reported 3Q Adj EBITDA of $61MM, significantly lower than our $126MM, once again impacted by losses from Heavy Civil group – *we were under the impression most of this was absorbed last Q*."

### VII.    INAPPLICABILITY OF STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE

317.    The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the untrue or misleading statements and omissions alleged herein. The statements and omissions complained of herein concerned then-present or historical facts or conditions that existed at the time the statements were made.

318.    To the extent any of the untrue or misleading statements alleged herein can be construed as forward-looking, (a) they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements, and the generalized risk disclosures Granite or other Defendants made were not sufficient to shield Defendants from liability, and (b) the person who made each such statement knew that the statement was untrue or misleading when made, or each such statement was approved by an executive officer of Granite who knew that the statement was untrue or misleading when made.

## VIII.   PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET DOCTRINE

319.    Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine.  At all relevant times, the market for Granite's common stock was efficient for the following reasons, among others:

    a)  Granite's common stock met the requirements for listing, and was listed and actively traded, on the NYSE, a highly efficient and automated market;

    b)  The average weekly trading volume of Granite's common stock was significant and amounted to 2,078,710 shares during the Class Period;

    c)  As a regulated issuer, Granite filed public reports with the SEC and the NYSE;

    d)  Granite was eligible to file simplified SEC filings;

    e)  Granite regularly communicated with the public through established market communication channels, including through the regular dissemination of news releases through major newswire services, communications with the financial press, and other wide-ranging public disclosures;

    f)  Numerous securities and credit analysts followed Granite and wrote reports that were published, distributed, and entered the public domain; and

    g)  The price of Granite's common stock quickly reacted to news.

320.    Accordingly, the market for Granite common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Granite common stock.  Under these circumstances, all purchasers of Granite common stock during the Class Period suffered similar injury through their purchases at artificially inflated prices.  A presumption of reliance therefore applies.

321.    In addition, or in the alternative, Lead Plaintiff is entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny, because the claims asserted herein are predicated in part upon omissions of material fact that Defendants had a duty to disclose.

## IX.   CLASS ACTION ALLEGATIONS

322.    Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following proposed class: all persons and

entities who purchased or otherwise acquired Granite common stock from April 30, 2018 through October 24, 2019, and were damaged thereby.

323.    Excluded from the Class are: (i) Defendants and any affiliates or subsidiaries thereof; (ii) present and former officers and directors of Granite and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant had or has had a controlling interest; (v) Granite's employee retirement and benefit plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding categories.

324.    The Class is so numerous that joinder of all members is impracticable.  Lead Plaintiff believes that the Class members number at least in the thousands.  Throughout the Class Period, Granite had an average daily volume on the NYSE of approximately 431,073.  As of October 22, 2019, Granite had 46,741,311 shares of common stock outstanding.

325.    Lead Plaintiff's claims are typical of the claims of Class members.  All Class members are similarly situated in that they sustained damages by acquiring Granite common stock at prices artificially inflated by the wrongful conduct complained of herein.

326.    Lead Plaintiff will fairly and adequately protect the interests of the Class.  Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interest that conflicts with those of the Class.

327.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  The questions of law and fact common to the Class include, but are not limited to, the following:

a)    Whether Defendants' conduct violated the federal securities laws, as alleged herein;

b)    Whether Defendants made any untrue statements of material fact or omitted to state any material facts necessary to make statement made, in light of the circumstances under which they were made, not misleading;

c)    Whether Defendants acted with scienter as to Lead Plaintiff's claims for relief under Section 10(b) of the Exchange Act;

d)    Whether the Individual Defendants were controlling persons under Section 20(a) of the Exchange Act;

e)   Whether and to what extent the prices of Granite common stock were artificially inflated or maintained during the Class Period due to the misstatements and omissions complained of herein;

f)   Whether and to what extent Class members have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

328.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.

329.   There will be no difficulty in the management of this action as a class action.  Class members may be identified from records maintained by the Company or its transfer agent(s), or by other means, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

## X.   CLAIMS FOR RELIEF

### COUNT I
**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against Defendants**

330.   Lead Plaintiff incorporates ¶¶ 1-329 by reference as if fully set forth herein.

331.   During the Class Period, Defendants made, disseminated, or approved the false and misleading statements specified above, which they knew or recklessly disregarded were false and misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

332.   Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:

a)   Employed devices, schemes, and artifices to defraud;

b)   Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c)   Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Granite common stock during the Class Period.

333.   Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Granite common stock.  Lead Plaintiff and the Class would not have purchased Granite common stock at the prices they paid, or

1  at all, if they had been aware that the market prices of those securities had been artificially inflated

2  by Defendants' false and misleading statements and omissions.

3        334.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff

4  and the Class suffered damages in connection with their purchases of Granite common stock

5  during the Class Period.

6  **COUNT II**

**For Violation Of Section 20(a) Of The Exchange Act**

7  **Against The Individual Defendants**

8        335.    Lead Plaintiff incorporates ¶¶ 1-334 by reference as if fully set forth herein.

9        336.    During the Class Period, Defendants acted as controlling persons of Granite within

10  the meaning of § 20(a) of the Exchange Act.  By virtue of their positions and their power to control

11  Granite's public statements, the Individual Defendants had the power and ability to control the

12  actions of Granite and its employees.  The Individual Defendants controlled Granite and its other

13  officers and employees. By reason of such conduct, the Individual Defendants are liable pursuant

14  to § 20(a) of the Exchange Act.

15  **XI.    JURY TRIAL DEMAND**

16        337.    Lead Plaintiff, on behalf of itself and the Class, hereby demands a trial by jury.

17  **XII.    PRAYER FOR RELIEF**

18        338.    WHEREFORE, Lead Plaintiff prays for relief as follows:

19           a)    Declaring this action to be a proper class action pursuant to Rule 23 of the

20  Federal Rules of Civil Procedure;

21           b)    Awarding Lead Plaintiff and the Class damages, including interest;

22           c)    Awarding Lead Plaintiff and the Class their reasonable costs and expenses

23  incurred in this action, including attorneys' fees; and

24           d)    Granting such other and further relief as the Court may deem just and

25  proper.

26

27

28

Dated: February 20, 2020

Respectfully submitted,

By: /s/ Peter E. Borkon

**BLEICHMAR FONTI & AULD LLP**
Peter E. Borkon (Bar No. 212596)
pborkon@bfalaw.com
555 12th Street, Suite 1600
Oakland, California 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020

– and –

Javier Bleichmar (*pro hac vice*)
jbleichmar@bfalaw.com
Ross Shikowitz (*pro hac vice*)
rshikowitz@bfalaw.com
Evan A. Kubota (*pro hac vice*)
ekubota@bfalaw.com
Thayne Stoddard (*pro hac vice*)
tstoddard@bfalaw.com
7 Times Square, 27th Floor
New York, New York 10036
Tel: (212) 789-1340
Fax: (212) 205-3960

*Counsel for Lead Plaintiff*
*the Police Retirement System of St. Louis*
*and Lead Counsel for the Putative Class*

1

## **CERTIFICATE OF SERVICE**

2          I hereby certify that on February 20, 2020, I electronically filed the foregoing document

3  with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being

4  served this day on all counsel of record via transmission of Notices of Electronic Filing generated

5  by CM/ECF.

6          I certify under penalty of perjury under the laws of the United States of America that the

7  foregoing is true and correct. Executed on February 20, 2020.

8

9                                                     */s/ Peter E. Borkon*
                                          _____
10                                                   Peter E. Borkon

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT                                              3:19-CV-04744-WHA