UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE POLICE RETIREMENT SYSTEM OF ST. LOUIS,<br><br>Plaintiffs,<br>v.<br><br>GRANITE CONSTRUCTION INCORPORATED, JAMES H ROBERTS, JIGISHA DESAI, and LAUREL J KRZEMINSKI,<br><br>Defendants. | Case No. 3:19-cv-04744-WHA<br><br>**ORDER RE MOTION TO DISMISS AND REQUESTS FOR JUDICIAL NOTICE** |

## INTRODUCTION

In this securities action, defendants move to dismiss, arguing that plaintiff has failed to allege an actionable omission or misrepresentation, that plaintiff has failed to plead scienter, and that the PSLRA's safe harbor provisions provide a defense against the alleged conduct. For the reasons below, defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

## STATEMENT

Granite Construction Incorporated is a publicly traded construction company headquartered in Watsonville, California. It bids on and completes large infrastructure projects for public and private clients. The Police Retirement System of St. Louis serves as the court-appointed lead plaintiff in this putative class action. The putative class consists of persons or entities damaged as a result of acquiring Granite stock between April 30, 2018, and October 24, 2019 (Amd. Compl. at ¶¶ 1–2, 19, 32, 299, 322).

Plaintiff's amended complaint asserts claims against Granite, as well as individuals James Roberts, its Chief Executive Officer; Jigisha Desai, its Chief Financial Officer; and

Laurel Krzeminski, its former Chief Financial Officer. The claims concern four infrastructure contracts Granite won between 2012 and 2014: (1) a $2.3 billion contract to design and build 21 miles of I-4 interstate highway in Florida (the "I-4 Ultimate Project"); (2) a $3.14 billion contract to design and build a bridge to replace the Tappan Zee Bridge in New York (the "Tappan Zee Project"); (3) a $1.1 billion contract to design and build a bridge in Pennsylvania (the "PennDOT Project"); and (4) a $1.2 billion project to rebuild 28.2 miles of highway in Texas (the "Texas Project"). The complaint alleges that fixed-price contracts governed each project, meaning that Granite agreed to complete the work "for a fixed price with extremely limited options to obtain additional compensation in case something went wrong." Moreover, Granite did not undertake each project on its own but rather as part of an integrated joint venture with other construction companies. Thus, its "financial interest in the projects (including its share of profits and losses) was tied to its ownership stake in each [p]roject." Granite took a 30% stake in the I-4 Ultimate Project, a 23.3% stake in the Tappan Zee Project, a 40% stake in the PennDOT Project, and a 35% stake in the Texas Project (*id*. at ¶¶ 4, 43–48, 52, 55, 157).

According to the complaint, defendants employed fraudulent accounting techniques in preparing financial reports for the four projects. The complaint alleges that each of the projects experienced significant cost overruns, which defendants either understated or hid in Granite's prepared financial reports. This included at least $100 million in connection with the I-4 Ultimate Project, $900 million in connection with the Tappan Zee Project, $340 million in connection with the PennDOT Project, and $25 million in connection with the Texas Projects. Given Granite's financial stake in each joint venture, the complaint alleges it should have been responsible for at least $14.4 million from the I-4 Project, $209.7 million from the Tappan Zee Project, $105.6 million from the PennDOT Project, and $8.75 million from the Texas Project, totaling $338.45 million in overruns. Had defendants been forthright in preparing Granite's financial statements, the complaint argues that its recognized profits and losses would have been roughly consistent with the joint ventures' profits and losses (on a pro rata basis). This did not happen. Throughout 2018, and in the first quarter of 2019, "Granite consistently

reported that its pro rata share of the [joint ventures] was more profitable than the [joint ventures] reported," a point that defendants' motion does not contest. For instance, in the first quarter of 2018, the joint ventures "sustained a massive $141 million loss," whereas Granite "recorded a $2.6 million gain." The complaint attributes these disparities to two types of accounting misconduct. The first concerns Accounting Standards Codification ("ASC") Topic 606. The second concerns ASC 450-20-50 (*id.* at ¶¶ 11, 13, 119–121, 157, 159, 184; Dkt. No. 74 at 7).

ASC Topic 606 pertains to revenue recognition. In preparing its reports, defendants used the "percentage of completion" method to calculate revenue for each project. Plaintiff's complaint does not dispute that this method, when employed correctly, comports with GAAP. To calculate revenue for a project under the "percentage of completion" method, a company first divides the *actual costs incurred thus far* by the *total estimated costs* to determine the percentage completed. Then, the company multiplies that percentage by the project's transaction price to estimate the total revenue recognized for the project. The following equation illustrates the method:

$$Revenue = \left(\frac{Actual\ costs\ incurred\ thus\ far}{Total\ estimated\ costs}\right) \times Transaction\ Price$$

Barring any increase in the transaction price, the discovery of new, previously unexpected costs will increase the denominator, thereby decreasing the revenue that a company can expect from a project (Amd. Compl. at ¶¶ 53–55, 159–161).

Plaintiff's complaint alleges that defendants abused the percentage of completion method in two ways, artificially inflating the revenue it recognized for the four projects. *First*, Granite allegedly "intentionally excluded known costs" that had arisen in each of the projects, including "unanticipated subsurface geotechnical issues," "increased steel prices and labor costs," "drilled shaft failures," "several weather events," and other unforeseen "site conditions" that delayed completion. Defendants' alleged failure to revise the estimated total costs kept each project's percentage of completion artificially high. *Second*, the complaint alleges that

3

1   when the joint ventures filed (disputed) claims against the entities that awarded them the
2   projects to recover these costs, Granite "fraudulently" added its expected share of the claim
3   recovery to the transaction price. The complaint alleges that recovery on these claims "was not
4   probable" due to the fixed-price nature of the contracts. Thus, by prematurely adding Granite's
5   share of the disputed claims to the transaction price, defendants improperly inflated the
6   transaction price of each project, in effect mitigating the impact that any increase in total
7   estimated costs would have on revenue. The complaint concludes that together, these
8   misstatements inflated the revenue recognized for each project in violation of GAAP (*id*. at ¶¶
9   5, 75–78, 91, 94, 156–158, 168–171, 179).

Turning to the second alleged abuse, ASC 450-20-50 concerns the required disclosure of "reasonably possible" additional costs. The complaint alleges that defendants consistently failed to disclose reasonably possible additional costs associated with the four projects. In total, the entities that contracted to complete the projects in question "had asserted or threatened over $1.3 billion in claims to recover" additional costs that had arisen in the course of the projects. Plaintiff's complaint alleges that Granite's share of these additional costs amounted to *$338.45 million*. The complaint alleges that ASC 450-20-50 required Granite to disclose its share of the overrun costs under its reported "reasonably possible additional costs," but it consistently underreported them. For the first three quarters of 2018, Granite's financial reports represented that three or four of its projects presented "additional costs [that] were reasonably possible in excess of the probable amounts included in the cost forecast," but according to these reports, these costs never had the potential to impact Granite's bottom line more than $47 million. Moreover, from the fourth quarter of 2018 through the second quarter of 2019, Granite omitted *any* additional costs from its disclosures. Plaintiff's complaint alleges that defendants intentionally failed to disclose its full share of the cost overruns, as required by ASC 450-20-50, in violation of GAAP (Amd. Compl. at ¶¶ 22–25, 105–10, 183–86).

Finally, the complaint alleges that defendants knew Granite was reporting "false and/or misleading" information in violation of GAAP in quarterly earnings calls and financial statements throughout the class period. It alleges that eight former employees (the "FEs") can

4

confirm this. The FEs have allegedly stated that Granite's senior executives, including the individual defendants, received "dozens of reports . . . each quarter which reflected financial information related to the [four] Projects, including cost overruns and specific write-downs," as well as "information on how the Projects were impacting Granite's income statement and balance sheet." The complaint alleges further that the four projects "were 'discussed extensively at the board level and the disclosure committee level,' and with the CEO and CFO." Specifically, FE 1, who worked as a Regional Controller at Granite, allegedly stated that defendant Roberts "knew" the company "was delaying write-downs and aggressively recognizing revenue [prematurely]," calling the practice "standard operating procedure" at the company. This allegedly contributed to Granite's broader accounting practice of "delaying bad news" until the company "got something resolved or got the next big project in" to make up for the losses. Moreover, the complaint alleges that defendants had a motivation to inflate the stock price: in 2018, Granite sought to use its stock acquire the Layne Christensen Company (*id*. at ¶¶ 9–10, 18–21, 25, 37, 73, 88, 143–53, 204, 212, 298).

The complaint alleges that while defendants had long succeeded in keeping the stock price artificially high, their practice of concealing losses caught up with them in mid-2019. Whereas Granite had previously reported greater profitability than the joint ventures, it reported losses in the second and third quarters of 2019 that, as a percentage of its interest, *far* exceeded that of the joint ventures. During those two quarters, Granite announced charges of $242 million, driven by the four Projects, which reduced profits and caused its stock price to drop over 40%. During the second quarter earnings call, defendant Desai told investors that the first charge, amounting to $106.7 million, resulted from "unanticipated project costs, which increased the denominator [in the percentage of completion analysis] thus lowering the project completion percentage and thereby reducing revenue." The complaint alleges that these charges could not have been attributed to unanticipated costs emerging in 2019, but rather resulted from losses incurred throughout the class period that had been "improperly delayed" (*id*. at ¶¶ 2, 13, 15, 17, 28, 132, 140, 154, 133, 272, 307).

Plaintiff allegedly acquired stock in Granite at an inflated price before the sharp decline in 2019. The complaint alleges violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 against all defendants. It also alleges violations of Section 20(a) of the Securities Exchange Act against individual defendants Roberts, Desai, and Krzeminski (*id.* at ¶¶ 322–25, 332, 336). Defendants now move to dismiss, arguing the following: (1) plaintiff has failed to allege an actionable misrepresentation; (2) plaintiff has failed to plead scienter; (3) the Private Securities Litigation Reform Act's ("PSLRA") safe harbor provides a defense; and (4) plaintiff has failed to allege control person liability (Dkt. No. 74 at 5–8).

## ANALYSIS

When ruling on motions to dismiss brought under Section 10(b), "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007). To state a claim under Section 10(b), plaintiff must plead the following: (i) a material misrepresentation or omission; (ii) scienter; (iii) connection with the purchase or sale of a security; (iv) reliance; (v) economic loss; and (vi) a causal connection between the material misrepresentation and the loss. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Defendants contest the first two elements (Dkt. No. 74 at 2–5).

### 1. RELIANCE ON FORMER EMPLOYEES.

As a preliminary matter, many of plaintiff's allegations arise from the eight confidential FEs. The complaint relies heavily on their descriptions of Granite's cost overruns and accounting practices in alleging the first two elements. PSLRA claims require more than "a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate" the allegations set forth in the complaint, so courts must address the reliability of confidential sources. *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999). Our court of appeals does not require that a complaint name sources "so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains adequate corroborating details." *In re Daou Sys.*, 411 F.3d 1006, 1015 (9th Cir. 2005)

(quotation marks omitted). It suffices to "number each witness and describe his or her job description and responsibilities." *Id.* at 1016.

Plaintiff has done so here. According to the complaint, FE 1 "served as a Regional Controller at Granite from January 2018 to November 2018" and "participated in the conference calls when presenting FE 1's quarterly memos on the project risk of the Texas Project." FE 2 "was a Senior Financial Reporting Analyst from prior to the Class Period through September 2019" and "prepared a plethora of [financial] reports related to the Projects which FE 2 emailed directly to [individual defendants] Roberts, Krzeminski and Desai." FE 3 "worked as a Granite financial planning and analysis manager from prior to the start of the Class Period to December 2019." FE 3 "oversaw a team of between two and five analysts (varying over time) and reported to Vice President, Operational Finance and Corporate Controller Brad Graham." FE 4 "was Granite's Vice President, Operational Finance and Corporate Controller from prior to the start of the Class Period to December 2018" and also "served as Chairman of Granite's disclosure committee." FE 5, who "held the titles of Engineer II and Engineer III," worked as "a Granite engineer from prior to the start of the Class Period to October 2019 and was assigned to the I-4 Ultimate Project throughout FE 5's employment." In this role, FE 5 "frequently prepared cost estimates" for the I-4 Ultimate Project. FE 6 worked at Granite "from prior to the start of the Class Period to March 2019" and "was a preconstruction coordinator on the I-4 Ultimate Project until January 2018." In this role, FE 6 "tracked cost overruns on the I-4 Ultimate Project . . . in Excel spreadsheets." FE 7 "was employed by Granite from prior to the start of the Class Period until January 2018, including as Controller for the Large Projects Group, Central Region[, which included the Texas Project,] from the end of 2009 until January 2018." FE 8 "served as a Consolidation Accountant II at Granite from July 2017 to October 2018" and "reviewed and analyzed" financial data for the joint ventures, "including for the I-4 Ultimate and Tappan Zee Projects." Having provided each witness's job title, description, and responsibilities, plaintiff's complaint has met the PSLRA's requirements for confidential witnesses. Importantly, this remains a preliminary question, distinct from whether the complaint has pleaded the elements of a

7

Section 10(b) claim with sufficient particularity (Amd. Compl. at ¶¶ 70, 73, 76, 87, 96, 101, 111, 118, 145–46, 203, 206, 208, 210).

### 2. MISREPRESENTATION.

Turning to the *first* factor, plaintiff's complaint alleges that Granite inflated revenue and failed to disclose additional costs, both in violation of GAAP (*id*. at ¶¶ 2, 183). Our court of appeals has held that overstating revenue in violation of GAAP "may state a claim for securities fraud," since "revenue must be *earned* before it can be recognized." To successfully allege misrepresentation stemming from "irregularities in revenue recognition, plaintiff[] should allege (1) such basic details as the approximate amount by which revenues and earnings were overstated; (2) the products involved in the contingent transaction; (3) the dates of any of the transactions; or (4) the identities of any of the customers or [company] employees involved in the transactions." While the complaint need not allege *each* of these details, it must "allege enough information so that a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue." *In re Daou Sys.*, 411 F.3d at 1016–17 (quotation marks and citations omitted).

Plaintiff's complaint meets this standard. It specifies 74 unique statements by defendants in earnings calls and 10-Q, 10-K, and 8-K financial reports in which defendants allegedly excluded known costs of $338.45 million and overstated revenues and earnings by $242 million. It enumerates the four relevant projects and demonstrates that the four joint ventures responsible for the projects (ventures in which Granite had a significant financial stake) experienced serious cost overruns, exceeding $1.3 billion. Moreover, it details the *causes* of the cost overruns for three of the four projects, supported by statements from FEs directly involved with those projects as well as claims submitted to the customers, requesting additional compensation to offset the overruns. For the fourth project, the Texas Project, the complaint does not detail what caused the overruns but nevertheless supports its allegation of a $25 million overrun with the statement of FE 1, who served as Regional Controller and bore responsibility for preparing quarterly memoranda, assessing the project's risks and liabilities. The complaint also lists the date of each allegedly false or misleading statement, relating to all

four projects, which span from April 30, 2018 through August 6, 2019, and it identifies the speaker attributable to each statement. Plaintiff's detailed pleading notwithstanding, defendants' motion still argues that the complaint falls short of what the PSLRA requires (Amd. Compl. at ¶¶ 17, 157, Exh. B).

The motion argues that the complaint "does not explain why any alleged misrepresentation was false." The complaint lists statements that plaintiff alleges "intentionally excluded known costs" and "did not accurately reflect the conditions of the Projects," but defendants' motion contends that these statements represent "conclusions, not facts" (Dkt. No. 74 at 10–11). Certainly, had the complaint presented only a "litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false," that would not suffice. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008). Plaintiff does more than this, however. The complaint, in great detail, draws on the statements of the FEs and the joint ventures' claims against customers to conclude that that problems with the four projects caused $1.3 billion in cost overruns, $338.45 million of which fell on Granite. Moreover, the complaint states clearly that *defendant Desai admitted* the charge that Granite took in the second quarter of 2019 stemmed from an increase in the denominator, thereby reducing the percentage of completion. The only question that remains, then, is whether these supposedly "unanticipated" costs that increased the denominator were *actually* unanticipated until mid-2019, or if they instead had been known in previous quarters (Amd. Compl. at ¶¶ 10, 157, 203–212, 307).

The complaint alleges more than enough facts to successfully plead the latter. It alleges large contrasts, occurring each quarter prior to mid-2019, between the relatively high rates of profitability that Granite reported and the relatively low profits (and sometimes charges) the joint ventures reported during the same period. It alleges that FEs confirmed Granite's practice of delaying charges until it could find a way to offset them. FE 3, who worked as a financial planning and analysis manager, even confirmed explicitly that by 2018, Granite *knew* it would have to take significant charges on the I-4 Project and the Tappan Zee Project. As for the other two projects, the complaint alleges that an internal company document from 2016

9

admitted that Granite "did not do enough to price each bridge site[']s unique characteristics" before bidding, which would "add costs to each bridge site" for the PennDOT Project. Another 2016 document allegedly "admitted (but did not publicly disclose) that [Granite] was woefully behind schedule" for the PennDOT Project "and on the precipice of incurring millions of dollars in penalties." Finally, FE 7, who worked as Controller for the region encompassing the Texas Project through November 2018, stated that Granite expected the Texas Project "to lose $25 million in 2018," while FE 1, another Controller, stated that throughout 2018, the total expected costs for the project "had not been updated." Taken together, plaintiff's complaint pleads specific facts sufficient to establish that the costs which inflated the denominator existed prior to the second quarter of 2019 (*id*. at ¶¶ 10–13, 15, 76, 94, 97–98, 100–01, 123–29).

This does not end the inquiry for the first factor. Even if the costs inflating the denominator existed prior to mid-2019, defendants' motion argues that it did not prematurely book claim recoveries, which the complaint alleges improperly inflated the transaction price (Dkt. No. 74 at 12). If Granite had recovered on its claims, this would have justified increasing the transaction price, and there would be no GAAP violation. The complaint, however, emphasizes that ASC 606-10-32-11 only justifies increasing the transaction price when "it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur." The complaint alleges that Granite's recovery against customers is not probable, and it has valid reasons for doing so. The contracts governing the four projects allegedly pay the joint ventures on a *fixed price* basis. In other words, the joint ventures should expect to be paid *only* the transaction price for which they have contracted, and not for anything else. Thus, it would be incorrect to rate claim recovery as probable. Granite's own 10-K reports concede that "[f]ixed price and fixed unit price contracts subject us to the risk of increased project cost." Defendants point out that recovery of claims *can* occur in certain instances; the joint venture recovered 23% of a $340 million claim against PennDOT in a settlement. But, it would contradict the language and nature of the fixed price contracts to infer from this settlement that recovery should be understood as "probable." Accordingly, this example does

1    not overcome plaintiff's allegation that defendants prematurely recognized revenue (Amd.
2    Compl. at ¶¶ 99, 165, 293).

3    Finally, defendants' motion argues that the complaint's misrepresentation theory fails
4    because it never alleges that "Granite management disbelieved what the company was saying"
5    in its financial reports and earnings calls (Dkt. No. 74 at 14). It posits that the allegedly
6    actionable statements should be considered opinions, rather than facts, and that opinions can
7    incur liability "*only if the speaker does not honestly hold the stated belief* and the belief is
8    objectively incorrect." *City of Dearborn Heights Act 345 Pol. & Fire Ret. Sys. v. Align Tech.,
9    Inc.*, 856 F.3d 605, 615 (9th Cir. 2017) (emphasis added). But plaintiff's complaint does not
10   premise its misrepresentation theory on forward-looking opinions, but rather on then-presently
11   known facts. It alleges that defendants "knew of the cost overruns long before Granite's 2Q
12   and 3Q 2019 charges." FE 4 stated that "the troubled Projects "were 'discussed extensively at
13   the board level and the disclosure committee level,' and that [individual defendants] Roberts
14   and Krzeminski were involved in the discussions as well." In other words, the statements
15   misrepresented *existing*, rather than future, overruns (Amd. Compl. at ¶¶ 21, 143, 206). The
16   Supreme Court has explicitly placed statements about *existing* things in the realm of "fact,"
17   rather than "opinion." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
18   575 U.S. 175, 183 (2015). Thus, while plaintiff still must plead scienter, the complaint deals
19   with then-existing facts and does not need to address the relationship between Granite's beliefs
20   and whether those beliefs rate as objectively true.

21   The complaint has sufficiently alleged misrepresentation under the first factor. Thus, this
22   order need not reach plaintiff's theory of omission.

23   **3.    SCIENTER.**

24   Turning to the *second* element, defendant's motion argues that the complaint has failed to
25   adequately allege scienter (Dkt. No. 74 at 16). Under the PSLRA, a plaintiff must "state with
26   particularity facts giving rise to a strong inference that the defendant acted with [scienter]." 15
27   U.S.C. § 78u-4(b)(2)(A). To survive a motion to dismiss, a complaint must "allege that the
28   defendants made false or misleading statements either intentionally or with deliberate

recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). A "strong inference" must be "cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 314. The inquiry need not be limited to "individual allegations in isolation" if "the overwhelming evidence drawn from a holistic view" of the pleadings gives rise to a strong inference. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710 (9th Cir. 2012). Our court of appeals has further held that plaintiffs may meet their pleading burden as to scienter of a corporation by alleging facts creating a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046 (9th Cir. 2014).

The complaint alleges that each of the three individual defendants knew about the cost overruns that formed the basis of plaintiffs' claims. The alleged facts strongly suggest that defendant Roberts had a deep understanding of the projects and their cost overruns. FE 4 stated that the four projects in question "were 'discussed extensively at the board level and the disclosure committee level,' and that Roberts . . . [was] involved in the discussions as well." Furthermore, FE 3, the financial planning and analysis manager, confirmed that FE 3 "was personally copied" on monthly emails *sent to Roberts* containing work in progress reports (the "WIP reports"), depicting "every month, job by job, the percent complete, the original bid of the job, and what the total cost was for each job." The complaint alleges that Roberts "reviewed" these monthly WIP reports each month as he received them. FE 2 also allegedly stated that FE 2 prepared "dozens of reports for Roberts . . . each quarter which reflected information related to the Projects, including cost overruns and specific write-downs." Moreover, Roberts's alleged knowledge extended well beyond the WIP reports. The complaint alleges that Roberts also "met regularly with the Projects' management and visited the Florida and New York Project sites multiple times." He also confirmed his direct involvement with the claims Granite allegedly used to inflate transaction prices. During the earnings call for the second quarter of 2019, Roberts explained to an analyst that that he "was 'personally involved' in 'one of [Granite's] biggest' disputes" with a customer and that such disputes were "more in

12

[his] path than [defendant Krzeminski's]." In short, the complaint alleges directly that Roberts had intimate knowledge of the cost overruns, as well as the claims Granite asserted against its customers (Amd. Compl. at ¶¶ 18, 143, 146, 149–150, 190, 204).

As to defendants Desai and Krzeminski, the allegations of scienter do not rate quite as strong as those pertaining to Roberts because the complaint does not allege either became personally involved with claims disputes. That said, it still alleges that each defendant, while serving as Chief Financial Officer, took part in the "extensive[]" discussions surrounding the projects to which FE 4 referred. Moreover, each received the monthly WIP reports on which FE 3 had been copied, and FE 2 prepared reports for each. Thus, the only substantial difference between the two and Roberts appears to be that Roberts played a more active part in claims disputes. Otherwise, the same facts suggesting scienter apply (*id*. at ¶¶ 18, 20–21, 149–51, 190, 204).

Defendants' motion argues that the complaint must plead more facts to give rise to a sufficiently strong inference of scienter. It argues that whether individual defendants "kn[ew] details about the projects does not bear on the only question that matters—whether Roberts believed Granite's estimates of project costs and revenues were incorrect" (Dkt. No. 74 at 16). Plaintiffs' complaint however, alleges more than mere access to a report containing accounting errors. It alleges facts indicating that that the individual defendants "closely tracked" and "discussed extensively" the financial performance of the projects. The individual defendants knew about the cost overruns and actively monitored the accounting (Amd. Compl. ¶¶ 18, 21). Scienter cannot be established simply by alleging an accounting error, "even when in violation of GAAP," but our court of appeals has held that "significant allegations of GAAP can provide evidence of scienter so long as they are pled with particularity." *In re Daou Sys.*, 411 F.3d at 1022. This becomes especially true when "statements by confidential witnesses establish that members of executive-level management, including individual defendants, had access to and used [the] reports . . . in real time." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017). Here, the complaint uses confidential FEs with personal knowledge of defendants' involvement to establish that the defendants had personal knowledge of the cost

13

overruns and GAAP violations that underlie this action.  The PSLRA requires that the scienter inference be "at least as compelling as any plausible opposing inference." *Tellabs*, 551 U.S. at 314.  It does not require the complaint to disprove every conceivable innocent explanation for the GAAP violation.  The complaint has thus met its burden here.

### 4. SAFE HARBOR.

Defendants' motion does not challenge the remaining *Dura* factors.  It does, however, argue that "[t]he challenged statements are protected by the [PSLRA's] safe harbor" (Dkt. No. 74 at 4).  The PSLRA's safe harbor protects forward-looking statements "containing a projection of revenues, income (including income loss) … or other financial items." 15 U.S.C. § 78u-5(i)(l)(A).  If a statement rates as forward-looking and comes accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially," then no liability attaches to the statement.  15 U.S.C. § 78u-5(c)(1)(A)(i).  Defendants' motion tries to argue that the figures featured in its financial reports and earnings calls, including the denominator used to calculate percentage of completion, constitute "forward-looking" statements (Dkt. No. 74 at 23–5).  But as discussed previously, plaintiff's complaint deals with *existing* facts pertaining to the four projects and their cost overruns.  In fact, the complaint expressly limits plaintiffs' claims to "then-present or historical facts or conditions that existed at the time the statements were made" (Amd. Compl. at ¶ 317).  Our court of appeals has held that safe harbor does not apply to such claims.  *In re Quality Sys.*, 865 F.3d at 1142.  Thus, safe harbor does not apply here, and defendants' motion to dismiss Section 10(b) and Rule 10b-5 claims against defendants is **DENIED**.

### 5. CONTROL PERSON.

Lastly, defendants' motion seeks dismissal of plaintiff's claims under Section 20(a) because "the Amended Complaint does not state an underlying claim" (Dkt. No. 74 at 25).  This argument fails, as the complaint pleads sufficient factual material.  But, defendants' motion does correctly address a temporal problem with the complaint.  Defendants Krzeminski and Desai both served as Chief Financial Officer, with Desai taking over the position from Krzeminski on July 8, 2018.  Prior to this date, Desai exercised no authority over Granite's

financial statements (or at least the complaint fails to plead as much).  The inverse is true for Krzeminski.  Accordingly, defendants' motion to dismiss Section 20(a) claims against Ms. Desai for statements made *prior* to July 8, 2019 is **GRANTED**.  The motion to dismiss Section 20(a) claims against Ms. Krzeminski for statements made *after* July 8, 2019 is also **GRANTED**.

### 6. REQUESTS FOR JUDICIAL NOTICE.

Federal Rule of Evidence 201(b) permits courts to take judicial notice of any fact "that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  While a court may take judicial notice of matters of public record at the motion to dismiss stage, it cannot take judicial notice of disputed facts contained in such public records.  *Khoja v. Orexigen Therapeutics, Inc.,* 899 F.3d 988, 999 (9th Cir. 2018).

Defendants request judicial notice of 38 documents, which include, among other things, accounting standards, Granite's financial disclosures, press releases, and analyst reports. Plaintiff has not objected to defendants' request.  Because these documents are the appropriate subjects of judicial notice, defendants' unopposed request for judicial notice of these 38 documents is **GRANTED**.

Plaintiff requests judicial notice of eight documents, which include various accounting standards and Granite's financial disclosures.  Defendants have not objected to plaintiff's request.  Because these documents are the appropriate subjects of judicial notice, plaintiff's unopposed request for judicial notice of these eight documents is **GRANTED**.

### CONCLUSION

Defendants' motion to dismiss Section 10(b) and Rule 10b-5 claims is **DENIED**.  The motion to dismiss Section 20(a) claims against defendant Roberts is **DENIED**.  The motion to dismiss Section 20(a) claims against defendant Krzeminski is **GRANTED** as to those statements made after July 8, 2019, and **DENIED** as to those made beforehand.  The motion to dismiss Section 20(a) claims against defendant Desai is **GRANTED** as to those statements made before July 8, 2019, and **DENIED** as to those made afterwards.

The answer is due in **FOURTEEN CALENDAR DAYS**. Discovery should proceed immediately.

**IT IS SO ORDERED.**

Dated: May 20, 2020.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE